**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**3:05 CV-10-V**

| | | |
|---|---|---|
| **ROGER M. BLAKENEY** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **ORDER** |
| | ) | |
| **R.C. LEE, Warden,** | ) | |
| **Central Prison** | ) | |
| **Raleigh, North Carolina** | ) | |
| | ) | |
| **Respondent** | ) | |
| | ) | |

THIS MATTER is before the Court upon Petitioner Roger M. Blakeney's (hereinafter "Petitioner" or "Blakeney") Petition for Writ of Habeas Corpus (hereinafter "Petition" or "PWHC") filed pursuant to 28 U.S.C. § 2254 [Doc. 3] and his Motion for Summary Judgment, Discovery and an Evidentiary Hearing [Doc. 37].  Also before the Court is the State's Motion for Summary Judgment.[1] [Doc. 16]

FACTS

On 13 May 1996, Blakeney was indicted for the first-degree murder of Callie Washington Huntley.  Blakeney also was indicted for arson, common law robbery, felonious breaking and entering, felonious larceny, and felonious possession of stolen goods.  Blakeney was tried capitally at the 25 August 1997 Criminal Session of Superior Court, Union County, the Honorable William H. Helms, Judge Presiding.  Blakeney was represented by Harry B. Crow, Jr. and Robert Huffman.

---

[1]Although the Warden of Central Prison is the named Respondent in this matter, the Court refers to Respondent throughout this Order as "the State."

The facts of this case are summarized in the North Carolina Supreme Court's opinion on

Blakeney's direct appeal:

On 15 April 1996, between the hours of 10:00 a.m. and 12:00 noon, defendant, age thirty-three, opened and crawled through a back window in his mother's home for the purpose of stealing something of value that he could sell. Defendant stole three of his mother's rings, a brown leather pouch, approximately $4.00 in change, a small herringbone chain, and his mother's savings account deposit book. Defendant then telephoned his wife and told her he would be home in a few minutes.

After defendant finished speaking with his wife, the victim, age seventy-six, drove behind the house. The victim had lived with defendant's mother for over twenty years. Defendant hid in a small room behind the refrigerator as the victim entered the residence. According to defendant's confession, which was admitted into evidence at trial, defendant entered the kitchen, and the two began arguing. Defendant told authorities that he turned to leave, but the victim grabbed him. Defendant charged at the victim, grabbed and wrestled a .22-caliber revolver out of the victim's hand, and hit the victim in the back of the head with the butt of the gun. The victim fell facedown on the kitchen floor and started bleeding. According to defendant, after some additional period of physical struggle, a metal can of kerosene was accidentally spilled. Defendant also claimed that a cigarette he was smoking fell out of his mouth at some time during the struggle. According to defendant, at some point, he pulled the victim off the floor, sat him in a chair, and wrapped an electrical cord around his hands and legs. Defendant then removed $78.00 from the victim's wallet, exited the residence, and departed the area in defendant's vehicle.

Terry Lee Bivens (Bivens), defendant's longstanding friend, worked at a nearby business and observed defendant departing his mother's residence on the day in question. Bivens recognized defendant's vehicle. Seconds later, Bivens noticed smoke coming from the residence. Bivens and several other witnesses looked on as the house began to burn.

Firefighters arrived at the scene and discovered the victim's wire-bound body as they fought the fire. Agent Van Worth Shaw, Jr. (Agent Shaw), an arson investigator for the State Bureau of Investigation (SBI), determined that the fire had two distinct points of origin and was caused by the use of a flammable liquid. In contrast to defendant's statement, all accidental causes were eliminated during the investigation, and Agent Shaw opined that the fire was intentionally set. The investigation revealed traces of kerosene on samples taken from the couch in the den and on the victim's clothing.

Dr. Robert Thompson, a forensic pathologist with the Office of the Chief Medical Examiner, performed an autopsy on the victim's body. The autopsy revealed that seventy-five percent of the victim's skin was charred. Dr. Thompson

also observed that the victim had received a wound to the back and a wound to the left temporal area of the head, which resulted in injury to the brain. Dr. Thompson opined that the victim was conscious for approximately three to five minutes after the fire started, that the victim died within approximately ten minutes, and that the cause of death was carbon monoxide poisoning produced by the fire.

On 16 April 1996 law enforcement officers located defendant at a friend's residence, sitting in the passenger seat of his vehicle. Defendant consented to a search of his vehicle, where the officers found his mother's stolen jewelry, leather pouch, and savings deposit book in the glove compartment. The authorities later recovered the .22-caliber revolver that defendant had taken from the victim. Defendant had exchanged the gun for a loan. The investigation also revealed that bloodstains found on defendant's clothing were consistent with the victim's blood.

*State v. Blakeney*, 531 S.E.2d 799, 806-808 (N.C. 2000).  At the close of the evidence, the State voluntarily dismissed the larceny charge.  In addition, the charge of felonious possession of stolen goods was not submitted to the jury.  The jury found Blakeney guilty of first-degree murder on the basis of malice, premeditation, and deliberation and under the felony murder rule.  The jury also found Blakeney guilty of first-degree arson, common law robbery, and felonious breaking and entering.

At the capital sentencing proceeding, the State submitted four aggravating factors for the jury's consideration: that the defendant had been previously convicted of a felony involving the use of violence to the person; that the murder was committed while the defendant was engaged in the commission of first degree arson; that the murder was committed for pecuniary gain; and that the murder was especially heinous, atrocious or cruel.  The jury found all four.  The jury was asked to consider eight (8) mitigating circumstances, including two statutory mitigating circumstances.  One or more jurors found three non-statutory mitigating circumstances to exist.  The jury recommended a sentence of death for the first-degree murder conviction, and the trial court entered judgment in accordance with that recommendation.  The trial court also entered

judgments sentencing Blakeney to consecutive terms of imprisonment for the remaining convictions.

## PROCEDURAL HISTORY

Blakeney filed a direct appeal to the North Carolina Supreme Court challenging his conviction and sentence of death. The North Carolina Supreme Court affirmed his conviction and sentence of death on July 13, 2000. *See State v. Blakeney*, 531 S.E.2d 799 (N.C. 2000). The United States Supreme Court denied Blakeney's Petition for Writ of Certiorari on January 16, 2001. *See Blakeney v. North Carolina*, 531 U.S. 1117, 121 S.Ct. 868, 148 L.Ed.2d 780 (2001).

On November 16, 2001, Blakeney filed a Motion for Appropriate Relief (hereinafter "MAR") in the Superior Court, Union County. Blakeney filed an amendment to his MAR on February 5, 2003.

On February 10, 2003, Superior Court Judge Susan Taylor conducted a motions hearing with the parties. On May 9, 2003, Blakeney filed a Second Amendment to his MAR, adding a Claim VIII. On June 5, 2003, Judge Taylor issued an Order dismissing Claims II, IV, V and VI of the MAR. On November 12, 2003, Judge Taylor entered an Order denying Claims VII and VIII.

On January 6-9, 2004, an evidentiary hearing was held in the Superior Court of Union County on Claims I and III of Blakeney's MAR. The Honorable Erwin Spainhour, Superior Court Judge, presided. Blakeney was represented in post-conviction by Franklin Wells and Jeffrey Bloom. On April 30, 2004, Blakeney filed a post-hearing Motion to Amend the MAR to Conform to the Evidence, adding Claim IX (misnumbered in the Motion as Claim VIII).

In an Order filed on May 26, 2004, Judge Spainhour denied and/or dismissed Claims I, III

and IX. On August 24, 2004, Blakeney filed a Petition for Writ of Certiorari to the North

Carolina Supreme Court. He filed a Motion to Supplement the Petition on September 7, 2004.

The North Carolina Supreme Court denied the Petition for Writ of Certiorari on December 2,

2004. *See State v. Blakeney*, 607 S.E.2d 650 (NC 2004).

Blakeney filed the instant Petition for Writ of Habeas Corpus on January 31, 2005. The

State filed an Answer and Motion for Summary Judgment on May 5, 2005. On July 7, 2005,

Blakeney filed a Response to the State's Motion for Summary Judgment and his own Motion for

Summary Judgment, Motion for Discovery and Motion for an Evidentiary Hearing. On July 15,

2005, the State filed a Reply to Blakeney's Response and Motion for Summary Judgment. On

July 25, 2005, Blakeney filed a Surreply.

DISCUSSION

LEGAL STANDARDS

A. *Standard of Review under The Antiterrorism and Effective Death Penalty Act of 1996*

For those of Blakeney's claims that were adjudicated on the merits by the North Carolina

courts and that are not procedurally defaulted, this Court's review is limited by the deferential

standard of review set forth in The Antiterrorism and Effective Death Penalty Act of 1996

(AEDPA), 28 U.S.C. § 2254, as interpreted by the Supreme Court in *Williams v. Taylor*, 529

U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). This Court may not grant federal habeas

relief unless the North Carolina court's adjudication of the claim "was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the Supreme Court

of the United States." § 2254(d)(1).

In *Williams*, the Supreme Court described two ways in which a state court decision will

5

be "contrary to" clearly established Federal precedent within the meaning of § 2254(d)(1). 529 U.S. at 405-06. A state court decision will fall under the "contrary to" clause if the state court "applies a rule that contradicts the governing law set forth in [the United States Supreme Court's] cases" or "confronts a set of facts that are materially indistinguishable from a decision of [the United States Supreme Court] and nevertheless arrives at a result different from [its] precedent." *Id.* In either of those scenarios, a Federal habeas court would be unconstrained by § 2254(d)(1) because the state court decision would fall within the § 2254 (d)(1) "contrary to" clause. *Id.* at 406.

A state court decision involves an unreasonable application of clearly established law if the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407-08. The Supreme Court also made it clear that an unreasonable application of federal law differs from an incorrect application of federal law. *Id.* at 410. Thus, "under 2254(d)(1)'s 'unreasonable application' clause . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id* at 411. In deciding whether a state court's application of clearly established federal law is unreasonable within the meaning of § 2254(d), a federal habeas court should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Williams,* 529 U.S. at 409.

*B. Harmless Error Analysis*

If this court finds that trial error rising to the level of a constitutional violation occurred, the error must then be evaluated under the standard articulated in *Brecht v. Abrahamson*, 507

U.S. 619, 637-38, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993). Under the *Brecht* standard, a reviewing court must determine whether the constitutional error had a "substantial or injurious effect or influence in determining the jury's verdict." *Id*. at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253 (1946)). The *Brecht* standard is rooted in the federal harmless-error statute, 28 U.S.C. § 2111. *Brecht*, 507 U.S. at 638. Under the *Brecht* standard, "habeas petitioners obtain plenary review of constitutional claims, but cannot receive habeas relief based on trial error unless they establish that the error resulted in "actual prejudice." *Id*. (citing *United States v. Lane*, 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986)).

ANALYSIS OF PETITIONER'S CLAIMS[2]

   CLAIM I: *Ineffective Assistance of Counsel at Sentencing*

   Petitioner claims that counsel were ineffective for failing to fully investigate and present readily available mitigating evidence to the sentencing jury. Specifically, Petitioner asserts that trial counsel were deficient for failing to interview and call more family members and friends of Blakeney to testify at sentencing and for failing to obtain relevant records pertaining to Petitioner and his family. Petitioner asserts further that had these witnesses and records been made available to Dr. Mark Worthen, Petitioner's mental health expert at trial, he would have diagnosed Petitioner with a mental illness, not a personality disorder, and he could have testified in support of two statutory mitigating circumstances.[3] (PWHC p. 11)

---

   [2]References to the trial transcript appear as (Tp _); references to the MAR evidentiary hearing transcript appear as (MAR Tp _).

   [3]In his Response to the State's Motion for Summary Judgment, Petitioner claims for the first time in *any* court that counsel were ineffective for failing to review his armed robbery prosecution file. Petitioner asserts that had counsel reviewed the file, they would have discovered a wealth of mitigating evidence, and they would have known that the State intended

Blakeney raised this claim in his MAR as Claim III (3) & (4). The MAR court denied the claim on the merits. Because the MAR court correctly identified the governing legal standard as that set forth in *Strickland v. Washington*, 466 U.S. 668,687-88 (1984), this Court's review is limited to the question of whether the MAR court's application of the *Strickland* standard was "objectively unreasonable." *See Williams*, 529 U.S. at 409, 120 S.Ct. 1495.

The *Strickland* court articulated a two-pronged test to determine whether "counsel's assistance was so defective as to require reversal of a conviction or death sentence." *Id* at 686-87. Petitioner must first show that counsel's representation was deficient and must next show that counsel's errors prejudiced the defense so seriously "as to deprive the Defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial can not be relied on as having produced a just result." *Id* at 686.

Under the *Strickland* standard of review, this Court's scrutiny of trial counsel's performance must be highly deferential. *Id.* The test is not whether petitioner's new lawyers, with the benefit of hindsight, would have acted differently, but whether "counsel made errors so

---

to use his confession in the armed robbery case as aggravating evidence for the murder of Huntley.

A response to a motion for summary judgment is not the proper vehicle to raise new claims. Because Petitioner has not filed a motion to amend his Petition for Writ of Habeas Corpus to include a claim that counsel were ineffective for failing to review his armed robbery prosecution file, the Court will not consider any allegations or arguments stemming from this new claim. However, the Court does note that it was trial counsel, not the prosecution, who brought Petitioner's armed robbery confession to the jury's attention and who introduced it into evidence. (Tp. 1223) The Court notes further that Petitioner does not provide any factual support for his assertion that there was mitigating evidence in his armed robbery prosecution file that was not discovered by trial counsel.

serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. "'Deficient performance' is not merely below-average performance; rather, the attorney's actions must fall below the wide range of professionally competent performance." *Griffin v. Warden*, 970 F.2d 1355, 1357 (4th Cir. 1992).

Even if a court concludes that counsel's performance was deficient, the court may not set aside the conviction or sentence if the error "had no effect on the judgment." *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*. at 693. Instead, the claimant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*.

At sentencing, Dr. Worthen, a psychologist, testified that he met with Blakeney five times prior to trial and that during those times, he interviewed Blakeney, administered psychological tests, and evaluated him. He also testified that he interviewed Blakeney's mother, Gracie, his sister, Peggy, and his wife, Tiney. Dr. Worthen testified further that he reviewed some records from the Union County school system, the North Carolina Department of Corrections (hereinafter "DOC"), and the Union County Mental Health Center. Dr. Worthen testified extensively from a psycho-social history that he had developed of Blakeney. He diagnosed Blakeney with cocaine dependence, cannabis dependence and alcohol dependence. He also diagnosed Blakeney with a Personality Disorder, not otherwise specified (hereinafter "NOS"), which, he explained, means that Blakeney does not have the signs or symptoms of one specific

personality disorder, but he does have signs or symptoms of several different personality disorders that when taken together meet the criteria for a full-blown personality disorder. Specifically for Blakeney, the signs or symptoms are avoidant, dependent, anti-social, and narcissistic traits. He testified further that Blakeney's substance abuse was evidence of anti-social behavior supporting the personality disorder diagnosis.

Additionally, Dr. Worthen testified that Blakeney's ability to adequately consider the consequences of his actions was impaired to some extent by the chronic use of alcohol and other drugs, and by the fact that he reportedly had been awake for most of the previous three days. However, it was Dr. Worthen's opinion that Blakeney was not so impaired that he lost significant awareness of his circumstances, nor did he significantly lose his ability to control his behavior.

At post-conviction, however, Dr. Worthen testified that had trial counsel provided him with Blakeney's complete DOC records, Blakeney's wife's Department of Social Services records and access to Blakeney's other siblings, he would have diagnosed Blakeney with a depressive disorder NOS and not a personality disorder. Furthermore, he testified that he would have been able to testify at sentencing in support of two statutory mitigating circumstances: 1) that the murder was committed while the defendant was under the influence of mental or emotional disturbance, and 2) that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired. *See* N.C. Gen. Stat. § 15A-2000(f)(2) & (6).

Assuming *arguendo* that the post-conviction diagnosis is the more accurate one, Dr. Worthen did not need counsel's help to diagnose Blakeney with a depressive disorder. Dr. Worthen testified at the MAR hearing that his initial diagnosis of personality disorder was based

upon his interviews/evaluations of Blakeney and upon Blakeney's responses to the psychological tests that he had administered. In other words, his diagnosis was based upon what Blakeney told him and on how Blakeney answered psychological test questions. Dr. Worthen testified further that his interview with Blakeney's sister, Peggy, supported his diagnosis. Specifically, he testified that Peggy had indicated that she had observed Blakeney exhibit signs of anti-social, narcissistic, avoidant and dependent personality traits.

Dr. James Bellard, a forensic psychiatrist hired by Petitioner in post-conviction, also testified at the MAR hearing. It was his opinion that Blakeney was suffering from Major Depression at the time of the murder. Like Dr. Worthen's, Dr. Bellard's diagnosis was based upon his interview/evaluations with Blakeney and his interview with Peggy. According to Dr. Bellard, Blakeney reported experiencing seven identifiable symptoms of the illness of depression at the time of the murder. Significantly, Blakeney and Peggy were able to describe those symptoms as having existed for at least two months prior to the murder. (MAR Tpp. 523-24) Furthermore, Dr. Bellard testified that Blakeney's social history increased Blakeney's risk of depression and substance abuse. According to Dr. Bellard, Blakeney's substance abuse was indicative of "self-medication," not a personality disorder. In Dr. Bellard's opinion, Blakeney attempted to alleviate his depression by smoking crack and drinking because those substances temporarily made him feel less depressed. Dr. Bellard also testified that he had reviewed Dr. Worthen's pre-trial report containing his diagnosis and opinions and evaluated the psychological tests that Dr. Worthen had administered. He disagreed that the psychological tests indicated a

personality disorder.[4]

It is evident from Dr. Bellard's testimony that in making his diagnosis of Major

Depression, he relied upon the same sources that were available to Dr. Worthen when he made

his diagnosis of personality disorder.[5]  As such, Dr. Worthen's testimony that it was the

documents and interviews obtained in post-conviction that made his diagnosis of depressive

disorder possible is unconvincing.[6]  Furthermore, much of the information contained in the post-

conviction documents was available to Dr. Worthen through the people he interviewed in

preparation for trial.  For example, according to Dr. Worthen: the complete DOC records

indicated a prior diagnosis of depression had been made; affidavits of and interviews with

---

[4]Dr. Bellard also disagreed with Dr. Worthen's pre-trial opinion that at the time of the murder, Petitioner was not under the influence of drugs or alcohol.  Dr. Bellard testified that in his opinion, Petitioner was under the influence of alcohol, cocaine and marijuana at the time of the murder.  This opinion was based upon Blakeney's self-report, Peggy's confirmation, the Union County Mental Health Center records and Blakeney's admission to Dr. Worthen that he had been up for at least three days prior to the crime.  Dr. Bellard testified that he did not take Blakeney's initial answers regarding his use of substances prior to the crimes at face value.  Rather, he asked "specific questions" that yielded admissions by Blakeney that he had symptoms of intoxication at the time of the murder.

[5]Petitioner may argue that Dr. Bellard reviewed all of the post-conviction documents and affidavits of family members and utilized them in making his diagnoses and in forming his opinions.  That is true to a point.  Dr. Bellard testified that he did review all of the aforementioned material.  However, when testifying about his diagnosis of Major Depression, Dr. Bellard referred only to self-reporting by Blakeney and confirmation of those "self-reports" by Peggy. (MAR Tpp. 523-24; 526-27)  He referred to material gathered in post-conviction when discussing Blakeney's ability to adjust to prison life, factors from Blakeney's social history that increased his risk for developing depression and engaging in criminal behavior, and Blakeney's previous attempts to obtain substance abuse treatment – in other words, evidence that might support mitigating and non-mitigating circumstances at sentencing.

[6]The MAR court did not make any findings of fact regarding the credibility of either Dr. Bellard or Dr. Worthen.

Blakeney's other siblings revealed signs of depression prior to the murder;[7] Blakeney's wife's DSS records revealed the chaotic and highly stressful environment in which Blakeney was living and problems his wife was having with alcohol; Blakeney's employment records revealed that he had made a number of unsuccessful attempts to obtain and retain employment. All of these additional sources, according to Dr. Worthen, would have led him to diagnose Blakeney with a depressive disorder rather than a personality disorder. However, if asked, Blakeney and his wife could have told Dr. Worthen about their home life and any substance abuse problems Tiney may have had. If asked, Blakeney could have told Dr. Worthen about his employment history, including the fact that he was employed at the time of the murder; that his wages were being garnished to pay child support for one of his children; that he had had negative drug screens, and that he had never gotten into trouble on the job. If asked, Blakeney could have told Dr. Worthen that he had no juvenile criminal record. Dr. Worthen should have known that Blakeney had completed his GED because it was noted in the discovery material provided by counsel. Finally, both Blakeney and his sister, Peggy, could have identified symptoms of depression pre-dating the murder, as they did for Dr. Bellard.[8]

_____

[7]In light of Petitioner's assertion that counsel were deficient for failing to make his other siblings available to Dr. Worthen, the record shows that it was Dr. Worthen who determined which family members he wanted to interview. Dr. Worthen knew that Blakeney had six living siblings; however, he asked to interview only Peggy. In fact, he informed counsel in a letter dated April 5, 1997, that he wanted to interview family members and associates of Blakeney's and that _he_ would provide the names of the family members and friends that he wished to interview to attorney Crow's secretary so that she could arrange the interviews. (Def. MAR Exh. 26) After interviewing Petitioner's mother and wife, Dr. Worthen asked only to interview Blakeney's sister, Peggy. (Def. MAR Exh. 26, Lettters dated May 1, 1997 and May 24, 1997)

[8]Dr. Worthen testified at sentencing that Blakeney had denied any symptoms of depression. Furthermore, the three family members that Dr. Worthen interviewed, including Blakeney's wife, apparently did not report noticing symptoms of depression in Blakeney. On the

As for the post-conviction DOC records that Dr. Worthen found critical in forming his new diagnosis, he acknowledged on cross-examination that there was no documented diagnosis of depression in those records. Rather, there was an intake report, dated a month after Blakeney began serving his sentence for armed robbery, in which he had reported having feelings of depression. As Dr. Worthen also acknowledged, it is common for inmates to experience feelings of depression.

Whatever the reason for Dr. Worthen's original diagnosis, the record indicates that he had the necessary resources to make a diagnosis of depressive disorder prior to trial. As such, any prejudice arising from the original diagnosis is not attributable to trial counsel and cannot support an ineffectiveness of counsel claim. *See e.g.*, *McHone v. Polk,* 392 F.3d 691, 706 (4th Cir. 2004) (expert's failure to utilize readily available evidence to formulate opinion could not be attributed to counsel).

Nor can Petitioner succeed on his claim that he was prejudiced at sentencing because of counsel's failure to obtain records confirming that he had completed the Drug and Alcohol Rehabilitation Treatment (hereinafter, "DART") program while serving his sentence for armed robbery. At sentencing, Dr. Worthen testified that Blakeney had told him that he had completed the DART program while in prison, but that he (Dr. Worthen) had made several unsuccessful attempts to obtain records from the DOC confirming that fact. Dr. Worthen, both on direct and on cross-examination, stated that he was not sure whether that meant that the DOC simply could

---

other hand, according to Dr. Worthen, both Blakeney and his sister confirmed personality disorder traits. Perhaps motivated by Blakeney's subsequent conviction and death sentence, they provided different answers to Dr. Bellard. However, competent trial counsel are not responsible for anticipating such changes in the stories given the two mental health experts.

not locate those records or that Blakeney had not completed the program as claimed. Picking up on Dr. Worthen's testimony, the prosecutor asked Dr. Worthen to read to the jury a letter from Cherry Correctional Facility, which housed one of the DART programs, stating that Blakeney had not completed the program at that facility.[9] In his closing argument at sentencing, the prosecutor argued that Blakeney was not worthy of belief and offered as an example that Blakeney had not completed the DART program as he had claimed to Dr. Worthen. The prosecutor argued, without objection, that not even Blakeney's own expert believed what Blakeney said.

Petitioner argues that had counsel obtained the DART records, the prosecutor would not have been able to make him out to be a liar and would not have been able to argue that not even his own mental health expert believed him. When the thoroughness of counsel's investigation is challenged, a reviewing court must assess whether counsel's decision not to investigate or to abandon further investigation was itself reasonable. *Strickland*, 466 U.S. at 691.

The record shows that on May 24, 1997, Dr. Worthen sent a letter to trial counsel Crow requesting several types of records, including any from the DOC. (MAR Tpp. 277-78; Def. MAR Exh. 26). On June 18, 1997, counsel sent a letter and signed release to the DOC requesting all of Blakeney's records. (State MAR Exh. 33). On July 21, 1997, counsel received from the DOC ten pages containing primarily medical information from various correctional facilities at which Blakeney had been housed. (State MAR Exh. 34; MAR Tp. 175) On August 28, 1997, in response to another request for Blakeney's DOC records, trial counsel received five additional pages of records from the DOC. (Def. MAR Exh. 23).

---

[9]Blakeney completed the DART program at Craggy Correctional Facility.

As demonstrated above, Blakeney's attorneys twice attempted to secure his DOC records. The results of their follow-up with the DOC may have led them to believe that they had been supplied everything in the file. There is no reason to believe that counsel would know how much documentation is in a DOC file. Furthermore, the fact that there is no mention in the DOC records of Blakeney's completion of the DART program would not necessarily have led a reasonable attorney to investigate further. After all, Blakeney previously had revealed a lack of trustworthiness by telling different people, including counsel, vastly different versions of what had happened prior to his mother's house burning down.

Ultimately, Petitioner cannot show that he was prejudiced by counsel's failure to obtain the DART records. The absence of DART records was only one example of several cited by the prosecutor as evidence that Blakeney was untruthful and that Dr. Worthen did not believe what Blakeney had told him. The prosecutor argued, without objection, that Dr. Worthen did not believe what Blakeney had told him about the arson and murder and that he did not believe the answers that Blakeney had given to some of the questions on the psychological tests. Indeed, Dr. Worthen testified at sentencing that the story Blakeney had told the police was likely more accurate than the very different story that Blakeney had told him about the crimes. He also testified that on the questionnaires he administered, Blakeney minimized his substance abuse problems, and that he (Dr. Worthen) had to adjust for that in making his diagnosis. Dr. Worthen testified that he likewise had to adjust for the fact that Blakeney exaggerated some symptoms of psychological problems on at least one of the tests that he took. The jury, therefore, had ample evidence to conclude that Dr. Worthen doubted Blakeney's veracity. As such, there is no reasonable probability that the jury would have returned a life sentence had the prosecutor not

been able to argue that the absence of the DART records was evidence that Blakeney was not truthful. *See Strickland*, 466 U.S. at 694.

Finally, Petitioner claims that counsel were ineffective for failing to interview and present at sentencing the testimony of all of his siblings and certain friends and former co-workers. Petitioner also faults counsel for failing to call his mother and his wife to testify at sentencing. The MAR court made a number of findings of fact under the deficiency prong of *Strickland* and ultimately concluded that counsel had valid strategic reasons for not calling Blakeney's mother and wife to testify. The MAR court also concluded that the testimony presented by the other lay witnesses at the evidentiary hearing would have been of *de minims* value to the jurors when making a sentencing determination and that Blakeney, therefore, was not prejudiced by counsel's failure to call them to testify at sentencing.

The decision about which witnesses to call is a strategic one, to which enormous deference is owed. *See U.S. v. Terry*, 366 F.3d 312, 317 (4th Cir. 2004) (citations omitted). Crow interviewed both Petitioner's mother, Gracie, and his wife, Tiney, prior to trial and determined that the defense would be better served by having Dr. Worthen, an experienced witness, present the evidence Gracie and Tiney might otherwise have presented. Crow testified at the MAR hearing that he did not call Gracie and Tiney because he was not sure that they would be able to handle testifying or that they would make effective witnesses. (MAR Tpp. 145-47; 161) On the other hand, Crow felt that Blakeney's sister Peggy had the poise and ability to make an effective witness, so he called her to testify.

Counsel's decision not to call Gracie and Tiney as witnesses was "within the wide range of professionally competent performance." *Strickland*, 466 U.S. at 689. Gracie's MAR

testimony was confused and contradictory and revealed a remarkable lack of knowledge of her son's formative years. For example, she testified that Blakeney was a good student and made good grades in school. The record reveals that Blakeney was a poor student, that he failed at least two grades and that he never completed the ninth grade, albeit he made several attempts to do so. As for Tiney, her MAR testimony revealed questionable judgment in her handling of her own home-life that would have been a distraction to the jury and done nothing to improve the mitigation case.[10] The MAR court's conclusion that counsel were not ineffective for failing to call Gracie and Tiney at sentencing was not an unreasonable application of *Strickland*.

As for whether Blakeney was prejudiced by counsel's failure to locate, interview and present evidence from Blakeney's other family members and friends,[11] such a determination can be made only by reweighing the aggravating evidence against the mitigating evidence presented at sentencing and at the evidentiary hearing. *See Wiggins v. Smith*, 539 U.S. 510, 534, 123 S.Ct. 2527, 2542 (2003). *Strickland*'s prejudice prong requires the Court to determine whether it is reasonably probable that the jury would have returned a life sentence but for counsel's deficient performance. 466 U.S. at 694. Therefore, when reweighing the mitigating evidence, the Court includes only the evidence that the jury heard and that which it would have heard but for counsel's deficient performance. In other words, the Court does not include evidence from the MAR hearing that cannot be attributed to counsel's deficient conduct. As such, the Court does

---

[10]Specifically, the Court notes Tiney's decision to permit her fourteen year-old daughter to marry her abusive twenty-two year-old boyfriend.

[11]If it is easier to dispose of an IAC claim on the ground of lack of sufficient prejudice, there is no need for the Court to determine whether counsel's conduct was deficient. *See Strickland*, 466 U.S. at 697.

not include MAR evidence offered through Gracie and Tiney or evidence from Dr. Worthen and Dr. Bellard that Blakeney was suffering from some kind of depression at the time of the murder.

Nor, for that matter, will the Court consider as aggravating evidence Blakeney's admission to Crow that he lit the carpet on fire. The Court agrees with Petitioner that the admission is relevant only to whether counsel were deficient for failing to present evidence at trial that the fire could have been an accident. Furthermore, the information was protected by the attorney/client privilege, so it is not something that the jury would have learned.

The testimony of Blakeney's friends and family at the MAR hearing was largely repetitive of the evidence offered at sentencing through Dr. Worthen and Peggy. Dr. Worthen testified extensively at sentencing about Blakeney's social history. Much of what he testified to was corroborated by Peggy's sentencing testimony. Between them, they testified that Blakeney was the youngest of nine children and that he was very close to his mother, Gracie. Blakeney's father left the family when Blakeney was two or three. The family lived in a two-bedroom house that had no running water and only intermittent electricity. The windows were covered with plastic, not glass. The house was filthy and had rats, snakes and roaches. The children were often cold and hungry. During the winter, they were able to take advantage of free breakfast and lunch programs at school, but in the summer they tried to stay at friends' homes where they knew there would be food. Gracie frequently was absent from the house..

When Blakeney was about nine or ten, his mother began seeing Huntley. After Huntley entered the children's lives, Huntley and Gracie moved to another house across the street and left the children in the previous house. Peggy testified that Gracie and Huntley moved out because Huntley did not want the children around. Huntley's disposition in this matter produced constant

arguments between Gracie and him.  Blakeney largely was cared for by older brothers and sisters, and the children often had to rely on the landlord, Brice Griffin, for food and water.  Huntley and Gracie drank heavily and frequently.  They argued often and sometimes those fights would involve knives or guns, although Dr. Worthen testified that he was unaware of any actual attack involving a weapon.  When Huntley and his mother fought, Blakeney tried to stay out of the way.  Dr. Worthen testified that Blakeney had told him that despite the fights, Blakeney never developed a strong dislike for Huntley.  Gracie alternated between neglect and over-protection and indulgence of Blakeney, especially when she was drinking.

Dr. Worthen's review of Blakeney's school records indicated that Blakeney had below average grades and that he left school in the 9th grade, although he returned in three successive years in an unsuccessful attempt to complete that grade.  When he was 15, he broke into his landlord's house to steal food because there had been no food at his own home for several days.  Blakeney started drinking alcohol when he was 16 and started smoking crack cocaine when he was 24.  He sought treatment for his substance abuse problems in September 1995 at the Union County Mental Health Center.  The Center staff recommended detoxification, but Blakeney did not follow through with the recommendation.

Peggy testified that she would no longer give Blakeney money because she assumed he would just use it to buy drugs.  In her experience, Blakeney walked away from arguments rather than let them escalate into a fight.  To her knowledge, Blakeney did not become argumentative or violent when he drank and used drugs.

Blakeney has six children by five women.  The mother of his youngest two children is his wife, Tiney.  Dr. Worthen testified that Tiney had characterized Blakeney as "a good father" who

was able to relate to and discipline the children better than she was. They argued frequently over the fact that he was spending money on alcohol and drugs rather than on the family, but she had not been thinking of separation or divorce.

Dr. Worthen explained to the jury that Blakeney's upbringing significantly retarded the proper development of his character and ability to function in everyday life. According to Dr. Worthen, Blakeney did not receive the consistent discipline and regular guidance and instruction from his parents that is necessary to develop the abilities and skills to function as a responsible, contributing member of society. Dr. Worthen also testified that people who grow up under similar conditions as Blakeney – poverty, absent father, alcoholism, domestic violence, unsanitary living conditions, etc., are at higher risk for both mental illness and criminal behavior in general. Furthermore, individuals who develop under similar conditions as Blakeney but who overcome those conditions to lead productive, responsible lives, have had a responsible adult in their lives who was actively involved with them. According to Dr. Worthen, Blakeney never had such a person in his life.

Also testifying at sentencing were two deputy sheriffs who had contact with Blakeney at the Union County jail while he was awaiting trial. They testified that Blakeney had not gotten into any trouble at the jail; that he had not broken any of the rules while there, and that they had not received complaints about him from anyone at the jail. Dr. Worthen testified that Blakeney's records from the DOC indicated that during his five years of incarceration for his armed robbery conviction, Blakeney had only three rules infractions – all non-violent – and three commendations for "exemplary acts," for which he received time off from his sentence. He also received merit time for other reasons not specified in the records in Dr. Worthen's possession.

Based upon the DOC records, and the fact that Blakeney did not show any violence or aggression or threats during his incarceration at Union County jail, Dr. Worthen concluded that Blakeney did not pose an imminent threat to other inmates or a greater risk for violence than the average prisoner.[12]

Based upon the foregoing, the jury found the following mitigating circumstances to exist: that the defendant grew up in very unfortunate and difficult circumstances in that he grew up in a physical and psychological environment which significantly retarded the proper development of his character and functional abilities; that the defendant's father was absent from the home since Blakeney was two or three years old; and that the defendant's mother was in and out of the home and involved in an alcoholic and verbally and sometimes physically abusive relationship with Mr. Huntley, which the defendant witnessed. The jury rejected the following proffered mitigating circumstances: that the defendant has no significant history of prior criminal activity; that the defendant attempted to leave the house several times before the lethal acts occurred; that the defendant grew up in extreme poverty, and that the defendant would not be an imminent danger to himself or others in prison.

Blakeney's other siblings, friends and former co-workers offered very little additional mitigating evidence at the MAR hearing. All testified that he was never violent growing up. None were aware of any trouble that Blakeney might have had with the law growing up. Most disavowed knowledge of his early drug and alcohol abuse, although some acknowledged that

---

[12]In post-conviction, Dr. Worthen testified that the absence of violent incidents during his incarceration for armed robbery supported his new opinion that Blakeney did not suffer from a personality disorder. It is not clear to the Court why this would be so in post-conviction but not prior to trial when Dr. Worthen also was aware of this information.

they knew or suspected that he was using drugs prior to the murder. All pronounced themselves "shocked" when they learned of both the armed robbery and assault of a convenience store employee and the murder of Callie Huntley. All testified that such actions were out of character for Blakeney. However, several who had contact with him in the weeks prior to the fire and murder testified that he had been acting differently, as if he was depressed and there was a lot of weight on his shoulders. They indicated that he was complaining of money problems and his inability to find a job that paid well. Several spoke anecdotally of Blakeney's generosity with his time, especially his willingness to help elderly neighbors.

One brother revealed that Blakeney was employed at the time of the murder; another gave some additional details about Huntley. Specifically, Ronald Blakeney testified that Huntley threatened him (Ronald) with a knife on one occasion, but he was able to talk Huntley into giving him the knife.

Also testifying at the MAR hearing was Dr. Pamela Laughon, a psychologist, who identified the records that she had discovered during post-conviction in her capacity as a mitigation specialist.[13] Some of her testimony was repetitive of Dr. Worthen's and Peggy's, but she also testified that Petitioner's DART records revealed that he had volunteered for the drug rehabilitation program. She also was able to provide more detail about the three non-violent infractions that Dr. Worthen had referred to at sentencing. Additionally, she testified that Petitioner completed his GED and took a vocational course – plumbing – while in prison for the armed robbery. Finally, she testified that he had been commended for the quality of work he had

---

[13]As will be discussed in a later claim, the MAR court accepted Dr. Laughon as an expert in the field of psychology but did not accept her as a "mitigation specialist."

done on road duty.

With regard to Petitioner's employment history, Dr. Laughon testified that his employment records indicated that Petitioner had had a series of short jobs, but there was no evidence in them that he had trouble getting along or that he was a trouble maker. The records indicated that he got raises where he worked. The two drug screen results in the records were negative. Dr. Laughon also testified that Petitioner's school records were devoid of any disciplinary problems and that he had no juvenile criminal record.

The Court is not convinced that the additional mitigating evidence, when combined with what the jury learned at sentencing, would have been enough to outweigh the aggravating evidence in this case. The aggravating evidence was compelling. The evidence presented at trial tended to show that Petitioner broke into his mother's house looking for something to steal to sell for drugs; beat up an elderly man; tied him to a chair; ensured that he would have no easy way to escape and then set fire to his mother's house. While the house was burning with Huntley in it, Petitioner drank and smoked crack with friends and even visited a pool hall in South Carolina. Meanwhile, Huntley regained consciousness (if he ever lost it) in a room engulfed in flames and filled with smoke. He would have known that he was going to die, and while consciousness lasted for only three to five minutes, the jury would have understood that for someone convinced that he was facing an impending and horrific death by burning, such a length of time would have been an eternity. The fact that Huntley was lucky and only suffocated to death would not have lessened the terror that he felt in those last minutes of life. This, combined with the fact that the arson and murder served such an insignificant purpose – merely hiding Petitioner's theft of a change purse, a check book and some of his mother's jewelry – was more than enough to

outweigh the mitigating evidence presented at sentencing and in post-conviction.

The State, however, offered more in the way of aggravation. The prosecution presented the testimony of Petitioner's armed robbery victim. He described being robbed by Petitioner at gun-point and then being struck by Petitioner in the back of the head with the gun. Petitioner had stolen the gun from Callie Huntley, the subsequent victim of the arson and murder. Petitioner acknowledged to the investigating detective that he had a problem with cocaine. From the circumstances of the two crimes, the jury easily could have concluded that despite his otherwise non-violent history, when desperate, Petitioner was willing to hurt and even kill in order to obtain money to buy drugs.

Finally, Petitioner is not entitled to an evidentiary hearing in this Court on his IAC claim. "A district court may grant an evidentiary hearing in a § 2254 case only where the petitioner has 'allege[d] additional facts, that, if true, would entitle him to relief' and has "establish[ed] one of the six factors set forth in *Townsand v. Sain*, 372 U.S. 293, 312, 83 S.Ct. 745 9 L.Ed.2d 770 (1963).' "[14] *Robinson v. Polk*, 438 F.3d 350, 368 (4th Cir. 2006) (citing *Fullwood v. Lee*, 290 F.3d 663, 681 (4th Cir. 2002)). Petitioner had a full and fair hearing on this claim in State court; furthermore, he has failed to allege any additional facts, that if true, would entitle him to relief.

For the foregoing reasons, the MAR court's conclusion that counsel were not ineffective

---

[14]The six *Townsend* factors are as follows:
(1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.
*Fullwood*, 290 F.3d at 681 n. 7 (internal quotation marks omitted).

for failing to interview additional family and friends and obtain additional documentary evidence was not an unreasonable application of *Strickland*. This claim is denied.

CLAIM II: *Batson*

A. Substantive *Batson* Claim

Petitioner claims that through the use of challenges for cause and peremptory strikes, the State excluded all eligible African American jurors, resulting in Petitioner's trial by an all-white jury. Furthermore, Petitioner alleges that through the use of challenges for cause and peremptory strikes, the Union County prosecutor's office excluded all eligible black jurors from three other capital murder trials that occurred prior to his own trial. According to Petitioner, these facts show a pattern by the Union County prosecutor's office of excluding black jurors from capital trials. Petitioner complains that he was denied an evidentiary hearing on this claim in the MAR court. He seeks an evidentiary hearing in this Court.

The Equal Protection Clause forbids the State from using peremptory challenges to exclude potential jurors "solely on account of their race."[15] *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 1719 (1986). Under *Batson*, the Supreme Court articulated a three-part test by

---

[15]Petitioner also cites the prosecution's challenges for cause to support his claim that the prosecutor impermissibly excluded black jurors during his trial. However, in North Carolina, it is the trial court, not the prosecutor, that determines whether a juror should be excused for cause. Petitioner does not allege that the trial judge was complicit in the prosecutor's alleged discriminatory practices. Therefore, the State's successful challenges for cause are irrelevant to Petitioner's *Batson* claim.

Furthermore, Petitioner's assertion that the prosecutor dismissed all of the eligible black jurors is a misstatement of fact. The prosecutor excused one black juror, Robert Crawford, using a peremptory challenge. (Tp. 387)  The trial court excused two black jurors, Ronny Marsh (Tp. 90) and Bobby Chambers (Tp. 122) upon the prosecution's challenge for cause. On its own motion, the trial court dismissed two black jurors, George Crawford (Tp. 46) and Marcell Griffin (Tp. 680), for cause. (The undersigned is relying on the direct review Record on Appeal for the names of the African-American jurors excused during voir dire. (p. 122))

which a defendant may establish a *prima facie* case of discrimination by the prosecutor. *See id*. at 96-97. The defendant must show (1) that he is a member of a distinct racial group; (2) that the prosecutor has used peremptory challenges to remove from the venire members of the defendant's race; and (3) that "these facts and any other relevant circumstances raise an inference that the prosecutor used [the peremptory challenges] to exclude the veniremen from the petit jury on account of their race." *Allen v. Lee*, 366 F.3d 319, 328 (4th Cir. 2004) (citing *Batson*, 476 U.S. at 96). After the defendant makes a showing sufficient to "raise an inference of purposeful discrimination," the burden shifts to the prosecutor to provide race-neutral explanations for striking those jurors. *See id.* at 329 (citing *Batson*, 476 U.S. at 96-97). "The trial court then will have the duty to determine if the defendant has established purposeful discrimination." *Batson*, 476 U.S. at 98.

The record in this case reveals that the State used a peremptory challenge to strike one black venireman, Robert Crawford. Blakeney made no objection when the prosecutor excused Mr. Crawford.[16] On direct appeal, Petitioner did not raise a claim that the prosecutor had used his peremptory strikes to exclude Mr. Crawford based upon his race.

Petitioner raised a *Batson* claim for the first time in his Amended MAR. In Claim VI, he asserted that the prosecutor had used peremptory challenges to exclude all eligible black jurors from his jury. Petitioner also asserted that in three other capital murder trials preceding his own,

---

[16]Blakeney asserts in the instant Claim that "trial counsel moved for relief and argued a violation of the right to trial by a fair cross-section of the community." (PWHC p. 25) This statement is deceptive. At various times during voir dire and before the jury was impaneled, trial counsel moved to dismiss the jury venires and the petit jury on the ground that their members did not represent a fair cross-section of the community. However, trial counsel made no objection or motion after the prosecutor excused Robert Crawford, and none of the motions to dismiss mentioned Robert Crawford or the prosecution's use of its peremptory strikes.

the Union County prosecutor's office used peremptory strikes to systematically exclude all eligible black jurors. Petitioner argued that these cases were evidence of a "systemic pattern of conduct" by the Union County prosecutor's office.

The MAR court refused to hold a hearing on this issue. In its June 5, 2003 Order, the MAR court held that Petitioner was not entitled to a merits review of his *Batson* claim because he had failed to object to the prosecutor's peremptory strike at trial. (MAR June 5, 2003 Order, pp. 82-83) Citing the North Carolina Rule of Appellate Procedure 10, the MAR court held that Blakeney's failure to comply with the contemporaneous objection rule constituted waiver.[17] (MAR June 5, 2003 Order, p. 83)

In the instant Petition, Petitioner again raises the *Batson* issue, proffering the same three cases relied upon in his Amended MAR. However, Blakeney is not entitled to a merits review or an evidentiary hearing in this Court because the claim is procedurally defaulted.

Ordinarily a federal habeas court will not review a claim that is procedurally defaulted, absent a showing of cause and prejudice or a fundamental miscarriage of justice to excuse the procedural default. *Fisher v. Angelone*, 163 F.3d 835, 844 (4th Cir. 1998) (citation omitted). Generally, a claim will be defaulted if a state court has expressly found that review is barred by an adequate and independent state procedural rule. *See Ashe v. Styles*, 39 F.3d 80, 85 (4th Cir. 1994). "A state rule is adequate if it is 'firmly established,' and regularly and consistently

_____

[17]The MAR court cited Rule 10(b)(2), which pertains only to preservation of objections to jury instructions. *See* N.C. R. App. P. 10(b)(2). On the other hand, Rule 10(b)(1) states that in order to preserve a question for appellate review, "a party must have presented to the trial court a timely request, objection or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context . . . ." N.C. R. App. P 10(b)(1). From the context it is clear that citation to Rule 10(b)(1) was intended; therefore, the Court finds that the MAR court's citation of Rule 10(b)(2) rather than 10(b)(1) was inadvertent.

applied by the state court." *McCarver v. Lee*, 221 F.3d 583, 588 (4th Cir. 2000) (internal citations omitted).

Under North Carolina's rules of appellate procedure, a challenge to the State's exercise of its peremptory strikes must be raised at trial by timely objection in order to preserve the issue for appeal. *See* N.C. R. App. P. 10(b)(1). The failure to make a timely objection constitutes waiver. *See id*. Rule of Appellate Procedure 10 is an adequate and independent state procedural rule. *See e.g. Kornahrens v. Evatt*, 66 F.3d 1350, 1357 (4th Cir. 1995) ("[I]f a defendant defaults by not following proper state appellate procedure, causing the state courts to rule against him solely on state-law procedural grounds, [the federal courts] have no power to review his defaulted issues because they are based solely on state procedural grounds rather than federal constitutional grounds"). By failing to raise a timely objection at trial, Petitioner failed to preserve for his direct appeal a constitutional challenge to the prosecutor's use of a peremptory strike to excuse Robert Crawford. Therefore, this claim is procedurally defaulted on federal habeas review. *See Daniels v. Lee*, 316 F.3d 477, 486-488 (4th Cir. 2003); *Howard v. Moore*, 131 F.3d 399, 420 (4th Cir. 1997) ("Errors at trial not objected to, in contravention of State contemporaneous objection rules, are not cognizable in federal habeas corpus proceedings . . . .") (quoting *Satterfield v. Zahradnick*, 572 F.2d 443, 446 (4th Cir.1978)); *Davis v. Allsbrooks*, 778 F.2d 168, 174 (4th Cir.1985).

Petitioner argues that "the default was not an adequate and independent state bar," and cites two 1988 North Carolina cases that, according to Petitioner, hold that failure to make a *Batson* objection at trial does not preclude review on direct appeal. (Pet. Response to State's Motion for Summary Judgment, p. 30). However, *State v. Allen*, 372 S.E.2d 855, 861-62 (NC

1988) *sentence vacated on other grounds*, 494 U.S. 1021, 110 S.Ct. 1463 (1990) and *State v. Jackson*, 368 S.E.2d 838, 839-42 (NC 1988) merely reflect the holding of *Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S.Ct. 708, 716 (1987), that the new rule articulated in *Batson v. Kentucky* applied to defendants whose cases were pending on direct review when *Batson* was decided.. As Petitioner's trial occurred more than ten years after *Batson* was decided, *Allen* and *Jackson* are of no precedential value to his claim.[18] Furthermore, Petitioner's argument is contradicted by *State v. Adams*, in which the North Carolina Supreme Court held that the defendant's failure to object to the prosecutor's peremptory challenges on the grounds that they were racially based precluded him from raising the issue on appeal. 439 S.E.2d 760, 765 (N.C. 1994).

Petitioner has failed to demonstrate cause and prejudice or that a fundamental miscarriage of justice would occur to excuse his failure to preserve this issue by a timely objection. *See Wainwright v. Sykes*, 433 U.S. 72, 82, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Indeed, Petitioner has alleged neither cause nor prejudice with respect to his failure to timely object to the prosecution's use of a peremptory strike to excuse Robert Crawford. Although Petitioner raises an independent ineffective assistance of counsel claim for failure to raise a *Batson* objection, he does not argue that counsel's ineffectiveness was the cause of his default of his underlying *Batson* claim. *See generally*, *Edwards v. Carpenter*, 529 U.S. 446, 453, 120 S.Ct. 1587, 1592 (2000) (ineffectiveness claim asserted as cause to excuse procedural default of another claim must itself be exhausted in the state courts). Nor is this Court required to make that argument for him. Therefore, this claim is procedurally defaulted. *See Wainwright v. Sykes*, 433 U.S. at 82;

---

[18]The Court notes that, unlike Petitioner, the defendants in *Allen* and *Jackson* made objections on the record to the prosecutors' use of peremptory strikes to exclude African Americans.

*Fisher v. Angelone*, 163 F.3d at 844.

        B.  Ineffective Assistance of Counsel for Failing to Raise *Batson* Claim

Petitioner raises an alternative claim that trial counsel were ineffective for failing to object to the prosecutor's use of a peremptory strike to excuse Robert Crawford and for failing to investigate and present evidence to the trial court that the Union County prosecutor's office excluded all eligible black jurors from three other capital murder trials that occurred prior to his own trial. Petitioner complains that he was denied an evidentiary hearing on his ineffectiveness claim in the MAR court. He seeks an evidentiary hearing in this Court on this claim.

Petitioner's ineffective assistance of counsel (hereinafter "IAC") claim is governed by the legal standard set forth in *Strickland v. Washington*, 466 U.S. at 687-88. In order to determine whether counsel were ineffective, the Court must examine whether the prosecutor's use of a peremptory strike to remove Robert Crawford from the jury violated *Batson v. Kentucky,* and, if so, whether Petitioner was prejudiced by counsel's failure to object to Crawford's removal. As noted previously, under *Batson*, the Supreme Court articulated a three-part test by which a defendant may establish a *prima facie* case of discrimination by the prosecutor. 476 U.S. at 96-97. Only after the defendant has made a *prima facie* case of discrimination is the prosecutor required to give a race neutral explanation for his peremptory strikes. *See id*. at 97. It is then up to the trial court to determine if "the defendant has established purposeful discrimination." *Id*. at 98. The threshold question, then, is whether Petitioner has made a *prima facie* case of discrimination by the prosecutor.

In the state courts, Petitioner attempted to have two bites of the apple on this question. On direct appeal, he raised a claim that counsel were ineffective for failing to make a *Batson*

objection when the State struck Robert Crawford.  In his MAR, he raised the same claim that he does here[19] – that counsel were ineffective for failing to make a *Batson* objection and for failing to present evidence that in three previous capital cases, the prosecution used peremptory strikes to remove all eligible black jurors.  The MAR court refused to hold a hearing on this claim.  It struck the three cases cited by Petitioner, finding that they did not support Petitioner's assertion that Union County prosecutors had engaged in a pattern of conduct of improperly using race as a factor in selecting a jury.[20]  The MAR court then held that this claim was procedurally barred pursuant to N.C. Gen. Stat. §15A-1419(a)(2) because the North Carolina Supreme Court had concluded on direct review that Petitioner had failed to make a *prima facie* showing of a *Batson* violation at trial.[21]

Under AEDPA's rules, because the MAR court invoked a state *res judicata* rule in declining to review this claim, the relevant decision for federal habeas purposes is that of the North Carolina Supreme Court on direct review.[22]  *See Goins v. Angelone*, 226 F.3d 312, 320 (4th

---

[19]MAR Claim VIII.

[20]The three cases relied upon by Petitioner are *State v. Richardson*, 467 S.E.2d 685, 691 (NC 1996), *State v. Strickland*, 488 S.E.2d 194 (NC 1997), and *State v. Hoffman*, 505 S.E.2d 80, 84 (NC 1998).

[21]Section 15A-1419(a)(2) bars relitigation in post-conviction court of any claim or *issue* previously decided on the merits.  While Petitioner did not raise a claim on direct appeal that counsel were ineffective for failing to present evidence that black jurors were excluded in other capital cases, the issue of whether he had established a *prima facie* case of discriminatory intent based on evidence from his own trial was litigated on the merits on direct review.

[22]Although the MAR court did a merits review after finding that this issue was procedurally barred, this Court is bound by the procedural ruling. *See Ashe v. Styles*, *supra*, 39 F.3d at 86 (Where a state court "both addresses the merits of the federal question but also invokes a state procedural bar that is adequate and independent of federal law as an independent ground for decision, a federal court must accord respect to the state ground for decision . . . .").

Cir. 2000) *abrogated on other grounds by*, *Bell v. Jarvis*, 236 F.3d 139 (4th Cir. 2000); *Ramdass v. Angelone*, 187 F.3d 396, 402 (4th Cir. 1999). (MAR Court Order dated Nov. 12, 2003, p. 16 ¶ 19, p. 21 ¶ 23b) As noted previously, on direct appeal Petitioner claimed that counsel were ineffective for failing to make a *Batson* objection when the prosecutor used a peremptory strike to excuse Robert Crawford. (Def. App. Brief CLAIM V B, p. 47) Petitioner put forth no argument to support his claim; instead he sought a remand to the state Superior court so that a hearing could be held on the issue. The North Carolina Supreme Court denied the claim on the merits. *See State v. Blakeney*, 531 S.E.2d 799, 814-15 (NC 2000). The court reviewed the record on appeal, including the transcript of the voir dire, and determined that Petitioner had failed to make a *prima facie* case of discriminatory intent by the prosecutor as required under the first step of *Batson*. *See id*. Therefore, the court held, counsel were not ineffective for failing to make a *Batson* objection. *See id*.

Ordinarily, the Court would review the North Carolina Supreme Court's decision to determine whether it was contrary to or an unreasonable application of established Federal law. *See* § 2254(d)(1). However, Petitioner does not challenge that court's adjudication of this issue *in any way*. In fact, he does not directly acknowledge that he raised a *Batson*-related IAC claim on direct appeal. He does not assign error to the state Supreme Court's factual or legal conclusions rejecting his *Batson*-related IAC claim. Most importantly, he has not directed this Court to any "relevant circumstances" from his trial or the record on appeal that would constitute evidence of discriminatory intent on the part of the prosecutors when they used a peremptory challenge to strike Robert Crawford (e.g. racially suspect comments by the prosecutors during voir dire, similarities between voir dire answers by white jurors who were not excused by the

prosecutor and those of Robert Crawford, etc.). *See e.g., Batson*, 476 U.S. at 97 (An inference that a prospective juror has been peremptorily challenged because of his race can also be established through the State's questions and statements during voir dire). Because Petitioner has not alleged error on the part of the state Supreme Court or challenged that court's conclusion that there is no evidence in the record on appeal of discriminatory intent by the prosecutor when he removed Robert Crawford, he has waived any argument in this Court that the state Supreme Court was incorrect in either its factual or legal conclusions.

Since Petitioner waived any challenge to the North Carolina Supreme Court's conclusion that there is no evidence of discriminatory intent by the prosecutor when he removed Robert Crawford, his support for a *prima facie* case of a *Batson* violation by the State consists solely of the following evidence presented in his MAR and in the instant claim: 1) Petitioner is African-American; 2) prosecutors used a peremptory strike to excuse Robert Crawford, an African American, from Petitioner's jury; and 3) in three other Union County capital cases, prosecutors allegedly struck all African American jurors who were not struck for cause. Petitioner refers to the three prior Union County capital cases as "*Swain*" evidence and argues that under *Swain v. Alabama*, 380 U.S. 202, 222-24, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), he is entitled to show "the prosecutor's systematic use of peremptory challenges to strike African-American jurors over time." It appears that Petitioner's argument is that had trial counsel made a *Batson* objection and presented evidence from *Strickland*, *Hoffman* and *Richardson*, it would have been sufficient to establish a *prima facie* case of discriminatory intent on the part of the prosecutors when they

excused Robert Crawford.[23] *See Batson*, 476 U.S. at 96-97.

In *Swain v. Alabama*, the Supreme Court held that in any given trial, the prosecutor cannot be made to explain his peremptory strikes unless the defendant can show that "in case after case, whatever the circumstances, whatever the crime and whoever the defendant or victim," the prosecutor had used peremptory strikes to remove qualified black veniremen who had survived challenges for cause, "with the result that no [blacks] ever serve on petit juries." 380 U.S. at 222-24. *Batson* rejected *Swain*'s evidentiary formula for establishing a *prima facie* case of discriminatory intent on the part of the prosecutor. *See Batson*, 476 U.S. at 93.

Assuming that Swain's *prima facie* evidentiary standard survived *Batson*, Petitioner's evidence of "historical systematic exclusion" is insufficient to raise an inference of discriminatory intent in his own case. Looking at the evidence Petitioner has offered to support his claim, *Strickland* immediately can be discounted. Strickland did not raise any *Batson*-related claims on direct appeal, *see State v. Strickland*, 488 S.E.2d 194 (NC 1997), or in his MAR (Exh. 20 of Pet.'s AMAR). Therefore, there is no evidence before this Court of how many, if any, African-Americans were excused by the prosecution through the use of peremptory strikes.[24] Petitioner's reliance upon *Hoffman* and *Richardson* is even less tenable. In both of those cases,

---

[23]The Court presumes that Petitioner is attempting to use evidence from *Strickland*, *Hoffman* and *Richardson* to establish a *prima facie* case of discriminatory intent. This presumption is based upon Petitioner's failure to otherwise explain the relevance of these three cases to his trial. After all, he does not use the term "*prima facie*" anywhere in his Petition or refer to the three criteria he must meet under *Batson* to establish a *prima facie* case of discriminatory intent.

[24]Since Petitioner's claim is that "100% of the eligible black jurors were excused by the prosecutor" through peremptory strikes and challenges for cause, the Court needs some evidence of how many were struck using peremptory challenges as opposed to challenges for cause. *See Swain*, 380 U.S. at 225-26. Petitioner has failed to provide this information from *Strickland*.

the defendants raised a *Batson* issue at trial and on direct appeal, and the North Carolina Supreme Court resolved the issue to the defendants' detriment, finding no purposeful discrimination in *Hoffman*, 505 S.E.2d at 85, and no *prima facie* case of purposeful discrimination in *Richardson*, 467 S.E.2d at 691.

Petitioner argues that when considering "*Swain*" evidence, the Court should not look beyond the fact that Strickland, Hoffman, and Richardson had all-white juries. However, the defendant in *Swain* was unable to make out a *prima facie* case of discriminatory intent because he did not provide the courts with the ability to look beyond the fact of historically all-white juries to determine the prosecutors' role in forming them. *See* 380 U.S. at 226 (record before the Court silent "as to when, why and under what circumstances" the prosecutor had removed black jurors in previous cases). Furthermore, unlike in the *Swain* era where all of the historic evidence of systematic exclusion would have been silent as to the prosecutors' reasons for using peremptory strikes in a given trial, in the *Batson* era, that is no longer the case. On the contrary, as *Richardson* and *Hoffman* demonstrate, trial and appellate courts are able to resolve *Batson* issues on the record before them. Therefore, when a defendant chooses to rely on other cases, as Petitioner does here, a reviewing court can more easily determine whether there is, in fact, evidence of historic systematic exclusion such that purposeful discrimination should be inferred in the objecting defendant's trial. After all, it would be illogical to accept as historic evidence of purposeful discrimination a case in which the defendant had failed to establish "purposeful discrimination." *Batson*, 476 U.S. at 98.

Petitioner has failed to present sufficient evidence to establish a *prima facie* case of purposeful discrimination on the part of the prosecutor when he excused Robert Crawford.

36

Therefore, he likewise has failed to show that counsel were deficient for failing to raise a *Batson* objection.  If there is no factual or legal foundation for raising an objection, then counsel's failure to object does not fall below the range of professionally competent performance. *See e.g.*, *A.M. v. Butler*, 360 F.3d 787, 795 (7th Cir. 2004) ("If there was no underlying constitutional violation, a motion to suppress would have been futile and counsel could not be viewed as ineffective for failing to present such a motion."); *United States v. Carter*, 355 F.3d 920, 924 (6th Cir.2004) (counsel was not ineffective for failing to file motion where there was no reasonable probability that motion would be granted).

Furthermore, even if counsel were deficient, Petitioner cannot show that he was prejudiced by counsel's failure to raise a *Batson* objection.  For the sake of argument, the Court will assume that counsel were deficient for failing to object when the State struck Robert Crawford and for failing to present the trial court with evidence from the *Strickland*, *Hoffman* and *Richardson* cases.  The Court will assume further that had counsel properly pressed a *Batson* objection, Robert Crawford would have served on the jury.  There is no evidence that a jury so constituted would have returned a verdict different from that returned by Petitioner's actual jury. *See Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066 ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding *if the error had no effect on the judgment*."(emphasis added)); *see also*, *Young v. Bowersox*, 161 F.3d 1159, 1160-61 (8th Cir. 1998).  Nor is there any reason to believe that a jury with Robert Crawford on it would have returned a life sentence.  Indeed, Petitioner does not even make this argument.  He certainly has not put forth any evidence, nor does he argue, that the individual jurors who tried him were not impartial.  Furthermore, the presence of Robert Crawford on the jury would not

have changed the strength of the State's case against Petitioner or the nature of the evidence offered for and against him at sentencing. In short, Petitioner has failed to put forth any evidence that he was prejudiced by counsel's failure to raise a *Batson* objection at trial.

Finally, Petitioner is not entitled to an evidentiary hearing on this claim. He has failed to establish one of the six factors in *Townsand v. Sain* and to allege facts that, if true, would entitle him to relief on this claim. *See Robinson v. Polk*, 438 F.3d at 368. For the foregoing reasons, the state court's rejection of Petitioner's IAC claim was not an unreasonable application of *Strickland*.

CLAIM III: *Brady v. Maryland*[25]

Petitioner claims that the State failed to disclose material information exculpating him and relating to both impeachment and mitigating information in violation of *Brady v. Maryland*. 373 US 83, 83 S.Ct. 1194 (1963). In *Brady*, the United States Supreme Court held that the prosecution deprives a criminal defendant of due process when it suppresses evidence that is "favorable to an accused . . . where that evidence is material either to guilt or punishment . . . ." 373 US at 87. There are three elements that Petitioner must establish in order to prove a *Brady* violation: (1) the evidence must be favorable to Petitioner, "either because it is exculpatory, or because it is impeaching"; (2) "that evidence must have been suppressed by the State, either willfully or inadvertently"; and (3) the evidence must be material, *i.e.*, "prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 282, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999).

_____

[25]Petitioner raised this claim in the state post-conviction court as Claim IX in his Further Amendment to Motion for Appropriate Relief to Conform to the Evidence, filed after the conclusion of the MAR evidentiary hearing. It was misnumbered in that document as Claim VIII.

In order to establish the "prejudice" component, Petitioner must show that "there was a reasonable probability" that the result of the trial would have been different if the suppressed evidence had been disclosed to the defense. *Strickler*, 527 U.S. at 263. In other words, the question is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995). Because the MAR court correctly identified the governing legal standard as that set forth in *Brady v. Maryland*, 373 US at 87, this Court's review is limited to the question of whether that court's application of *Brady* was "objectively unreasonable." *See Williams*, *supra*, 529 U.S. at 409, 120 S.Ct. 1495.

### A. Petitioner's DART Records

While incarcerated for the armed robbery conviction, Petitioner completed the DART program at Craggy Correctional Facility, a state prison. During preparation for trial, counsel twice requested Petitioner's complete records from the North Carolina DOC. However, they did not receive the complete records.[26] There was no mention in the records of Petitioner having completed the DART program. On the other hand, in response to post-conviction counsel's request specifically for the DART records and a discovery order, the DOC provided post-conviction counsel with Petitioner's records from the DART program. (Pet. MAR Exh. 8A) Petitioner asserts that his DART records were valuable mitigating evidence that was suppressed by the State during his trial.

The MAR court held that Petitioner was unable to prove a *Brady* violation because the

---

[26]In response to their requests, trial counsel received ten pages of records generated on July 21, 1997 (State MAR Exh. 34) and five pages on August 28, 1997 (Def. MAR Exh. 23).

prosecution did not suppress his DOC records. The MAR court held that the DOC was not an agent of or acting on behalf of the prosecution when it failed to disclose all of the information in Petitioner's DOC files. Therefore, the court concluded, *Brady* did not apply to the DOC's actions, or, in this case, its failure to act.

*Brady* places an affirmative duty on prosecutors "to learn of any favorable evidence known to others acting on the government's behalf in the case." *Kyles v. Whitley*, 514 U.S. at 437. Although *Kyles* requires prosecutors to discover and disclose material, exculpatory evidence in the hands of police and others assisting or acting as agents of the prosecutor in a case, "'*Kyles* cannot be read as imposing a duty on the prosecutor's office to learn of information possessed by other government agencies that have no involvement in the investigation or prosecution at issue.'" *United States v. Pelullo*, 399 F.3d 197, 216, 218 (3rd Cir. 2005) (citations omitted) (no *Brady* violation where Federal prosecutor had no knowledge of evidence in the hands of U.S. Dept. of Labor investigators uninvolved in investigation and prosecution of defendant); *accord United States v. Hall*, 434 F.3d 42, 55 (1st Cir. 2006) (Federal prosecutor had no duty under *Brady* to discover and disclose favorable information maintained by Rhode Island state courts when there was no evidence that the federal prosecutor or any agent working on her behalf had the information prior to or during trial.); *Moon v. Head*, 285 F.3d 1301, 1310 (11th Cir. 2002) (refusing to impute to a Georgia prosecutor knowledge of evidence in the possession of a Tennessee Bureau of Investigation agent because the agent was not part of the "prosecution team" or acting on behalf of the prosecutor); *United States v. Morris*, 80 F.3d 1151, 1169 (7th Cir. 1996) (*Brady* did not require federal prosecutor to seek out allegedly exculpatory information in the hands of the Office of Thrift Supervision . . . , the Securities Exchange Commission . . . , or

the Internal Revenue Service . . . when it had been unaware of the existence of that information.);
*United States v. Locascio*, 6 F.3d 924, 949-50 (2nd Cir. 1993) (refusing to impute to a Federal
prosecutor knowledge of evidence in the possession of FBI and other investigative agents
uninvolved in defendants case).

Petitioner has presented no evidence that the prosecutors in this case were aware of the
DART information in the DOC records or that the DOC had failed to fully honor a defense
request for documents.  Moreover, Petitioner has presented no evidence that a county prosecutor
has any authority over the North Carolina DOC, which administers the state prison system. *See
State v. Clark*, 493 S.E.2d 770, 773 (NC 1997) (Records that were in control of the DOC were
not "within the possession, custody or control of the prosecutor or those working in conjunction
with him or his office.")  Petitioner has presented no evidence that the DOC was acting as an
agent of or on behalf of the Union County prosecutors.  Nor has Petitioner presented any
evidence that anyone at the DOC participated in the investigation or prosecution of Petitioner for
the murder of Callie Huntley.  In short, there is no evidence of any sort of relationship between
the prosecution and the DOC.  As such, there is no basis for imputing the DOC's actions (or
inaction) to the prosecution, and the MAR court's conclusion that the prosecution did not
suppress Petitioner's DART records was not an unreasonable application of *Brady v. Maryland*.

B.  Petitioner's Oral Statement to Detective Honeycutt

Prior to his arrest, Petitioner made an oral statement to Detective Ronnie Honeycutt of the
Union County Sheriff's Office.  Pursuant to North Carolina law, prosecutors disclosed the
substance of Petitioner's oral statement to trial counsel prior to trial. *See* N.C. Gen. Stat. § 15A-
903(a) (1997).  At the MAR hearing, Detective Honeycutt testified that Petitioner made his oral

confession after the Detective told Petitioner that, "[I]t was time for him to stop hurting his family and hurting himself and tell the truth." (MAR Tp. 824)  Detective Honeycutt also testified that he told Petitioner to "face up to what you've done and be a man." (MAR Tp. 823)

Petitioner asserts that his decision to confess after Detective Honeycutt's appeal to his feelings for his family would have countered the picture the prosecution allegedly sought to paint that he was a cold, calculating, anti-social individual who was devoid of feelings for anyone but himself.  Therefore, Petitioner claims, prosecutors violated *Brady v. Maryland* by failing to disclose to trial counsel what Detective Honeycutt had said to Petitioner prior to his confession.

The MAR court held that this claim was procedurally barred pursuant to § 15A-1419(a)(3), abandoned on direct appeal and without merit under State law.  Section 15A-1419(a)(3) bars collateral review in the State courts of claims that could have been brought on direct appeal but were not.  The Fourth Circuit has recognized that § 15A-1419(a)(3) generally is an independent and adequate state procedural bar. *McCarver v. Lee*, *supra*, 221 F.3d at 589.  The MAR court concluded that Blakeney could have raised this issue on direct appeal and that he in fact abandoned this claim on direct appeal by failing to brief two assignments of error in the record on appeal.  The State raises procedural default as a defense to federal habeas review. However, this Court agrees with Petitioner that the MAR court's procedural default holding is based upon a misreading of Blakeney's MAR claim.

On direct appeal, Blakeney made two assignments of error regarding the admissibility of his pre-trial statements (Assignments of Error Nos. 28 and 31), both of which he abandoned by failing to brief them in his appellate brief on direct appeal to the North Carolina Supreme Court. In his MAR Claim IX, Petitioner argued that had the prosecution disclosed what Detective

Honeycutt said to Petitioner before his confession, the jury would have learned that Petitioner responded to appeals to his humanity. Petitioner *did not* argue in his MAR claim that had the full context of Detective Honeycutt's side of the conversation been disclosed, the trial court would have been compelled to suppress Petitioner's statements to police. Instead, he raised a standard *Brady* claim that the prosecution suppressed exculpatory evidence that was material at sentencing. For the foregoing reasons, the Court believes Petitioner has raised two separate and distinct claims – one regarding suppression of his own statements to police, which he abandoned on direct appeal, and the other regarding suppression of material, exculpatory evidence by the prosecution, which he raised in his MAR, – and that the MAR court, for reasons that are unclear, has equated the two.

Even if this claim is not procedurally defaulted, it is without merit. In addition to concluding that this claim was procedurally barred and abandoned, the MAR court determined as a matter of State law that the claim had no merit.[27] The MAR court's merits review did not address Petitioner's federal constitutional claim that the prosecution violated *Brady v. Maryland* when it did not disclose "the context" of the conversation between Petitioner and Detective Honeycutt. Because the MAR court did not address Petitioner's constitutional claim, this Court's merits review is *de novo*.

*Brady* does not apply " 'if the evidence in question is available to the defendant from other sources,' " *United States v. Wilson*, 901 F.2d 378, 380 (4th Cir.1990) (quoting *United States v. Davis*, 787 F.2d 1501, 1505 (11th Cir.1986)), either directly or via investigation by a

---

[27]The MAR court's merits review was confined to whether the prosecution violated the North Carolina discovery statute, N.C. Gen. Stat. § 15A-903. (MAR May 21, 2004 Order, p. 135, ¶189.d.)

reasonable defendant, *see Barnes v. Thompson*, 58 F.3d 971, 975 n. 4 (4th Cir.1995).  If evidence

available to the defendant from other sources falls outside of *Brady* then, by extension, evidence

actually known to the defendant also must fall outside the *Brady* rule. *See Fullwood v Lee*, 290

F.3d 663, 686 (4th Cir. 2002).  In *Fullwood*, the prosecution failed to disclose an oral statement

Fullwood had made to a detective in which he admitted killing the victim but claimed he had

been using cocaine and had lost control. *Id*. at 685.  Fullwood argued that this statement was

material under *Brady* because it would have afforded him a diminished capacity defense and

mitigated his crime from first to second-degree murder.  The Fourth Circuit held that the State

did not suppress the information that came out during the conversation between Fullwood and

the detective because "Fullwood, better than anyone, knew about his cocaine use on the night

prior to the stabbing and knew that he had recounted this fact to Detective Robinson."  *Id*. at 686.

In this case, the State disclosed to the defense the substance of Blakeney's oral statement

to Detective Honeycutt.  Although, the State did not disclose the substance of Detective

Honeycutt's portion of the conversation, Blakeney, as a participant, is presumed to know, better

than anyone, what was said during that conversation.  *See id*.

As the Fourth Circuit stated in *Stockton*, "[a]ware of the existence of potentially

exculpatory information, a defendant cannot sit idly by in the hopes that the prosecution will . . .

disclose that information and, when the prosecution does not do so, seize upon the prosecution's

conduct as grounds for habeas relief."  41 F.3d at 927 (citation omitted).  For the foregoing

reasons, Petitioner has failed to show that the prosecution suppressed "the context" of

Petitioner's oral statement to Detective Honeycutt.  *Strickler v. Greene*, 527 U.S. at 282**.**

CLAIM IV:  *IAC for Failing to Raise Accident Defense*

Petitioner claims that counsel were ineffective for failing to adequately investigate and present evidence that accident could not be ruled out as a source of the fire that killed Huntley. Specifically, Blakeney asserts that counsel misunderstood their own arson investigator's conclusions about whether the kerosene patterns on the floor of the den were "pour patterns" or "spill patterns."  Additionally, Blakeney asserts that counsel should have discovered and presented evidence that Huntley was in the habit of filling the home's kerosene heater in the house and, in the process, spilling kerosene on himself and on the floor.  Blakeney asserts that had they done so, the defense's arson expert could have testified that accident could not be ruled out as a source of the fire.  Additionally, Blakeney argues that he was prejudiced at sentencing by counsel's failure to present this evidence to refute the aggravating factors that the murder was committed during the course of an arson and that the murder was particularly heinous, atrocious or cruel.

At trial, the State's arson expert, State Bureau of Investigation (hereinafter "SBI") Agent Van Worth Shaw testified that there were two points of origin for the fire, one in the living room where the victim's bound, prone body was found and the second in the den where Blakeney told police that he had left Huntley tied in a chair.[28] (Tpp. 931; 975)  Agent Shaw testified that he smelled an odor of kerosene around the den couch (Tpp. 936-37) and that he found evidence of "pour patterns" in front of the den couch. (Tpp. 947-50)  He testified that "pour patterns" are patterns left when an accelerant – an ignitable or flammable liquid – is poured onto a surface and

---

[28]The kitchen, den, and living room were at the front of the house.  A wide, open doorway separated the den from the living room. (State's MAR Exh. 5 – SBI Drawings of Crime Scene, p. 6)

then set on fire. (Tp. 947)  As for the living room, Agent Shaw concluded that the point of origin was near the victim's head, in a corner area of the room. (Tp. 938-39)  Agent Shaw did not find any visible pour patterns on the living room floor. (Tpp. 952-54)  However, he detected an odor of kerosene as he was removing debris in the area of the point of origin in the living room. (Tp. 955)  He testified that in his opinion the fire was set deliberately through use of an accelerant and an open flame device to light the liquid and that in the course of his investigation, he was able to eliminate all accidental causes of the fire. (Tpp. 975-976)

SBI Agent Larry Ford, the State's expert in forensic chemistry, testified that he examined samples of debris collected by Agent Shaw. (Tp. 1080)  He found accelerant consistent with kerosene in the two debris samples that Agent Shaw collected in front of the den couch. (Tpp. 1082; 1084)  However, he did not find the presence of an accelerant in the debris sample taken from the living room. (Tp. 1085)

At the MAR evidentiary hearing, post-conviction counsel called Gracie Blakeney who testified that Huntley filled the home's kerosene heater in the den and in the process frequently spilled kerosene on the floor and on himself.[29] (MAR Tpp. 234-35)  Post-conviction counsel also called William Pearce, Blakeney's arson investigator who had not testified at trial.  Pearce testified that the presence of kerosene on the floor in the den could not be relied upon as an indicator of arson because there was no way to determine whether the kerosene patterns were the result of someone pouring the kerosene as opposed to someone spilling it while using the

---

[29]Petitioner also asserts that Defense MAR Exhibits 1-3 corroborate Gracie's MAR testimony that Huntley poured and spilled kerosene on himself and on the floor.  Petitioner has mischaracterized these Exhibits.  Exhibits 1-3 are statements Gracie Blakeney and her daughter, Claree, gave to police.  None of these exhibits contain *any* information regarding Huntley's habit of filling the heater in the house and in the process spilling kerosene on himself and on the floor.

portable heater. (MAR Tpp. 368-69; 378-81; 388)  He also testified that the trace amounts of kerosene found on the victim's clothes could be consistent with a person spilling kerosene on his own clothing. (MAR Tp. 377)  Finally, he testified that based upon different burn patterns in the den and living room, he concluded that there was only one point of origin of the fire – in the living room. (MAR Tp. 387)  Pearce was unwilling to offer an opinion as to the cause of the fire in either the den or the living room. (MAR Tp. 390)  However, his ultimate conclusion was that the cause of the fire – whether accidental or intentional – could not be determined to a reasonable degree of scientific certainty in the field of arson investigation. (MAR Tpp. 388-89)

The MAR court denied Petitioner's IAC claim on the merits.  The court held that because Petitioner told counsel that he had lit the carpet on fire, counsel were not ineffective for failing to present evidence that the fire could have been an accident.  Because the MAR court correctly identified the governing legal standard as that set forth in *Strickland v. Washington*, *supra*, this Court's review is limited to the question of whether that court's application of the *Strickland* standard was "objectively unreasonable." *See Williams*, *supra*, 529 U.S. at 409.

At the MAR evidentiary hearing, the State introduced notes taken by attorney Crow during an interview with Blakeney.  In the notes is the following:

> . . . RB [Roger Blakeney] got cord and tied hands; RB stradling [sic] and tied legs RB sat there thinking what now.  RB went out to car and got lighter and lit carpet. Just trying to scare.  Did not know kerosene on floor.  Lit and left.  Hoped would go out.

(State's MAR Exh. 1)  Crow also testified that Blakeney had told him that he had lit the carpet on fire. (MAR Tpp. 41; 125; 131-32)  The MAR court found that Crow's testimony regarding the notes and the substance of the admission was credible.

In the instant Petition, Blakeney challenges the legitimacy of the notes containing the admission. However, the MAR court's finding that Crow's testimony was credible is a finding of fact. A finding of fact by a State court is presumed to be correct, and Blakeney bears the burden of rebutting that presumption "by clear and convincing evidence." § 2254(e)(1).

In challenging the notes, Blakeney makes a number of arguments. First, he asserts that the notes were not in the original trial file turned over by trial counsel to post-conviction counsel, and that Crow produced the notes and his recollection, for the first time just prior to a motions hearing in the state post-conviction proceeding. These are unsubstantiated allegations, raised for the first time on habeas review. Blakeney offered no testimony from any witness at the MAR evidentiary hearing regarding whether post-conviction counsel had received these notes during post-conviction discovery. Nor did he present any evidence regarding statements Crow might have made that conflicted with his MAR testimony. Post-conviction counsel did not pose any questions to Crow regarding the legitimacy of these notes other than to ask him to explain a supposed discrepancy between the notes at issue and notes from another Crow/Blakeney interview in which Blakeney stated that there was no fire in the room when he left. (Def. MAR Exh. 20) Blakeney had a full hearing in state court on his IAC claim, and as such, an opportunity to present evidence to support these allegations. He did not do so.

Blakeney also asserts that the admission's legitimacy is questionable because it is on "a single, undated sheet of legal pad paper." (PWHC p. 46 n. 32) Furthermore, Blakeney asserts that the note is contradicted by a dated interview in which he maintained to Crow that he did not know how the fire started. There is nothing in the record before this Court that matches Petitioner's description of either set of interview notes. For instance, State MAR Exhibit 1 is not

48

a "single . . . sheet of legal pad paper"; it is nine (9) pages of notes of an interview with Blakeney. The notes begin with some biographical information about Blakeney. At the bottom of page three (3), the notes turn to a description of the events surrounding the murder. In the middle of page seven (7) is Blakeney's admission that he lit the carpet with a lighter. The notes continue with a description of Blakeney's activities after he left the victim's house and include some details about his interview with police. The notes end with what appears to be more biographical information. This brings the Court to Blakeney's assertion that his admission to Crow is contradicted by a dated interview in which he denied knowing how the fire started. Blakeney cites Defense MAR Exhibit 20. Contrary to Blakeney's assertion, Defense MAR Exhibit 20, like State MAR Exhibit 1, is *not* dated. It is two (2) pages of undated notes from an interview that Crow apparently conducted with Blakeney. Therefore, the fact that the notes containing the admission are undated is meaningless.

Furthermore, Defense MAR Exhibit 20 does not state that Blakeney denied knowing how the fire started. Instead, the notes contain the following: "Fought & knocked him out. Tied up. Says was hot. Can by heater. Roger says no fire in room when left." (Def. MAR Exh. 20) The statement that there was "no fire in room" could mean a number of things, none of which conflict with his admission to Crow that he lit the carpet.[30] For example, it could mean that Blakeney left before the flames had a chance to take hold. Even if the two statements are contradictory, that does not cast doubt on the authenticity of State MAR Exhibit 1. After all, Blakeney told different stories about what happened at Huntley's house to everyone with whom he spoke. The differences involve not just minor details but some significant facts, as well. For example, he

_____

[30]Crow testified that he did not view the two statements as inconsistent. (MAR Tp. 196)

told Detective Honeycutt and Agent Underwood that he was hiding in the house when Huntley got home and that during the struggle in the den, the kerosene can was knocked over. This conflicts with his stories to Crow that the kerosene can was beside the heater (Def. MAR Exh. 20) and that he did not know that kerosene was on the floor when he lit the carpet (State MAR Exh. 1). He also told Crow that he had left the house after robbing it and only returned when Huntley passed him on the road and asked him to follow him home. He told Dr. Worthen a similar story but left out all of the details of his hitting Huntley with the hand gun, the fire poker and his fist. (State MAR Exh. 8) On the other hand, he told Dr. Bellard a story similar to the one he had told police. (MAR Tpp. 548-49) He also told Detective Honeycutt and Agent Underwood that while he was tying Huntley up, Huntley kept threatening "to get him." He told Crow that he knocked Huntley out and then tied him up. As such, the fact that there may be a contradiction in the two statements that he gave Crow does not cast doubt on the authenticity of the notes containing the admission.

Blakeney also argues that the notes cannot be legitimate because Crow did not share Blakeney's admission with anyone else.[31] This argument overlooks the confidentiality requirement of the attorney-client privilege. Under North Carolina law, "when the relationship of attorney and client exists, all confidential communications made by the client to his attorney on the faith of such relationship are privileged and may not be disclosed." *In re Investigation of Death of Eric Miller*, 584 S.E.2d 772, 782 (N.C. 2003) (citations omitted). Blakeney and Crow

---

[31]In his argument in his PWHC, Blakeney argues that the note cannot be legitimate because Crow did not share the alleged admission with Dr. Worthen, among others. It appears that Blakeney has come around 180 degrees from post-conviction counsel's assurances to the MAR court, that Blakeney was not going to argue that Crow should have disclosed the admission to Dr. Worthen. (MAR Tp. 449)

were involved in an attorney-client relationship.  Additionally, there is no evidence that Blakeney intended his conversations with Crow to be anything but confidential or that Blakeney waived the attorney-client privilege until he filed the instant IAC claim.[32]  As such, the fact that Crow did not share Blakeney's admission with anyone else is not probative of its legitimacy.

Finally, Blakeney argues that the notes containing the admission cannot be legitimate because Crow hired an arson expert, William Pearce, and contested the arson issue as if Blakeney were innocent of arson.  Petitioner overstates both Pearce's role and defense counsel's actions at trial.  Crow did not hire Pearce to investigate the cause of the fire or to investigate whether accident was a valid defense.[33]  In his pre-trial letter to Pearce, Crow asked him to determine two things: 1) how "the state can say that the fire was started in two places," and 2) how "[the state can] say that the accelerant, apparently kerosene, was poured." (State MAR Exh. 4)  As his MAR testimony confirms, Crow's primary purpose in hiring Pearce was to determine whether the State's conclusion that kerosene was poured in the den was accurate and to analyze the data that the defense had received from the State. (MAR Tpp. 46; 63; 128)  Because of Blakeney's admission, trial counsel did not attempt to affirmatively raise either self-defense or accident as a defense.  As Crow explained in his MAR testimony, the defense strategy was to raise a reasonable doubt as to whether Blakeney intentionally set the fire that killed Huntley, *"within the bounds of what the law [allowed]."* (MAR Tp. 197) (emphasis added).

---

[32]The attorney-client privilege is waived, to an extent, when a defendant files an IAC claim as grounds for the illegality of his conviction or sentence.  *See* N.C. Gen. Stat. §15A-1415(e).

[33]Only the thought processes of attorney Crow are relevant to this claim.  At the MAR hearing, attorney Huffman testified that he had no recollection of any of the discussions he and Crow had regarding the arson investigator and whether to call him as a witness. (MAR Tp. 214)

For the foregoing reasons, Petitioner has failed to provide clear and convincing evidence that the MAR court's credibility determination was erroneous. *See* § 2254(e)(1). Therefore, when considering whether counsel were ineffective for failing to investigate and present evidence that accident could not be ruled out as a cause of the fire, the Court must accept as correct Crow's testimony that Blakeney told him that he had set the carpet on fire.

The standard for assessing counsel's competence under *Strickland* is whether his "assistance was reasonable considering all the circumstances." 466 U.S. at 686. When the thoroughness of counsel's investigation is challenged, a reviewing court must assess whether counsel's decision not to investigate or to abandon further investigation was itself reasonable. *See Wiggins v. Smith*, *supra*, 539 US at 523. A determination of reasonableness requires a "context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." *Strickland*, 466 U.S. at 688.

Furthermore, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. . . . [W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Id*. at 690-91. In this case, Blakeney admitted to Crow that the fire was not an accident, establishing that investigating whether the fire was an accident would not be fruitful. However, Petitioner argues that despite Blakeney's admission that the fire was not an accident, counsel had an obligation to investigate whether there was evidence that the fire could have been an accident and to present evidence that accident could not be ruled out as a source of the fire, if there was evidence to support that theory. (PWHC, p. 47; 48) Blakeney has cited no "clearly

established law" holding that an attorney has an obligation to investigate a defense that the attorney knows has no merit. Furthermore, Blakeney has cited no "clearly established law" holding that an attorney has an obligation to present evidence that the attorney knows to be untrue.[34]

The Supreme Court has not addressed the specific question of whether the Sixth Amendment's guarantee of assistance of counsel requires an attorney to present a defense that he knows to be false or to be based upon a false premise. However, in *Nix v. Whiteside*, the Court held that the right to effective assistance of counsel does not require an attorney to cooperate with the defendant in presenting perjured testimony. 475 U.S. 157, 164-71, 106 S.Ct. 988, 993-96 (1986); *see also*, *United States v. Cronic*, 466 U.S. 648, 656 n. 19, 104 S.Ct. 2039, 2045 n. 19 (1984) ("Of course, the Sixth Amendment does not require that counsel do what is impossible or unethical. If there is no bona fide defense to the charge, counsel cannot create one . . . ."). A number of appellate courts have held that an attorney's duty to effectively represent a client does not include violating rules of professional conduct. *See Putman v. Head*, 268 F.3d 1223, 1246 (11th Cir.2001) ("Although an attorney has an ethical duty to advance the interest of her client, that duty is limited by an equally solemn duty to comply with the law and standards of professional conduct.") (internal quotation marks, alteration, and citation omitted); *Anderson v. Calderon* 232 F.3d 1053, 1095 (9th Cir. 2000), *overruled on other grounds*, *Osband v. Woodford,* 290 F.3d 1036, 1043 (9th Cir. 2002) ("[Anderson's attorney] believed that Anderson did kill Blundell, and to attempt to manufacture evidence to the contrary would be a 'fraud on the

---

[34]At the time of the trial, Pearce did not know that Blakeney had admitted starting the fire. As such, any testimony that he could have given at trial that accident could not be ruled out as a source of the fire would have been based upon a premise that Crow knew to be false.

court.'"); *Davis v. Singletary*, 119 F.3d 1471, 1475 (11th Cir.1997) ("Because of his ethical duty not to present a defense based upon what he personally knew to be a lie, [the defense attorney] could not have used at trial [the defense expert's opinion], founded as it is on a falsehood."); *U.S. v. Evans*, 92 F.3d 540, 544 (7th Cir. 1996) ("Criminal defense lawyers, like other lawyers, do not have an ethical duty to make groundless arguments; indeed, they have an ethical duty not to make such arguments. . . . The refusal to act unethically by making a groundless argument can never be a ground for arguing ineffective assistance of counsel.") (citations omitted); *Scott v. Dugger*, 891 F.2d 800, 803 (11th Cir.1989) ("[A]ppellant's lawyer could not have rendered ineffective assistance by failing or refusing to present a false defense."); *Williams v. Kemp*, 846 F.2d 1276, 1281 (11th Cir. 1988) ("In light of the admission by Williams, [his attorney's] decision not to produce contrary testimony merely fulfilled his ethical obligation to refrain from producing false or misleading evidence" and did not constitute ineffective assistance.").

North Carolina's rules of professional conduct prohibit an attorney from knowingly advancing a defense that is unwarranted under existing law or from participating in the creation of evidence when the lawyer knows that the evidence is false. *See* Rules of Professional Conduct of the North Carolina State Bar Rule 7.2 (1996) (amended 2003). In this case, Crow knew that the fire was not an accident. He also understood that to put forth evidence that the fire was or could have been an accident would have violated the rules of professional conduct. (MAR Tp. 125) As such, the defense strategy was to raise a reasonable doubt as to whether Blakeney intentionally set the fire that killed Huntley (MAR Tpp. 48-50), *"*within the bounds of what the law [allowed]" (MAR Tp. 197). Based upon the foregoing legal citations, the MAR court's conclusion that counsel were not deficient for failing to investigate or present evidence that

accident could not be ruled out was not an unreasonable application of *Strickland*. *See* §
2254(d)(1).

As Crow also recognized, Blakeney's admission that he lit the carpet on fire did not
absolve counsel of their duty under the Sixth Amendment to review and investigate possible
weaknesses in the State's arson case (i.e. places where the defense could raise a reasonable
doubt) (MAR Tpp. 48-50). The Sixth Amendment requires that "the prosecution's case [ ]
survive the crucible of meaningful adversarial testing." *Cronic*, 466 U.S. at 656. To that end,
Crow hired Pearce primarily to determine whether the State's conclusion that kerosene was
poured in the den was accurate because to Crow, "that seemed to be a bit of a stretch." (MAR
Tpp. 46; 63; 128) This was a reasonable step to take in light of Blakeney's statement to Crow
that he did not know that there was kerosene on the floor (State MAR Exh. 1) and his conflicting
statement to police that the kerosene can had been knocked over during his fight with Huntley.
Counsel provided Pearce with copies of the SBI reports and diagrams of the house, as well as the
crime scene video tape. (State MAR Exh. 4)

Blakeney accuses Crow of misunderstanding Pearce's opinion and report about the "pour
patterns" in the den. Crow testified at the MAR evidentiary hearing that Pearce reported to him
prior to trial that he would not be able to contradict Shaw's conclusion that the spots in the den
were pour patterns because they looked like pour patterns to him. (MAR Tpp. 65; 68; 69;
163;189) As a result, he made a strategic decision not to call Pearce to testify about some of the
helpful information that he had provided and run the risk of having the prosecutor ask his opinion
about the kerosene patterns in the den. (MAR Tpp. 67-68; 189-90)

Pearce, on the other hand, testified that his pre-trial opinion was that because a portable

55

kerosene heater was used in the house, he was unable to determine whether the kerosene patterns in the den were "pour patterns" or "spill patterns" caused by use of the heater.[35]  He testified that he communicated this opinion to Crow in his August 1997 letter. (MAR Tp. 417)  The letter states the following:

> If there are pour patterns present in the den, it seems to me that it would be hard to determine if they had been from previous spills when the portable heater might have been in that area.  I think Mr. Ford will tell you that the kerosene in the heater is consistent with that found on the floor.

(Def. MAR Exh. 7)

It is not surprising that Crow's recollection was that Pearce's opinion was consistent with Agent Shaw's.  The letter refers to the kerosene patterns as "pour patterns."  Furthermore, it implies that Pearce would not be able to contradict Shaw's conclusion because it would be difficult for him to determine if the patterns had been caused by spills.  Based upon his understanding of Pearce's opinion, Crow made a tactical decision not to call Pearce as a witness because he believed that his testimony potentially could cause more harm than good.

Assuming without deciding that Crow did misunderstand Pearce's report, Blakeney cannot show prejudice. *See Strickland*, 466 U.S. at 687.  The State's case for arson was built on strong circumstantial evidence and the absence of any other logical explanation for the fire.

---

[35]It is clear from Pearce's testimony that the information that Huntley filled the heater in the house and spilled it on himself and on the floor was not a critical component of Pearce's analysis.  As his letter to Crow indicates, Pearce already knew that kerosene was a "natural occurrence" in the house because he knew that a portable heater was used in the home.  Furthermore, he testified that his opinion was based primarily upon his knowledge of the common practices of people who use portable kerosene heaters.  He testified that in his experience, people do not follow the instructions for proper use of the heaters and frequently over-fill them such that some kerosene spills out. (MAR Tpp. 391-92)  Therefore, the information that Huntley filled the heater in the house and spilled it merely corroborated his opinion.

Prosecutors presented evidence of an incapacitated victim, whose hands, knees and feet were tied with cord, locked or blocked exits, kerosene on the floor and on the victim's clothes, Blakeney's admission that he was in the house and that he was the one who tied the victim, and witness testimony of smoke pouring from the house within minutes of Blakeney's departure. Pearce's testimony regarding the kerosene patterns did not contradict Shaw's conclusion that they were pour patterns; it merely offered an alternative, albeit non-incriminating, explanation for the kerosene patterns on the floor in the den. However, in his cross-examination of Agent Shaw at trial, Crow was able to elicit non-incriminating explanations for the kerosene patterns on the floor. Agent Shaw acknowledged that there was no scientific way to tell how long the kerosene patterns had been on the floor. (Tp. 980) He also acknowledged that the kerosene heater was portable and could be moved from place to place. (Tp. 980) While he testified that the patterns were not consistent with a spill, he acknowledged that the fire could have consumed part of a kerosene spill and still left spots resembling the pour patterns. (Tp. 982) Finally, he testified that it was possible that water from the fire hoses could have dispersed kerosene that was on the floor leaving spots that resembled the pour patterns. (Tp. 982) Furthermore, the jury knew that there were only trace amounts of kerosene on the victim's clothes, because Crow elicited testimony on cross-examination that the State's expert was only able to detect the presence of kerosene on the clothes through use of a second more sensitive test conducted after the first test failed to reveal the presence of any accelerant. In fact, the jury specifically asked to see this portion of the trial transcript during deliberations.

Even if Pearce's testimony could have explained away the presence of kerosene on the floor in the den and on Huntley's clothes, it would not have overcome the two blocked exits, the

second point of origin in the living room, where Huntley was not in the habit of filling the kerosene heater, and the absence at the scene of an open-flame device that could have caused the fire. Although not present in the one debris sample taken from the living room, Agent Shaw testified that he smelled kerosene when he was shifting debris in that area, and Pearce testified that the absence of kerosene in the one debris sample did not mean that no accelerant was present at that point of origin because kerosene can burn off in a fire. Agent Shaw testified that he had eliminated all accidental sources of the fire (e.g. Act of God, electrical short), and that neither the wood stove nor the portable kerosene heater caused the fire because neither was in operation when the fire started. Pearce agreed that neither the wood stove or kerosene heater was the cause of the fire.

Finally, Pearce was unable to refute Agent Shaw's testimony that the cigarette Blakeney supposedly was smoking while hiding from Huntley could not have caused the fire. (MAR Tp. 419) As an initial matter, there were two points of origin for the fire, and the cigarette could not have been in two places at the same time. Alternatively, if Pearce's testimony is to be believed and the only source of origin was the living room, it is not likely that Blakeney's lit cigarette would have wound up in the far corner of the living room when his own statement to police indicates that the struggle during which he supposedly lost it occurred in the kitchen and den. Agent Shaw testified that the fire was started with an open flame device, a fact that Pearce did not dispute. As such, the jury could only have conclude that Blakeney either took the device with him or that it was destroyed in the fire. Either way, even if Pearce had testified that the kerosene on the floor in the den and on Huntley's clothes could have been from prior spillage, it is not reasonably probable that the jury would have concluded that Blakeney did not deliberately set the

fires (or fire) that killed Huntley. *See Strickland*, 466 U.S. at 687.

Blakeney's argument that evidence that the kerosene on the floor in the den and on Huntley's clothes could have been from prior spillage would have undermined the aggravating factor that the crime was "especially heinous, atrocious, and cruel" is equally without merit. Support for that factor came from evidence other than the State's argument that Blakeney "put kerosene on [Huntley]." (Tp. 1357)  On the contrary, evidence for this factor is found in the presence of blocked exits and the fact that Huntley was conscious but immobile during the fire.

In order to determine whether there was sufficient evidence to prove the existence of an aggravating factor, a court must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements ... beyond a reasonable doubt.' " *Roach v. Angelone*, 176 F.3d 210, 218 (4th Cir. 1999) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).  At sentencing, the trial court gave the following North Carolina pattern jury instruction for statutory aggravating factor § 15A-2000(e)(9):

> Was this murder especially, heinous, atrocious or cruel?
> In this context, heinous means extremely wicked or shockingly evil. Atrocious means outrageously wicked and violent.  And cruel means designed to inflict a high degree of pain with utter indifference to or even enjoyment of the suffering of others.  However, it is not enough that this murder be heinous, atrocious or cruel as those terms have just been defined.  This murder must have been especially heinous, atrocious or cruel; and not every murder is especially so. For this murder to have been especially heinous, atrocious or cruel, any brutality which was involved in it must have excluded that which is normally present in any killing; or this murder must have been a conscienceless or pitiless crime which was unnecessarily tortuous to the victim.

(Tpp. 1412-13)

William Williams, the first fire fighter to enter the house, testified at trial that he

59

attempted to enter the living room through the front door in order to fight the fire in the front part of the house.  He testified that the door was blocked from the inside, and that in order to enter, he broke through a panel on the upper part of the door.  As he crawled through the panel, he realized that there was a chair blocking the door.  He had to crawl over the top of the chair to gain entrance into the house. (Tp. 732)  Gracie Blakeney testified at trial that Huntley always kept a chair in the corner between the front door and the wall separating the living room and den. (Tpp. 1044-45) The jury, of course, determined whether her testimony about the chair was consistent with Williams's testimony.

Williams also testified that once inside he moved from the living room into the den. When he attempted to move from the den into the kitchen, he discovered that the door separating the two rooms was latched on the kitchen side so that in order to enter the kitchen he had to go back outside and enter the kitchen through the side door, the only other entrance to the house. (Tpp. 733; 740; 742)  If Blakeney's statement to police is to be believed, his fight with Huntley began in the kitchen and then continued into the den, where he tied Huntley to a chair.  As such, only he could have latched the door from the kitchen side, thereby eliminating a potential exit for Huntley had he been able to untie himself.  This left as Huntley's only exit the doorway between the living room and the hallway, which was near the point of origin of the living room fire [36]

In addition to evidence that Blakeney attempted to prevent Huntley from escaping the burning house, there was evidence that Huntley was conscious prior to his death.  The jury knew

_____

[36]The hallway led into the storage room, which led into the kitchen.  There was some testimony that the refrigerator had been pulled away from the kitchen wall and was partially blocking the entrance between the storage room and kitchen.  (Tpp. 768; 814)  The position of the refrigerator is represented in SBI Agent Bobby Bonds' drawing of the crime scene. (State's MAR Exh. 5 – SBI Drawings of Crime Scene, p. 6)

that Huntley did not burn to death but died of asphyxiation due to inhaling the smoke and chemicals from the fire. Therefore, he was dead before the first flames touched him. However, the jury also knew that for three to five minutes before succumbing to the smoke and fumes, Huntley was conscious and unable to move because of the bindings around his hands, feet and knees. He therefore would have been acutely aware of the heat and fire around him and the fact that he was going to die in that fire. And, he would have been terrified.

Even taking into account Pearce's MAR testimony that the kerosene in the den and on Huntley's clothes could have been caused by Huntley himself, a rational trier of fact could have found the essential elements of the "especially heinous, atrocious, or cruel" aggravating factor beyond a reasonable doubt. Not only did the State present evidence that Blakeney beat and tied up an elderly man and then lit the house on fire, it also presented evidence that he attempted to trap Huntley in the house so that he could not escape even if he managed to untie himself. Finally, the State presented evidence that Huntley was conscious for some period of time before he died. As such, in the last moments before his death, he would have been aware that he was going to die, perhaps by burning to death, but unable to prevent it. Therefore, a rational trier of fact could have found that Huntley's murder was a "conscienceless or pitiless crime which was unnecessarily tortuous to the victim." *See e.g.*, *State v. Gibbs*, 436 S.E.2d 321, 357 (NC 1993) (Finding sufficient evidence for submission of "especially heinous, atrocious or cruel" aggravating circumstance where bound and gagged victim was conscious and "suffering under the knowledge that her death was imminent."). For the foregoing reasons, the MAR court's conclusion that counsel were not ineffective for failing to offer evidence that the kerosene on the floor and on Huntley's clothes could have been spillage was not an unreasonable application of

*Strickland. See Williams*, 529 U.S. at 409.

CLAIM V: *MAR Court's Refusal to Accept Expert as a Mitigation Specialist*

During the MAR evidentiary hearing, the court refused to accept Petitioner's Mitigation

Specialist, Dr. Pamela Laughon, as an expert in the field of "mitigation specialist." The court did

accept Dr. Laughon as an expert in psychology and allowed her to testify as such. Petitioner

claims that the MAR court's refusal to accept Dr. Laughon as an expert Mitigation Specialist and

to allow her to testify as such violated his Eighth and Fourteenth Amendment rights under the

United States Constitution.

Under 28 U.S.C. § 2254, a federal court "shall entertain an application for a writ of habeas

corpus in behalf of a person in custody pursuant to the judgment of a State court only on the

ground that he is in custody in violation of the Constitution or laws or treaties of the United

States." Blakeney is not in custody because of an evidentiary ruling by the MAR court; he is in

custody because he was tried, convicted and sentenced to death at a criminal trial. Therefore, to

the extent that this claim challenges only the constitutionality of the procedures employed in the

state post-conviction proceedings and not the constitutionality of his conviction and sentence, it

cannot provide a basis for federal habeas relief. *See Wright v. Angelone*, 151 F.3d 151, 159 (4th

Cir. 1998) (citing *Bryant v. Maryland*, 848 F.2d 492, 493 (4th Cir. 1988) ("[C]laims of error

occurring in a state post-conviction proceeding cannot serve as a basis for federal habeas corpus

relief")); *see also Steele v. Young*, 11 F.3d 1518, 1524 (10th Cir.1993) (holding that petitioner's

challenge to state "post-conviction procedures on their face and as applied to him would fail to

state a federal constitutional claim cognizable in a federal habeas proceeding"); *Kirby v. Dutton*,

794 F.2d 245, 247 (6th Cir.1986) (holding that § 2254 was not available to challenge "a denial of

the sixth amendment right to effective assistance of counsel, a denial of due process, and a denial of equal protection in the State post-conviction proceedings--claims unrelated to his detention").

In this claim, Blakeney is challenging the MAR court's ruling during a state post-conviction evidentiary hearing on a matter that was within the discretion of the court. This claim in no way challenges the constitutionality of his conviction or sentence. It is merely a complaint about an evidentiary ruling by a post-conviction court. Therefore, this claim is not cognizable on federal habeas review because it raises no constitutional issues. *See Wright*, 151 F.3d at 159

Nor is Petitioner entitled to an evidentiary hearing in this Court. *See Robinson v. Polk*, *supra*, 438 F.3d at 368. Although Petitioner asserts that the MAR court's refusal to allow Dr. Laughon to testify as an expert mitigation specialist deprived him of a full and fair hearing on post-conviction review, such an argument is meritless. Dr. Laughon was accepted as an expert in psychology and testified extensively regarding the nature and importance of evidence she had discovered regarding Blakeney's family and social background, his education prior to and during incarceration, his work history, and his history of drug and alcohol abuse, among other things. She was allowed to testify, despite the court's refusal to accept her as an expert Mitigation Specialist, that in her opinion as a mitigation specialist it is the job of the trial attorneys to seek the records they think will be most helpful, not the job of a mental health expert or even a mitigation specialist. (MAR Tp. 800) She also was allowed to testify that Petitioner's complete DART records and employment records were available to trial counsel. (MAR Tpp. 784; 790) Additionally, she was allowed to testify about why she thought a jury should hear certain evidence (i.e. why she thought certain evidence was mitigating). (MAR Tpp. 786-87; 789-90;792) Finally, she was allowed to give her opinion that, "in the preparation for any kind of penalty phase, . . .

63

one would need to make a reasonable effort to locate the most basic of records." (MAR Tp. 799) In short, although Dr. Laughon ostensibly testified as an expert psychologist, she was able to get into evidence the type of evidence and opinion testimony one would expect from a mitigation specialist. The Court notes that some of the above-mentioned testimony strayed over the line and into the purview of the trier of fact. Nevertheless, Petitioner was able to get it into evidence largely without objection.

What Dr. Laughon was not allowed to do was give her opinions regarding whether counsel's performance in preparing and presenting a mitigation defense was deficient. As the MAR court noted, it is for the trier of fact to determine whether counsel's performance was deficient. *See* N.C. Gen. Stat. § 15A-1413 (1977). When an expert witness is in no better position than the trier of fact to render an opinion on a matter, then there is no error in excluding the witness's testimony. *See Noland v. French*, 134 F.3d 208, 217 (4th Cir. 1998), *cert. denied*, 525 U.S. 851, 119 S.Ct. 125, 142 L.Ed.2d 101 (1998). In this case, Dr. Laughon was in no better position that the MAR judge to assess the adequacy of trial counsel's performance in preparing for sentencing.

For the foregoing reasons, Petitioner has failed to put forth a cognizable claim for federal habeas review. He also has failed to show that he was deprived of a full and fair hearing in post-conviction or that he is entitled to an evidentiary hearing in this Court.

CLAIM VI: *Brady Claim Regarding Witness Statements*

Petitioner alleges that the prosecution suppressed statements by witnesses that would have corroborated portions of his statement to police and that would have provided a benign explanation for certain evidence that the prosecution used against him. Petitioner also alleges that

the prosecutor's failure to disclose these statements is evidence of a pattern of conduct of suppressing material evidence in capital cases. The State raises procedural default as a defense to the latter portion of this claim.

Petitioner raised this claim as Claim I in his MAR. The MAR court denied the claim on the merits. (May 21, 2004 Order, pp. 15-27) The court struck the two exhibits upon which Petitioner relied to support his allegation that the prosecutor had suppressed material evidence in other capital cases. (June 5, 2003 Order, pp. 6-10)

Petitioner's claim that the prosecutor has engaged in a pattern of conduct of suppressing material evidence in capital cases is not exhausted in the state courts. Absent a valid excuse, a state petitioner must exhaust his remedies in state court before seeking federal habeas corpus relief. *See* § 2254(b)(1)(A). Generally, a claim will be defaulted on federal habeas review if the claim was not fairly presented to all appropriate state courts and an adequate and independent state procedural rule would now bar review. *See Clagett v. Angelone*, *supra*, 209 F.3d at 378. As noted by Respondent, Blakeney failed to present this claim in his Petition for Writ of Certiorari to the North Carolina Supreme Court following the denial of his MAR. The rule of exhaustion requires that the substance of the claim be fairly presented to *all* appropriate courts, including the state's highest court with jurisdiction to review the claim. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Because he did not present this claim to the State's highest court, it is unexhausted. Furthermore, it would be procedurally defaulted if he attempted to raise it now in state court. *See* N.C. Gen. Stat. § 15A-1419(a); N.C. R. App. P. 21.

Petitioner has failed to demonstrate cause and prejudice to excuse his failure to fairly present this portion of his claim to the North Carolina Supreme Court. Furthermore, he has failed

to show that a fundamental miscarriage of justice would occur if the Court refused to address the claim on the merits. Therefore, this portion of Petitioner's claim is procedurally defaulted. *See Fisher v. Angelone*, 163 F.3d at 844.

Petitioner asserts that the prosecution failed to disclose the following evidence that Petitioner argues either corroborated his story to police or cast doubt on the prosecution's evidence:

> Handwritten notes of an interview conducted at 1510 on April 15, 1996, with Gracie Blakeney (MAR Def. Exh. 1) (hereinafter "Exhibit 1"). These notes state that the victim lit the kerosene heater on the morning that he died.[37]
> Handwritten statement of Claree Blakeney Griffin, Petitioner's sister, dated April 15, 1996 (MAR Def. Exh. 2) (hereinafter "Exhibit 2"). Griffin states that Huntley always kept the kerosene heater running high because he was always cold, even when others were hot.
> Handwritten statement of Gracie Blakeney, dated April 15, 1996 (MAR Def. Exh. 3) (hereinafter "Exhibit 3"). This statement contains information regarding firearms in the house. According to Gracie, Huntley kept a rifle behind a chair in the front room and a shotgun in the bedroom.
> Handwritten notes of an interview conducted on April 15, 1996, with Ken Baucom, one of the first firefighters to enter the house (MAR Def. Exh. 4) (hereinafter "Exhibit 4). According to Baucom, there appeared to be a rifle or shotgun lying on the floor towards the right side of the front room.
> Handwritten notes of an interview conducted on April 15, 1996 with Shirley Roland, the victim's daughter (MAR Def. Exh. 5) (hereinafter "Exhibit 5"). In the interview, Shirley stated that Huntley had called her house at 12:15 to ask if she had just called. He told her that when he came in the house, the phone was ringing, and he was unable to get to it in time.
> Copy of a computer print-out showing that Huntley had received a citation on April 13, 1996 for failing to have a child passenger in the rear seat (MAR Def. Exh. 6) (hereinafter "Exhibit 6").

---

[37]In the instant Petition, Petitioner asserts that this exhibit also contains information that Huntley was in the habit of "always lighting the heater, pouring kerosene in the living room and frequently spilling kerosene on his clothing and on the floor." (PWHC p. 54) This is false. Exhibit 1 contains a brief note that "Callie lit the Kero-Sun heater this morning" There is no reference in Exhibit 1, or any of the other exhibits at issue in this claim, to Huntley pouring kerosene or spilling kerosene.

As noted previously, *Brady* does not apply " 'if the evidence in question is available to the defendant from other sources,' " *United States v. Wilson*, 901 F.2d at 380 (citations omitted), either directly or via investigation by a reasonable defendant, *see Barnes v. Thompson*, 58 F.3d at 975 n. 4. The MAR court found that trial counsel either was aware of the information in Exhibits 1-6 or could have discovered the information through reasonable investigation. As such, the court concluded that the prosecution did not suppress the allegedly exculpatory evidence contained in those exhibits.

A finding of fact by a State court is presumed to be correct, and Petitioner bears the burden of rebutting that presumption "by clear and convincing evidence." 2254(e)(1). Petitioner has failed to show that the State court's findings of fact were erroneous. For example, defense counsel knew that Huntley had lit the kerosene heater on the morning of the fire. In an April 8, 1997 interview, Gracie Blakeney told attorney Crow that there was a fire in the kerosene heater when she left for work on the morning of the fire. (MAR State Exh. 6) With regard to Exhibit 2, although Claree Blakeney Griffin's April 15, 1996 handwritten statement (Exhibit 2) was not disclosed to defense counsel, a copy of the type-written version of her April 15, 1996 statement (MAR State Exh. 24) was delivered to the defense as part of a supplemental discovery package. (MAR State Exhs. 29 & 30) As such, trial counsel were in possession of the entire contents of Exhibit 2.

With regard to Exhibits 3 and 4, trial counsel knew that Huntley kept guns in the house. The SBI crime scene videotape that was given to defense counsel during discovery shows a shotgun in a gun rack in Huntley's bedroom. (State MAR Exhibit 4; Tp. 819; MAR Tp. 596) This portion of the tape was shown to the jury, so it too was aware that there was at least one gun in the

house at the time of the murder. (Tp. 819)  As for Exhibit 5, attorney Crow testified at the MAR

hearing that Blakeney knew who Huntley had called before their confrontation began. (MAR Tp.

178)  As such, this information was easily discoverable by counsel had they thought it relevant.

Finally, with regard to Exhibit 6, Huntley's traffic citation, defense counsel were shown the

citation during a discovery conference. (State MAR Exhibit 25; MAR Tp. 599).  Furthermore,

attorney Crow looked up Huntley's driving record at the Union County Clerk of Court's Office

and discovered the citation at that point.  (MAR Tp. 89-90)

Based upon the foregoing, the MAR court's finding that the prosecution did not suppress

the evidence in these exhibits was not erroneous.  As such, the MAR court's conclusion that there

was no *Brady* violation with regards to these exhibits was not an unreasonable application of

clearly established Federal law.

Petitioner claims in the alternative that counsel were ineffective for failing to use the

information in Exhibits 1-6.  Citing *Strickland v.Washington*, the MAR court concluded that

counsels' pre-trial investigative efforts and related actions at trial were objectively reasonable and

not a source of prejudice to Petitioner. 466 U.S. at 687-88.  Because the MAR court correctly

identified the governing legal standard as that set forth in *Strickland v. Washington*, this Court's

review is limited to the question of whether that court's application of the *Strickland* standard was

"objectively unreasonable." *See Williams*, 529 U.S. at 409.

In the instant Petition, Blakeney argues that had counsel used the information in Exhibits 1

and 2, Gracie Blakeney and Claree Blakeney Griffin's April 15, 1996 statements respectively,

these witnesses could have corroborated his story to police that the heater was on when he got to

the house.  Furthermore, Petitioner argues that evidence contained in Exhibit 1 of Huntley's

careless use and filling of the kerosene heater in the house would have provided an explanation for the presence of kerosene on his clothing. As to Petitioner's first argument, trial counsel elicited testimony from Gracie Blakeney on cross-examination that the kerosene heater was on when she left for work on the day of the murder. (Tp. 1047) Petitioner's second argument has no factual basis. As indicated in a previous footnote, neither Exhibit 1 nor Exhibit 2 contain any information regarding Huntley's alleged habit of filling the heater in the house and in the process spilling kerosene on himself and on the floor. Therefore, there is no factual basis for Petitioner's argument that had counsel discovered and used these exhibits, they would have been able to provide an explanation for the presence of kerosene on Huntley's clothing and on the floor of the living room and den.

Petitioner also argues that had counsel discovered and used the information in Exhibits 3 and 4, they could have corroborated Blakeney's story to police that Huntley had threatened to get his gun and that Blakeney had tied Huntley up to prevent that. This argument too is based upon a misstatement of fact. In none of his three statements (oral statement to police, written statement to police, statement to Dr. Worthen) did Blakeney state that during the altercation, Huntley threatened to get a gun. (MAR State Exhibits 12, 14, & 8) In the two statements in which he acknowledged involvement in the incidents leading to Huntley's death, Blakeney said that he knew Huntley kept guns in the house and the he was afraid that Huntley was going to get one when he ran from the kitchen to the den. While his belief may have been real, there is no evidence that an actual threat was made. Therefore, the evidence of the presence of other guns in the house at most would have corroborated Blakeney's story to police that he thought Huntley was going to get a gun and that he tied Huntley up to prevent that. And, in fact, trial counsel

corroborated Blakeney's story to police by eliciting testimony from Agent Underwood on cross-examination that there was a shotgun in the house. (Tp. 897-98)  Additionally, during his closing argument at the guilt/innocence phase of the trial, defense counsel Huffman argued to the jury that the presence of the shotgun in the house corroborated Blakeney's story that when Huntley ran from the kitchen, he (Blakeney) thought Huntley was going to get a shotgun or rifle. (Tp. 1154)

Finally, Petitioner argues that had counsel discovered and used the information in Exhibits 5 and 6, they would have been able to corroborate his story about how the altercation started. Prior to trial, Blakeney told three different stories about his contact with Huntley.  In his oral statement to police, Blakeney denied any involvement in the crimes.  He stated that while he was visiting his mother and Huntley's house, the phone rang, and Huntley answered.  Blakeney stated that Huntley then called "some guy named Bill," and asked Bill if he had just called.  Blakeney told police that after Huntley hung up the phone, he (Blakeney) left.  There is no mention in his oral statement to police of Huntley talking about a traffic citation. (MAR State's Exhibit 12) Clearly, neither Exhibit 5 nor 6 corroborate Blakeney's oral statement to police.

In his written confession to police, Blakeney made no mention of Huntley either receiving or making any phone calls.  Nor does he mention Huntley talking about a traffic citation. (MAR State's Exhibit 14)  Only Blakeney's written confession to police was introduced at trial, and clearly, neither Exhibit 5 nor 6 corroborate this version of how the altercation started.  Therefore, Exhibits 5 and 6 were irrelevant to the guilt phase of the trial, and counsel were not deficient for failing to use them. *See Strickland*, 466 U.S. at 686-87

Although Petitioner puts forward no real supporting argument, he does assert that the information in these Exhibits could have been useful at sentencing because "it refutes the

prosecutors' claims that [he] lay in wait for his victim . . . ." In his third version of events, Blakeney told Dr. Worthen that after he robbed his mother's house, he drove to a mini-mart and bought chips and beer. As he was leaving the mini-mart, Huntley passed and honked at Blakeney, motioning him to come to the house. According to Blakeney, while the two men were outside, Huntley told Blakeney that he had just received a citation for not having a child safety seat and that he was upset about it. The phone then rang; Huntley went inside and answered it. According to Blakeney, who went inside with Huntley, Huntley talked on the phone for a period of time. A few minutes after Huntley got off the phone, the altercation between the two men started. (MAR State's Exh. 8) The jury heard this statement through Dr. Worthen's testimony at the sentencing phase of the trial.

While Exhibits 5 and 6 arguably corroborate this version of events, Petitioner cannot show that he was prejudiced by counsel's failure to present this evidence to the jury. *Id*. at 694. During the guilt phase of the trial, the jury heard Blakeney's confession that he was hiding in the house when Huntley returned home. Additionally, the jury heard all of defense counsel's efforts to corroborate the self-serving portions of Blakeney's confession. For example, counsel brought out evidence that the kerosene heater was on; that there was another gun in the house; and that the presence of Huntley's glasses on the floor near the refrigerator corroborated Blakeney's story that Huntley tried to prevent him from leaving through the side door. Notwithstanding the evidence that supported some of the self-serving portions of Blakeney's confession, the jury found him guilty of first-degree murder under a theory of premeditation and deliberation.

The story Blakeney told Dr. Worthen is very different from his confession to police and omits almost all of his inculpatory behavior (i.e. there is no mention of Blakeney hitting Huntley

in the head with the gun, or of hitting him several times with the fire poker, or of punching him in the mouth).  This Court is not convinced that there is a reasonable probability that, presented with Blakeney's even more self-serving statement to Dr. Worthen, the jury would have returned a life sentence had counsel presented evidence that Huntley had received a traffic citation and that he had called his daughter prior to the altercation that killed him. *See id*, at 694.  Based on the foregoing, the MAR court's rejection of this claim was not an unreasonable application of clearly established Federal law. *See* § 2254(d)(1).

CLAIMS VII & IX: *Improper Closing Arguments*

Petitioner claims that the prosecution created a materially false impression regarding the facts of the case and the credibility of certain witnesses during closing arguments at both the guilt/innocence and sentencing phases of the trial.  In Claim VII, Petitioner asserts that the prosecution's argument that Petitioner intentionally set the fire that killed Callie Huntley was contradicted by testimony of the State's own witnesses.  Petitioner asserts further that the prosecution misled the jury by failing to present it with alternative, non-incriminating explanations for the fire.[38]  In addition, Petitioner asserts that in closing arguments the

---

[38]Petitioner asserts that the prosecution misled the jury because jurors were not told that the fire in the den could have been the result of an accidental fire in the living room spreading through the attic to the den.  Suffice it to say that it is not the role of the prosecution to present to the jury non-incriminating explanations for evidence or for the actions of those involved in a criminal matter.  The prosecution's theory of the case was that there were two points of origin for the fire – the living-room and the den – and that the fire was set deliberately.  The prosecution presented evidence to support that theory in the form of testimony from an expert arson investigator.  That expert arson investigator testified that in his opinion the fire was not the result of an accident and that there were two points of origin for the fire.  Having presented evidence through an expert that the fire was not an accident, the prosecution was not then required to offer alternative evidence that the fire might have been an accident.  Therefore, unless Petitioner is in possession of some evidence indicating that the expert was lying about his opinion, making assertions like the one here merely wastes the Court's time.

prosecution: 1) shifted the burden of proof to the defense; 2) improperly commented on Petitioner's right to silence and to an attorney; 3) argued that Petitioner had probably poured kerosene on the victim in the living room; 4) improperly injected parole considerations into the trial; and 5) improperly urged jurors to put themselves in the shoes of the victim.

In Claim IX, Petitioner claims that the prosecution created a materially false impression before the sentencing jury by improperly using answers Petitioner gave to certain psychological evaluation questions. During cross-examination of Dr. Worthen, the prosecutor asked about Petitioner's answers to certain questions that appeared in the psychological tests Dr. Worthen administered to Petitioner. The prosecution also used those answers in its argument to the jury at sentencing, which Petitioner claims violated his right to silence, right against self-incrimination, right to a trial by jury and right to counsel.

As Petitioner freely acknowledges, trial counsel did not object to any of the arguments at issue in these two claims. Therefore, the MAR court held that both claims were procedurally barred because Petitioner had waived any constitutional challenge on direct review by failing to object to the prosecutors' arguments.[39] (June 5, 2003 MAR Order, pp. 25-26) Rule of Appellate Procedure 10(b) is an adequate and independent state procedural rule, *see e.g. Kornahrens v. Evatt*, *supra*, 66 F.3d at 1357, as is the state's contemporaneous objection rule, *see Daniels v. Lee*, *supra*, 316 F.3d at 486-488. Because Petitioner failed to preserve a constitutional challenge to the prosecutors' closing arguments, absent cause and prejudice, these claims are procedurally defaulted on federal habeas review. *See Howard v. Moore*, *supra*, 131 F.3d at 420 ("Errors at trial not objected to, in contravention of State contemporaneous objection rules, are not cognizable in

---

[39]Petitioner raised these as Claims II and V respectively in his MAR.

73

federal habeas corpus proceedings . . . .").

Rather than attempting to show "cause" for counsel's failure to comply with the contemporaneous objection rule, Petitioner takes issue with the MAR court's alternative procedural ruling that his claims were barred under N.C. General Statute § 15A-1419(a)(3). Section 15A-1419(a)(3) bars claims in post-conviction that could have been raised on direct appeal. Petitioner asserts that he could not raise these claims on direct appeal because counsel did not object and, therefore, did not make a record for appellate purposes. (Pet's. Resp. to State's Answer, p. 47)

Petitioner is well aware that despite trial counsel's failure to object, he could have challenged the prosecutor's actions on direct appeal (Def.-Appellant's Brief, p. 90), and that the North Carolina Supreme Court would have reviewed the prosecutors' arguments for "gross impropriety." *See State v. Thomas*, 514 S.E.2d 486, 514 (NC 1999), *cert. denied*, 528 U.S. 1006, 120 S.Ct. 503, 145 L.Ed.2d 388 (1999) (When a defendant fails to timely object at trial to a prosecutor's closing argument but attempts to challenge the argument on appeal, the Supreme Court of North Carolina reviews the record for "gross impropriety.") Thus, the MAR court's procedural default holding under § 15A-1419(a)(3) does not contradict its holding that Petitioner waived these claims on direct review by failing to make a timely objection at trial. However, even if Petitioner had raised these claims on direct review, they still would be defaulted in this Court. The rule barring habeas review of a claim rejected by a state court on a procedural ground applies when a state court conducts a "plain error" or "gross impropriety" review after having found a procedural default. *See Daniels*, 316 F.3d at 487 (citing 778 F.2d 168, 176 (4th Cir.1985); *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001) ("We have held that [a] contemporaneous objection

rule ... bars federal habeas review absent a showing of cause and prejudice.... Moreover, we view a state appellate court's review for plain error as the enforcement of a procedural default.")). The basis for procedural default in this Court remains Petitioner's waiver of these claims by failing to comply with the State's contemporaneous objection rule.

For the foregoing reasons, Petitioner has failed to show cause and prejudice to excuse his failure to raise a timely objection to the prosecutors' arguments at trial and sentencing. *See Fisher v. Angelone*, 163 F.3d at 844. Petitioner's Claims VII and IX that the prosecution engaged in misconduct during closing arguments are procedurally defaulted.

Petitioner claims in the alternative that counsel were ineffective for failing to object to all of the prosecution arguments outlined above. The MAR court held that these claims were procedurally defaulted pursuant to § 15A-1419(a)(3) because Petitioner was in a position to raise them on direct review but failed to do so. (MAR Order, June 5, 2003 pp. 22-23; 25; 69 ¶¶ 79b & 80a.)

The Fourth Circuit has recognized that § 15A-1419(a)(3) generally is an independent and adequate state procedural bar. *See McCarver v. Lee*, *supra*, 221 F.3d at 589. Furthermore, the Fourth Circuit has recognized that North Carolina courts have applied § 15A-1419(a)(3) to bar IAC claims that could have been brought on direct review but were not. *See id.* ("[W]e reject McCarver's attempt to treat ineffective assistance claims as categorically different from other kinds of claims that can be barred under section 15A-1419(a)(3)"). In order to demonstrate that § 15A-1419(a)(3) is not consistently and regularly applied to IAC claims, Petitioner would need to cite a "non-negligible number of cases" in which an IAC claim could have been brought on direct review but was not, and in which the collateral review court nonetheless failed to bar the claim

under § 15A-1419(a)(3) because it was an IAC claim. *See Reid v. True*, *supra*, 349 F.3d at 805 (quoting *McCarver*, 221 F.3d at 589).

Petitioner has failed to cite any cases that meet the above criteria. In fact, he has failed to put forth any argument as to why these IAC claims should not be procedurally defaulted on federal habeas review. As the MAR court noted, the record on appeal was sufficient for appellate counsel to have raised each of these IAC claims on direct review. Indeed, all of the evidence Petitioner relies upon to support his claims is found in the trial transcript. (Tpp. 920; 947;980-82; 988-89; 1088-89; 1294, 1299, 1300)

Petitioner has failed to show cause and prejudice to excuse his failure to raise these IAC claims on direct review. *See Fisher v. Angelone*, 163 F.3d at 844. In fact, he has not put forth an argument on either element. Petitioner's claims VII and IX that counsel were ineffective for failing to object to the prosecution's alleged misconduct during closing arguments are procedurally defaulted.

In Claim IX, Petitioner also claims that counsel were ineffective for failing to properly prepare Dr. Worthen for cross-examination. The MAR court held that this claim was without merit.

During his evaluation of Petitioner, Dr. Worthen administered some psychological tests. On cross-examination, the prosecution asked Dr. Worthen about Petitioner's answers to certain questions from those psychological tests, specifically: (1) "When I was a kid before age 15, I was somewhat of a juvenile delinquent" (Tp. 1294); (2) "I do not always tell the truth" (Tp. 1299); (3) "At times I have been so entertained by the cleverness of some criminals that I have hoped they would get away with it" (Tp. 1299); (4) "I think nearly anyone would tell a lie to keep out of

trouble" (Tp. 1300); and (5) The defendant is *not* in disagreement "with the law when a criminal is freed through the arguments of a smart lawyer" (Tp. 1300). Petitioner does not challenge the MAR court's determination that under State law, those psychological tests were subject to examination and argument by the prosecution. (MAR Order, June 5, 2003 pp. 70-71 ¶¶ 83 & 84) Instead, Petitioner claims that had counsel were ineffective for failing to properly prepare Dr. Worthen for cross-examination on the tests he had administered.

In support of this claim, Petitioner relies upon a post-conviction affidavit of Dr. Worthen in which he states that had counsel properly prepared him for cross-examination, he could have explained Petitioner's responses to the psychological questions at issue. For example, he could have explained that some of Petitioner's responses simply were Petitioner's truthfulness in admitting some of his faults. He also could have explained that some of the answers were not indications of untruthfulness and that none of the answers were indicative of a specific mental health disorder or character trait. (MAR Affidavit of Mark Worthen, pp. 3-5, ¶¶ 7-13)

The record reveals that Dr. Worthen's training, experience and education qualified him as an expert in the field of clinical and forensic psychology. (Tpp. 1232-35) The trial court accepted him as such. (Tp. 1235) Dr. Worthen's testimony revealed that he met with Petitioner several times, during which time he administered a number of psychological tests. (Tpp. 1235-40; 1260-68; 1285) His testimony revealed that he spent roughly fifty (50) hours preparing for trial. (Tpp. 1287-88) Dr. Worthen's testimony also showed that he had testified as an expert on previous occasions. (Tp. 1234)

In light of Dr. Worthen's expertise, it is unclear to this Court how counsel could have prepared Dr. Worthen to respond to questions during cross-examination about the psychological

tests that he had administered or the significance of the responses Petitioner gave. After all, Dr. Worthen, not counsel, was the expert in psychology. To the extent that Dr. Worthen was unable to testify competently about the tests he had administered and the significance of the responses Petitioner gave, that was the fault of Dr. Worthen, not counsel, who were entitled to rely upon the expertise of their witness.[40] *See McHone v. Polk*, *supra*, 392 F.3d at 706 (rejecting petitioner's efforts to recast a claim concerning the effectiveness of an expert as IAC claim) (citation omitted). For the foregoing reasons, the MAR court's conclusion that counsel's actions did not fall below an objective standard of reasonableness was not an unreasonable application of clearly established Federal law. *See Parker v. Scott*, 394 F.3d 1302, 1326 (10th Cir. 2005) (same); *Tompkins v. Moore*, 193 F.3d 1327, 1334 (11th Cir. 1999) (same).

CLAIM VIII: *Brady Claim Regarding Victim-Impact Evidence*

Petitioner claims that the prosecution withheld exculpatory victim-impact evidence in violation of *Brady*. 373 US at 87. Specifically, Petitioner asserts that Sandra Huntley, the victim's daughter, filled out a victim-impact statement for prosecutors, in which she stated that she would be satisfied with a life-sentence for Petitioner.[41] (Pet. MAR. Exh. 17) Petitioner asserts further that his mother, Gracie Blakeney, the victim's companion, opposed a death sentence. Petitioner argues that by failing to disclose the above-mentioned information, the State denied Petitioner the opportunity to present "exculpatory" evidence to the jury at sentencing.

---

[40]The Court notes that Petitioner is *not* raising a claim that counsel were ineffective for failing on redirect examination to have Dr. Worthen clarify, explain or put Petitioner's responses into context for the jury.

[41]In her victim-impact statement, Sandra Huntley states that she "would like for Roger Blakeney to get the death penalty OR double life in prison with no chance of patrol [sic]."

Petitioner raised this claim as Claim IV in his MAR. In its June 5, 2003 Order, the MAR court denied this claim without an evidentiary hearing. The court held that because a witness's opinion regarding the type of sentence that a capital defendant should receive is inadmissible under North Carolina law, there was no *Brady* violation.

As an initial matter, Petitioner cannot show that the State suppressed this evidence. Defense counsel had full access to Gracie Blakeney and could have determined her views on an appropriate sentence for her son. *See United States v. Wilson*, *supra*, 901 F.2d at 380. There also is evidence in the record that defense counsel were aware that Sandra Huntley had expressed her views on an appropriate sentence for Blakeney. (MAR Tp. 183) Therefore, there is no apparent reason that they could not have discovered through reasonable diligence her views on an appropriate sentence. *See Barnes v. Thompson*, *supra*, 58 F.3d at 975 n. 4 (*Brady* does not apply if the evidence in question is available via investigation by a reasonable defendant).

Additionally, this claim must fail because the opinions of a victim's relatives regarding the appropriate sentence for a defendant are not material under *Brady*. Under *Brady*, evidence is material only when there exists a "reasonable probability" that had the evidence been disclosed the result at trial would have been different. *See Kyles v. Whitley*, *supra*, 514 U.S. at 433-434, 115 S.Ct. at 1565-1566. Under North Carolina law, a victim's opinion that a defendant should receive a life sentence rather than the death penalty is inadmissible at a sentencing trial. *See State v. Bowman*, 509 S.E.2d 428, 440 (NC 1998). Disclosure of Sandra Huntley's victim-impact statement would have had no direct effect on the outcome of the sentencing trial because Petitioner could not have introduced it, made mention of it during argument or questioned witnesses about it. *See Wood v. Bartholomew*, 516 U.S. 1, 6, 116 S.Ct. 7, 10 (1995). Therefore,

there was no *Brady* violation by the State because Sandra Huntley's victim-impact statement was not material. *See id.*; *Hoke v. Netherland*, 92 F.3d 1350, 1356 n. 3 (4th Cir. 1996) (inadmissible statements are immaterial "as a matter of law" for *Brady* purposes).

Petitioner argues that "victim-impact" evidence is admissible at sentencing under the Supreme Court's holding in *Payne v. Tennessee*. 501 U.S. 808, 827, 111 S.Ct. 2597, 2609 (1991). Petitioner misapplies the holding of *Payne*. In *Payne*, the Supreme Court held that, "if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar." *Id.* However, *Payne* does not hold that the Constitution requires admission of victim-impact evidence. Furthermore, the opinion of a victim's relative about the type of sentence a defendant should receive is not "victim-impact" evidence. *Payne*'s holding was limited to "evidence and argument relating to the victim and the impact of the victim's death on the victim's family." *Id.* at 827 & 830 n. 2. A personal opinion about the defendant or an appropriate sentence is not evidence relating to "the victim" or "the impact of the victim's death" on members of the victim's family.

Finally, Sandra Huntley and Gracie Blakeney's opinions regarding an appropriate sentence for Petitioner are not material under *Brady* because they are not "relevant mitigating evidence." *See Robison v. Maynard*, 943 F.2d 1216, 1217 (10th Cir. 1991). The United States Supreme Court has held that a sentencer "may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence." *Buchanan v. Angelone*, 522 U.S. 269, 276, 118 S.Ct. 757, 761 (1998) (citations omitted). Mitigating evidence is "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 57

L.Ed.2d 973 (1978) (plurality opinion)). "Relevance" for capital sentencing purposes carries the same meaning that it does in any other legal context: "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Tennard v. Dretke*, 542 U.S. 274, 284, 124 S.Ct. 2562, 2570 (2004) (quoting *McKoy v. North Carolina*, 494 U.S. 433, 440-41, 110 S.Ct. 1227, 108 L.Ed. 369 (1990) (internal citations and quotations omitted)).

As an initial matter, the victim's relatives' opinions about an appropriate sentence are not mitigating in that they do not relate to any aspect of Petitioner's "character or record or to any circumstances of the offense." *Lockett*, 438 U.S. at 604. Furthermore, their opinions do not "tend[ ] logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." *McCoy*, 494 U.S. at 440 (internal quotation marks omitted). Therefore, they are not relevant mitigating evidence and are not material under *Brady*.

Alternatively, Petitioner claims that counsel were ineffective for failing to discover that his mother did not want him sentenced to death and that a member of the victim's family would be satisfied with a life sentence. The MAR court held that counsel were not ineffective for failing to discover and offer evidence that was inadmissible under State law. The MAR court's denial of Petitioner's IAC claim was not an unreasonable application of clearly established Federal law, *see* § 2254(d)(1), because counsel will not be deemed to be ineffective for failing to offer inadmissible or irrelevant evidence. *See Hoots v. Allsbrook*, 785 F.2d 1214, 1222 (4th Cir. 1986) (counsel not ineffective for failing to offer inadmissible evidence); *Parker v. Scott*, 394 F.3d 1302, 1326 (10th Cir. 2005) (same); *Tompkins v. Moore*, 193 F.3d 1327, 1334 (11th Cir. 1999) (same).

CLAIM IX: *Improper Closing Argument at Sentencing* (Addressed at pages 72-78 of this

Order)

CLAIM X:  *Short-Form Indictment*

Petitioner claims that his conviction is invalid because the "short-form" indictment used in his case did not allege all of the elements of first-degree murder and because it failed to allege any of the aggravating factors that elevate a first-degree murder punishable by life in prison to a capital murder punishable by death.  He contends that these omissions render his first-degree murder conviction and death sentence invalid and that the trial court was without jurisdiction to try him for any offense greater than second-degree murder.

Petitioner raised this claim as Claim VII in his Amendments to his MAR.  The MAR court denied the claim on the merits. (MAR Order, Nov. 14, 2003, pp.29-30)

Petitioner does not assert that he did not have actual notice of the fact that he was charged with first-degree capital murder.  Nor could he.  The record reveals that on May 23, 1996, the lead prosecutor in this case, Scott Brewer, filed a Rule 24 Motion, requesting a pre-trial conference that is required in capital cases tried in North Carolina. (Record on Appeal, p. 19)  Additionally, on July 12, 1996, Robert Huffman, Petitioner's lead trial attorney, motioned the court for appointment of assistant counsel in light of the State's announcement that it would seek the death penalty for the murder of Callie Huntley. (Record on Appeal, p. 21)  Thus, more than a year before his trial, Petitioner had actual notice that he would be tried for first-degree murder and that the State would seek the death penalty.

As such, Petitioner's claim is not that he did not have notice of the charge against him.  Instead, his claim is that the indicting document itself was deficient under the United States Constitution.  Because the indictment was deficient, Petitioner argues, the trial court was without

jurisdiction to try him for first-degree murder and/or capital first-degree murder.

Petitioner claims that his indictment was insufficient to charge the offense of first-degree murder because it did not contain the specific allegations that distinguish first-degree murder (i.e. premeditation and deliberation or the commission of the murder in conjunction with another felony) from second-degree murder. Petitioner claims further that the indictment was insufficient to charge him with capital first-degree murder because it did not contain any of the aggravating factors that elevate a first-degree murder, punishable by life in prison, to a capital murder, punishable by death.

As to the first of these claims, relief is foreclosed by the Fourth Circuit's opinion in *Hartman v. Lee*, 283 F.3d 190 (4th Cir. 2002), which was recently reaffirmed in *Stroud v. Polk*, 466 F.3d 291, 295 (4th Cir. 2006). In *Hartman*, the Fourth Circuit held that because there is only one offense of "Murder" under North Carolina law, "a short-form indictment that alleges the elements of common law murder is sufficient to satisfy the demands" of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment. 283 F.3d at 198-99 (citations omitted). Consistent with N.C. Gen. Stat. § 15-144, Petitioner's murder indictment alleges the elements of common law murder. Therefore, it was constitutionally sufficient under the Sixth Amendment and Due Process Clause of the Fourteenth Amendment. *See id*.

Petitioner's second claim is that the aggravating factors on which the State relied in seeking the death penalty were "essential elements" of the crime of first-degree murder, and as such, should have been alleged in the indictment. This claim rests upon two assumptions. The first is that he has a constitutional right to an indictment alleging all essential elements of the charged crime; the second is that the trial court's jurisdiction was dependent upon all of the

essential elements being alleged in the indictment.[42]

To support his claim, Petitioner relies upon two recent United States Supreme Court cases, *Jones v. United States*, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999) and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).  *Jones* established the rule that, in federal prosecutions,

> under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.

526 U.S. at 243 n. 6.  As a result, in federal prosecutions, certain "sentencing factors" may function as the equivalent of elements of the crime, entitling a defendant to have them charged in an indictment and submitted to a jury using a "beyond a reasonable doubt" standard of proof.  *See Holliman v. Beck*, 351 F.Supp.2d 449, 452 (MDNC 2005).  In *Apprendi*, the Supreme Court held that the Sixth Amendment mandated that in state prosecutions, "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490.

It is undisputed that in the instant case, all essential elements of first-degree murder were submitted and found by the jury to exist beyond a reasonable doubt as required by *Apprendi*.  However, Petitioner reads the holding of *Apprendi* further.  According to Petitioner, *Apprendi*, like *Jones*, also requires that all elements of a crime, including sentencing factors rising to the level of elements of a crime, be alleged in an indictment.

The Indictment Clause of the Fifth Amendment provides, in pertinent part, that "[n]o

---

[42]The Court will assume *arguendo* that North Carolina's statutory aggravating factors are "essential elements" of the crime of first-degree capital murder.

person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. amend. V. However, prior to *Apprendi*, the Supreme Court had not construed the Fourteenth Amendment to include the Fifth Amendment right to presentment or indictment of a Grand Jury. *See Alexander v. Louisiana*, 405 U.S. 625, 633, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972); *Hurtado v. California*, 110 U.S. 516, 538, 4 S.Ct. 111, 28 L.Ed. 232 (1884). Nor does *Apprendi* extend the Fifth Amendment indictment requirement to state court prosecutions. *See Holliman*, 351 F.Supp.2d at 453. Indeed, the *Apprendi* Court expressly stated that the issue of whether the Fifth Amendment indictment requirement applied to the states through the Fourteenth Amendment was not before it. 530 U.S. at 477 n. 3 ("Apprendi has not here asserted a constitutional claim based on the omission of any reference to sentence enhancements . . . in the indictment. . . . [The Fourteenth] Amendment has not . . . been construed to include the Fifth Amendment right to 'presentment or indictment of a Grand Jury' . . . . We thus do not address the indictment question separately today.") (internal citations omitted).

   The Supreme Court's decision in *Ring v. Arizona* also does not support Petitioner's assertion that his indictment is constitutionally defective. 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). In *Ring*, the Supreme Court held that the Sixth Amendment requires that a jury, not the judge, determine the presence or absence of aggravating factors when those factors are essential to imposition of the death penalty. 536 US at 609. It is undisputed that in the instant case, the State submitted the aggravating factors upon which it relied to seek the death penalty to the jury and that the jury found those aggravating factors to exist "beyond a reasonable doubt." *See* N.C. Gen. Stat. §15A-2000(c)(1)-(3). However, as he did with *Apprendi*, Petitioner reads the holding of *Ring* further. According to Petitioner, *Ring* requires that the aggravating factors upon

which the state will rely when seeking the death penalty be alleged in an indictment.

The *Ring* Court was careful to warn against reading its holding too broadly. It noted that Ring's claim was "tightly delineated," alleging only that the *Sixth* Amendment required the jury to find the aggravating factors asserted against him. 536 U.S. at 597 n. 4. The Court noted that the issue of whether Ring's indictment was constitutionally defective under the *Fifth* Amendment for failing to include the aggravating factors asserted against him was not before it. *See id*; s*ee also United States v. Higgs*, 353 F.3d 281, 297 (4th Cir. 2003) ("The Supreme Court has not yet addressed the precise issue of whether, and to what extent, the Indictment Clause requires that the intent and aggravating factors be charged in the indictment."). The Court specifically noted that Ring had not raised a claim that his indictment was constitutionally deficient; the Court then cited the following from its *Apprendi* decision: "[The] Fourteenth Amendment has not . . . been construed to include the Fifth Amendment right to presentment or indictment of a Grand Jury." *Id*. (quoting *Apprendi*, 530 U.S. at 477, n.3) (internal quotations omitted). Therefore, *Ring* cannot be read to extend the Fifth Amendment Indictment Clause to the states. *See United States v. Allen*, 406 F.3d 940, 942 (8th Cir. 2005) ("*Ring* did not address the indictment issue because it involved a state prosecution, and the Fifth Amendment's grand jury requirement has not been construed to apply to the states. The same is true of . . . *Apprendi* . . . .").

Because the Fifth Amendment Indictment Clause has not been extended to the states through the Fourteenth Amendment, there is no "clearly established Federal law" requiring that all essential elements, including sentencing factors rising to the level of elements of a crime, be alleged in an indictment. Furthermore, there is no "clearly established Federal law" depriving a trial court of subject matter jurisdiction over a criminal matter if an indictment fails to allege all

essential elements, including sentencing factors rising to the level of elements, of a crime. In fact, the Supreme Court rejected just such an argument in *United States v. Cotton*. 535 U.S. 625, 631, 122 S.Ct. 1781, 152 L.Ed2d 860 (2002). In *Cotton*, the Supreme Court held that defective indictments or omissions from indictments do not deprive a federal district court of subject matter jurisdiction over a criminal matter. *See id*. at 631. Therefore, there is no federal constitutional provision that deprives a court of its authority to adjudicate a criminal matter in which there is a defect or omission in the indictment. *See* § 2254 (restricting habeas relief to those "in custody in violation of the Constitution . . . of the United States").

The Due Process Clause requires that a defendant be informed of the charges against him. *See Hartman v. Lee*, 283 F.3d at 194. The Sixth Amendment imposes a similar requirement. *See id*. North Carolina's short-form indictment was constitutionally sufficient to notify Petitioner of the charges against him.[43] *See id*. at 198-99. Furthermore, the State complied with § 15A-2004(b), which requires the prosecutor to give a defendant notice of its intent to seek the death penalty prior to arraignment or to the pre-trial conference required in capital cases, whichever comes later. Therefore, Petitioner had "reasonable notice" not only that he was charged with first-degree murder but that he also was to be tried capitally. For the foregoing reasons, the MAR court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established Federal law. *See* § 2254(d)(1).

CLAIM XI: *Fair Cross-Section*

Petitioner claims that his Fifth, Sixth, Eighth and Fourteenth Amendment rights were

---

[43]The Court stresses again that Petitioner does not assert that he did not receive adequate notice of the charges against him.

violated because his jury did not represent a fair cross-section of the community. Petitioner also claims that the venire from which his jury was drawn did not represent a fair cross-section of the community.

Although not explicit in the text, the Sixth Amendment requires that a defendant's jury be drawn from a venire representing a "fair cross-section of the community." *See Holland v. Illinois*, 493 U.S. 474, 480, 110 S.Ct. 803, 807 (1990) (quoting *Taylor v. Louisiana*, 419 U.S. 522, 527, 95 S.Ct. 692, 696, 42 (L.Ed.2d 690 (1975)). In order to establish a *prima facie* case for a violation of the Sixth Amendment right to a jury venire that represents a "fair cross-section" of the community, a defendant must show that: (1) the group allegedly excluded is a distinctive part of the community; (2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) this underrepresentation is due to systematic exclusion of the group in the jury selection process. *See Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979).

Petitioner, an African-American, was tried by an all-white jury. Prior to trial in this case, jury questionnaires were sent to prospective jurors. Of the prospective jurors who actually reported for jury service, 8.3% were African-American. *See State v. Blakeney*, *supra*, 531 S.E.2d at 808. According to 1994 census data provided by Blakeney, African-Americans comprised 16.15% of the population of Union County at the time of his trial. *See id*. Based upon the difference in these two percentages, Blakeney made several motions to dismiss the venire on the grounds that it did not represent a fair cross-section of the community. Blakeney did not argue or allege that the State had systematically excluded African-Americans, or any other distinctive group, from the jury pool. (Tpp. 33-36; 301-02; 411-12) The trial court denied the motions. After

the petit jury had been selected and before it was impaneled, Blakeney objected to impaneling the jury on the grounds that the all-white jury did not represent a fair-cross section of the community. Blakeney did not argue or allege that the State had systematically excluded African-Americans, or any other distinctive group, from the jury pool or from the petit jury. This motion also was denied.

Petitioner raised a "fair cross-section" claim on direct appeal. In his presentation of that claim, Petitioner did not allege that the jury selection process involved the systematic exclusion of African Americans from the jury pool. *See State v. Blakeney*, 531 S.E.2d at 808 & 809 ("Defendant does not argue that the jury selection process . . . involved systematic exclusion of African-Americans from the jury pool."). Instead, he argued that when counsel alerts the trial court of inadequate representation in the venire, the court must take affirmative steps to ensure that the jury venire is racially proportionate. *See id*.; *see also* Def. App. Brief, pp. 22 & 28. The North Carolina Supreme Court rejected the claim on the merits. Blakeney did not pursue a "fair cross-section" claim in his MAR proceedings.

Undeterred by the aforementioned record, Petitioner insists in the instant Claim that he has attempted throughout the state court process to demonstrate that the underrepresentation of African Americans in the jury pool was "due to systematic exclusion of the group in the jury selection process, *Duren v. Missouri*, . . . ," but that he "has not had a full and fair opportunity to develop this claim." (PWHC, p. 85) Petitioner then asserts that evidence of his attempts to demonstrate that African-Americans were systematically excluded is set out in his *Batson* claim. (PWHC, p. 85 "As set out in Claim II, the defendant's attempts to make such a showing have been denied throughout the state court process.") Petitioner raised a *Batson* claim for the first

time in his MAR.

By citing his *Batson* claim as evidence that he has attempted throughout the state court process to show that the State systematically excluded African Americans from the jury selection process, Petitioner appears to be asserting for the first time that the prosecutor's alleged discriminatory use of peremptory challenges deprived him of his Sixth Amendment right to a jury drawn from a "fair cross-section" of the community. *See Duren*, 439 U.S. at 364. Not only is this argument unexhausted in the state courts,[44] it has no merit.

The right to a jury "drawn from a fair cross-section of the community" derives from the Sixth Amendment's guarantee of an impartial jury. *See Holland*, 493 U.S. at 480. However, the Sixth Amendment fair cross-section right does not extend from the venire to the petit jury. *See id*. (citing *Lockhart v. McCree*, 476 U.S. 162, 173, 106 S.Ct. 1758, 1765, 90 L.Ed.2d 137 (1986) and *Taylor v. Louisiana*, 419 U.S. 522, 538, 95 S.Ct. 692, 702, 42 (L.Ed.2d 690 (1975)). As such, Petitioner has no right to a *jury* comprised of a fair cross-section of the community. *See id*. His right is to a *venire* comprised of a fair cross-section of the community. *See id*. Therefore, as long as the venire represents a fair cross-section of the community, there is no Sixth Amendment prohibition against a prosecutor using race-based peremptory challenges to excuse jurors from the

---

[44]Generally, a claim will be procedurally defaulted on federal habeas review if the claim was not fairly presented to all appropriate state courts and an adequate and independent state procedural rule would now bar review. *See Clagett v. Angelone*, *supra*, 209 F.3d at 378. In this case, Blakeney did not argue to either the trial court or to the appellate court that the prosecutor's use of peremptory challenges deprived him of a jury drawn from a fair cross-section of the community. Blakeney did not raise a "fair cross-section" claim in his MAR. As such, Blakeney failed to fairly present a claim in the state courts that the prosecutor's use of peremptory strikes violated his Sixth Amendment "fair cross-section" rights. This claim, therefore, is unexhausted and would be procedurally barred in State court if he now attempted to raise it there. *See* N.C. Gen. Stat. § 15A-1419(a).

petit jury. *See id*. at 481. Consequently, as long as the venire represents a fair cross-section of the community, a prosecutor's race-based peremptory challenges cannot satisfy the third prong of the *prima facie* test under *Duren*. *See id*. at 483.

The North Carolina Supreme Court rejected Blakeney's direct appeal claim that the venire from which his jury was drawn did not represent a fair cross-section of the community. The court determined that Blakeney had failed to establish that the representation of African-Americans in the venire was unfair and unreasonable (second prong under *Duren*). *State v. Blakeney*, 531 S.E.2d at 808-09. The court also determined that Blakeney failed to establish that the alleged underrepresentation of African Americans in the venire was the result of systematic exclusion in the jury selection process (third prong under *Duren*). *See id*. at 809.

The state court's conclusion was not an unreasonable application of established Federal law. As an initial matter, Blakeney does not state, and the record does not indicate, the percentage of African Americans in the three venires summoned for jury service. Instead, Blakeney's evidence of underrepresentation comes exclusively from the number of African Americans who actually reported for jury duty. Nor has Petitioner provided any evidence of the percentage of African Americans on the master jury list from which all Union County venires are drawn. *See* N.C. Gen. Stat. § 9-2. Furthermore, Petitioner has advanced no evidence, either in federal habeas court or in the state courts, that the State engaged in systematic exclusion of African Americans from the jury *venire*. *See Duren*, 439 U.S. at 364. In fact, as has been noted numerous times, Blakeney made no attempt to argue that the State had systematically excluded African Americans from the venire. *State v. Blakeney*, 531 S.E.2d at 809. For the foregoing reasons, the North Carolina Supreme Court's rejection of Petitioner's claim that the jury venire did not represent a

fair cross-section of the community was not an unreasonable application of established Federal law. *See* § 2254(d)(1).

Because Petitioner has failed to show that the venire from which his petit jury was drawn did not represent a fair cross-section of the community, his claim that his petit jury did not represent a fair cross-section of the community also must fail. *See Holland*, 493 U.S. at 481 (As long as the venire represents a fair cross-section of the community, there is no Sixth Amendment prohibition against a prosecutor using race-based peremptory challenges to excuse jurors from the petit jury). Therefore, Petitioner's "fair cross-section" claims are denied.

CLAIM XII: *Jury Questionnaire*

Prior to trial, prospective jurors were sent questionnaires to fill out and return. Over Blakeney's opposition, the trial court deleted a question regarding the racial makeup of prospective jurors' neighborhoods.[45] Blakeney claims that the court's refusal to allow the question deprived him of his constitutional rights to counsel, due process and freedom from cruel and unusual punishment.

Petitioner raised this claim as Claim II in his direct appeal to the North Carolina Supreme Court, which rejected the claim on the merits. *See State v. Blakeney*, 531 S.E.2d at 809. The court determined that the trial court did not abuse its discretion by deleting this question. *See id*. Furthermore, the court concluded, Blakeney failed to show that he was in any way prohibited from asking prospective jurors the same question during voir dire. *See id*.

The Sixth and Fourteenth Amendments "guarantee[ ] a defendant on trial for his life the

---

[45]The question removed from the jury questionnaire was: "Are the people in your neighborhood who you usually run into: All white? Mostly white? Evenly black and white? Mostly black? All black?" (Record on Appeal, p. 50)

right to an impartial jury." *Morgan v. Illinois*, 504 U.S. 719, 728, 112 S.Ct. 2222, 2229, 119 L.Ed.2d 492 (1992). Voir dire of prospective jurors "enabl[es] the court to select an impartial jury and assist[s] counsel in exercising peremptory challenges." *Mu'Min v. Virginia*, 500 U.S. 415, 431, 111 S.Ct. 1899, 1908, 114 L.Ed.2d 493 (1991); *see also Rosales-Lopez*, 451 U.S. 182, 188, 101 S.Ct. 1629, 1634 68 L.Ed.2d 22 (1981) (observing that voir dire is the means by which prospective jurors who are unwilling or unable to apply the law impartially may be disqualified from jury service). However, this Court is unaware of any Federal constitutional right to a juror questionnaire as a means of inquiry into the fitness and qualifications of prospective jurors. Likewise, the Court is unaware of any Federal constitutional right entitling a defendant to include certain questions in a jury questionnaire when a trial court authorizes use of a questionnaire in addition to the voir dire.[46] On the contrary, how a voir dire is conducted, is committed to the sound discretion of the trial court. *See Ristaino v. Ross*, 424 U.S. 589, 594, 96 S.Ct. 1017, 1020, 47 L.Ed.2d 258 (1976). It must be presumed then that unless the contents of a jury questionnaire are mandated by state law, it is within the discretion of the trial court to regulate the number and nature of the questions posed. *See State v. Blakeney*, 531 S.E.2d at 809 (citations omitted).

Petitioner cannot show that the trial court abused its discretion in deleting the question regarding the racial makeup of the neighborhoods of prospective jurors. The Constitution requires inquiry into racial or ethnic prejudice when "special circumstances" indicate that "racial issues [are] 'inextricably bound up with the conduct of the trial'." *Rosales-Lopez*, 451 U.S. at 189, 101

---

[46]The Court notes that although Petitioner criticizes the North Carolina court's adjudication of this claim as 'contrary to or an unreasonable application of decisions by the United States Supreme Court," he does not cite any decisions by the Supreme Court to support his claim. In fact, he does not cite decisions by any court to support this claim.

S.Ct. at 1634 (quoting *Ristaino*, 424 U.S. at 597, 96 S.Ct. at 1022). In his presentation of this claim, Petitioner does not assert that any "special circumstances" exist to require inquiry of prospective jurors regarding issues of race. That Petitioner is black and his jury was white do not constitute "special circumstances" requiring inquiry into racial bias. *See Goins v. Angelone*, 226 F.3d 312, 322-23 (4th Cir. 2000) (" '[T]here is no constitutional presumption of juror bias for or against members of any particular racial or ethnic group, presumably even when a jury pool is predominantly white'." (quoting *Goins v. Angelone*, 52 F.Supp.2d 638, 671 (E.D.VA 1999) (citation and internal quotation omitted in the original)). Furthermore, there is no Supreme Court decision holding that defendants accused of crimes against members of their own race have a right to question prospective jurors about racial bias. *See id*. Additionally, Petitioner has not shown that race was "inextricably bound up" with the conduct of the trial: none of the charges against Blakeney involved any element of race; race was not an element of any defense advanced by Blakeney; and none of the evidence adduced at trial or during sentencing suggested race as an issue in the case. *See id*. (citation omitted). Finally, even if Petitioner were entitled to make inquiries of prospective jurors regarding racial bias, he has failed to show that he was prohibited from doing so during voir dire. Indeed, he has not raised such an allegation. For the foregoing reasons, the North Carolina Supreme Court's rejection of this claim was neither contrary to nor an unreasonable application of established Federal law. *See* § 2254(d)(1).

CLAIM XIII:  *Removal of Prospective Jurors for Cause*

Petitioner claims that prospective jurors George Crawford and Jane Austin were improperly excused for cause upon the State's motion and after inadequate questioning by the State and the trial court. Petitioner also asserts that the trial court denied him an opportunity to

rehabilitate these jurors. Petitioner argues that the trial court's actions violated his Sixth Amendment right to a fair and impartial jury.

Petitioner raised this claim as Claim III in his direct appeal to the North Carolina Supreme Court, which rejected the claim on the merits. *See State v. Blakeney*, 531 S.E.2d at 809-11. The court determined that the trial court did not abuse its discretion in excusing Crawford and Austin for cause because both indicated that their views on the death penalty would interfere with their ability to follow the law. *See id*. at 810-11. The court also held that the trial court did not abuse its discretion in denying Blakeney an opportunity to attempt to rehabilitate these two prospective jurors. *See id*. at 811. Because the North Carolina court relied upon *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) and other related Supreme Court decisions, this Court's review is limited to whether that North Carolina court's application of *Witt, et al*. was "objectively unreasonable." *See Williams*, 529 U.S. at 409, 120 S.Ct. 1495.

The United States Constitution does not prohibit a state from "death qualifying" a jury in a capital case. *See Lockhart v. McCree*, 476 U.S. 162, 173, 106 S.Ct. 1758, 1764 (1986). A prospective juror may be excluded for cause when his or her views on the death penalty would "'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526 (1980)). This standard does not require that a juror's bias "be proved with 'unmistakable clarity.'" *Witt, 469 U.S. at 424.* As the *Witt* Court noted, "many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'." *Id*. at 424-35. Therefore, the question of challenge for bias is a "factual issue," and a trial judge's determination of juror bias is presumed

to be correct under § 2254(e)(1). *See id.* at 429-31. Petitioner may rebut this presumption of correctness with clear and convincing evidence. § 2254(e)(1).

During voir dire regarding his views on the death penalty, George Crawford stated that: he had moral, religious and personal beliefs against the death penalty (Tp. 43-44); he did not believe it was his responsibility to decide whether someone should be sentenced to death (Tp. 44, lines 5-9); and that he would be unable to make a decision regarding whether Blakeney should be sentenced to death (Tp. 44, lines 14-17). Equally important, he indicated that he would be unable to render a verdict on guilt or innocence (Tp. 45, lines 9-13; Tp. 46, lines 7-11). *See Witherspoon v. Illinois*, 391 U.S. 510, 523 n. 21, 88 S.Ct. 1770, 1777 n. 21 (1968) (Prospective jurors whose views on the death penalty would prevent them from making an impartial decision regarding guilt or innocence are excusable for cause). While Crawford is an example of a juror whose bias could not be determined with "unmistakable clarity," *Witt*, 469 U.S. at 424, his answers sufficiently indicated that his ability to follow the court's instructions and apply the law would have been impaired at both stages of the trial.

Jane Austin stated that she had been opposed to the death penalty her entire adult life. (Tpp. 48-49) Under direct questioning by the trial court, she stated unequivocally that if she had to choose between following the law and her own personal convictions, she would follow her own convictions. (Tp. 51, lines 3-18) She thereby acknowledged that her views on the death penalty were such that when the time came to decide punishment, she would make the decision based upon her own convictions, even if it meant disregarding the court's instructions and the applicable law. She also indicated that her views on the death penalty probably would prevent her from being able to decide guilt or innocence, knowing that a guilty verdict might result in a death

sentence. (Tp. 49, lines 7-13)

Petitioner has failed to show by clear and convincing evidence that the trial court erred in excusing prospective jurors Crawford and Austin for cause. Both indicated by their answers, either directly or indirectly, that their views on the death penalty would prevent or substantially impair their ability to follow the law and their oaths as jurors. *See Witt*, 469 U.S. at 424.

Petitioner also states that he was denied the opportunity to attempt to rehabilitate these prospective jurors. He has not cited any law nor put forth any argument regarding the trial court's denial of his request to rehabilitate these jurors. So, the Court is unsure if Petitioner merely is stating a fact or if this is part of his claim. In the event that it is the later, Petitioner's right is to a voir dire adequate to identify unqualified jurors. *See Rosales-Lopez*, 451 U.S. at 188. As such, " 'the restriction upon inquiries at the request of counsel, [are] subject to the essential demands of fairness.' " *See Morgan*, 504 U.S. at 730 (quoting *Aldridge v. United States*, 283 U.S. 308, 310, 51 S.Ct. 470, 471-72, 75 L.Ed. 1054 (1931). Unless the trial court's exercise of discretion in preventing Blakeney from attempting to rehabilitate these two jurors rendered the trial fundamentally unfair, there was no constitutional error. *See id*. at 730, n. 5 (citation omitted).

Petitioner has produced no evidence to rebut the trial court's presumptively correct finding that the jurors should be removed for cause, and he has advanced no evidence to suggest that further cross-examination of these witnesses would have been helpful or that rehabilitation was possible. Most critically, Blakeney has presented no evidence demonstrating that the jury selected was biased. Therefore, the State court's adjudication of this claim was not an unreasonable application of clearly established Federal law. *See* § 2254(d)(1).

CLAIM XIV: *Denial of Motion to Continue*

Prior to trial but after jury questionnaires were sent to prospective jurors, two articles about Petitioner's case appeared in a local newspaper. Those articles contained inaccurate information that Petitioner was on parole at the time of the murder. Petitioner moved to continue the trial on the grounds that prospective jurors might have been tainted by the newspaper articles. The trial court denied the motion. Petitioner claims that his Fifth, Sixth, Eighth and Fourteenth Amendment rights were violated when the trial court denied his motion to continue the trial until a new venire could be drawn.

Petitioner raised this claim as Claim IV in his direct appeal to the North Carolina Supreme Court, which rejected the claim on the merits. *See State v. Blakeney*, 531 S.E.2d at 811. The court found as a matter of fact that none of the jurors who participated in jury deliberations was exposed to the articles at issue. The court also noted that the three jurors who had been exposed to other pre-trial publicity all had indicated during voir dire that they could set aside what they had read and decide the case based solely on the evidence and law presented at trial. As a result, the court determined that the trial court did not abuse its discretion in denying the motion to continue because the denial was neither erroneous nor prejudicial to Blakeney. *See id*.

In order to show that a trial court's refusal to grant a continuance rose to the level of a constitutional violation, Petitioner must satisfy two elements. *See Hill v. Ozmint*, 339 F.3d 187, 196-97 (4th Cir. 2003). First, he must show that the court's decision to deny the continuance was erroneous (i.e. that the court " 'abused its discretion' "). *See id*. at 196 (citations omitted). Second, Petitioner must show that the trial court's decision was prejudicial to his defense. *See id*. at 196-97 (citing *United States v. Colon*, 975 F.2d 128, 130-31 (4th Cir. 1992)).

Petitioner asserts that three members of his jury, Vicki Turman, Sammy Bryant and Julie

Brown, had read about his case in the newspaper. However, the North Carolina Supreme Court found as a matter of fact that neither Vicki Turman nor Sammy Bryant had read either of the articles at issue in Blakeney's motion to continue. A finding of fact by a state court is presumptively correct. § 2254(e)(1). Petitioner may overcome this presumption with clear and convincing evidence. *See id*.

The record reveals that the articles at issue were printed on July 27, 1997 and August 4, 1997 in *The Enquirer Journal* of Monroe, North Carolina. Jury voir dire began on Monday, August 25, 1997. Both jurors Turman and Bryant were voir dired on Tuesday, August 26, 1997. Under questioning by the State, juror Turman stated that she had read about the case on Monday, August 25, 1997. (Tpp. 265-67) Under questioning by the State, juror Bryant stated that he had read about the case in an article that appeared in *The Charlotte Observer* on either August 25 or August 26, 1997. (Tp. 268) Counsel for defense did not question either juror regarding what these jurors had read or when. Petitioner has failed to put forth any evidence showing that these jurors was exposed to either the July 27, 1997 or August 4, 1997 articles in *The Enquirer Journal* that were the subject of Blakeney's motion to continue. As such, Petitioner has failed to show that the State court's finding of fact was clearly erroneous.

Juror Julie Brown stated under questioning by the State that she had read an article in *The Enquirer Journal* that merely stated when the trial was to begin and what the charges were. (Tp. 684) She did not state when she had read the article, and defense counsel did not ask her any questions about what she had read or when. Juror Brown was an alternate juror and did not take part in any deliberations during the guilt/innocence or sentencing phases of the trial.

Petitioner cannot show that he was prejudiced by the trial court's denial of his motion to

continue. Neither juror Turman nor Bryant was exposed to the articles at issue, and juror Brown did not participate in deliberations. Furthermore, counsel for defense had an opportunity to question all three jurors about what they had read but did not do so. Therefore, the North Carolina Supreme Court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established Federal law. *See* § 2254(d)(1).

CLAIM XV: *Proceedings Held Outside the Presence of Defendant*

A. Written Order Read Into Record

During the trial, the court held an evidentiary hearing to determine the merits of several of Blakeney's pre-trial motions to suppress evidence. The trial judge orally denied the motions and stated that he would dictate a written order at a later time for the record. (Tp. 874) At the end of Volume VI, the last volume of the trial transcript, there is a transcript of a proceeding at which the trial judge dictated his written order denying the motions to suppress. The portion of the transcript is undated, and although the trial judge interrupted himself several sentences into his findings of fact to state, "y'all follow this as I go along so if there [sic] any corrections or anything, speak up so I can address it as I come to it" (Tp. 1437), it is unclear who is present. Petitioner asserts that in holding this proceeding without him, the trial court violated his rights under the United States Constitution.

Petitioner raised this claim as Claim V in his direct appeal to the North Carolina Supreme Court, which rejected the claim on the merits. *See State v. Blakeney*, 531 S.E.2d at 811-13. The North Carolina court found that Blakeney had failed to show that he and counsel were absent during this proceeding. *See id.* at 812. The court went on to hold that, assuming *arguendo* that Blakeney was not present, there was no prejudicial error.

100

"The Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fifth Amendment together guarantee a defendant charged with a felony the right to be present at all critical stages of his trial." *United States v. Rolle*, 204 F.3d 133, 136 (4th Cir. 2000). The Confrontation Clause requires the defendant's presence when testimony is presented against him. *See United States v. Camacho*, 955 F.2d 950, 953 (4th Cir. 1992) (citation omitted). The Due Process Clause requires the defendant's presence in some situations where the defendant "is not actually confronting witnesses or evidence against him." *Id.* (citing *United States v. Gagnon*, 470 U.S. 522, 526, 105 S.Ct. 1482, 1484, 84 L.Ed.2d 486 (1985) (per curiam)). " '[T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.' " *Gagnon*, 470 U.S. at 526 (citation omitted).

As an initial matter, Petitioner has failed to provide any evidence that he, his counsel, or both, were not present during this proceeding. Instead, he relies on the lack of any indication in the record that he was present to prove that he was absent. As noted by the state Supreme Court, the lack of evidence that Blakeney was present does not prove that he was absent. As such, there is no evidence that Petitioner was not present at this proceeding.

Assuming *arguendo* that neither Petitioner nor counsel were present, Petitioner's Sixth Amendment confrontation rights are not implicated because this was not a proceeding at which evidence or testimony was taken.[47] Here the trial judge read into the record his findings of fact

---

[47]Petitioner argues that as a capital defendant, he has an unwaivable right to be present at *every* stage of his trial. In *Lewis v. United States*, 146 U.S. 370, 372, 13 S.Ct. 136, 137, 36 L.Ed. 1011 (1892) and *Hopt v. Utah*, 110 U.S. 574, 578, 4. S.Ct. 202, 204, 28 L.Ed. 262 (1884), both capital cases, the Supreme Court stated that a defendant charged with a felony has a nonwaivable right to be present throughout the trial. However, in subsequent cases, the Supreme Court has stated that the broad statements it made in *Lewis* and *Hopt* regarding a defendant's presence rights were dicta. *Snyder v. Massachusetts*, 291 U.S. 97, 118 n.2, 54 S.Ct. 330, 333, 78 L.Ed.

101

and conclusions of law arising out of a prior evidentiary hearing at which Petitioner and counsel were present and during which Petitioner's Sixth Amendment rights to confrontation, cross-examination and compulsory process were fully protected.

Petitioner argues that his confrontation rights were violated because the trial judge elicited "testimony" from SBI Agent Tony Underwood and ADA Scott Brewer when he asked them questions during the challenged proceeding. As he was announcing his findings relevant to the admissibility of Blakeney's confession, the trial judge asked if it was correct that Agent Underwood had told Blakeney that he was not under arrest but that Underwood just wanted to talk to him. (Tp. 1438) The transcript does not reveal to whom the question was addressed, but it was answered in the affirmative by ADA Brewer. (Tp. 1438) Later, when the trial judge was announcing its findings regarding admission of a blood sample, he asked whether it was correct that Blakeney signed a consent form for the sample "[t]he next morning."[48] (Tp. 1440) Again, the transcript does not reveal to whom the question was addressed, but this time it was answered in the affirmative by Agent Underwood. (Tp. 1440) Agent Underwood had testified on both of these

---

674 (1934) ("What was said in *Hopt v. Utah*, . . . on the subject of the presence of a defendant was dictum, and no more. . . . We may say the same of *Lewis v. United States* . . . ."); *Illinois v. Allen*, 397 U.S. 337, 342-43, 90 S.Ct. 1057, 1060, 25 L.Ed.2d 353 (1970)) ("The broad dicta in *Hopt v. Utah* . . . and *Lewis v. United States* . . . that a trial can never continue in the defendant's absence have been expressly rejected. *Diaz v. United States*, 223 U.S. 442, 32 S.Ct. 250, 56 L.Ed. 500 (1912)."). As such, the issue of whether a capital defendant must be present at all times in his trial has not yet been settled by the Supreme Court. Therefore, there is no "clearly established Federal law;" supporting Petitioner's argument that he had an unwaivable right to be present at all times in his trial. *See Williams v. Taylor*, *supra*, 529 U.S. at 412 (" '[C]learly established Federal law' . . . refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.").

[48]The transcript reveals that the court was not asking whether Blakeney had signed the consent form, as Petitioner asserts. Instead, the judge was confirming at what point Blakeney had signed it.

points during the evidentiary hearing. The responses he and ADA Brewer gave to the judge's questions during the challenged proceeding were supported by his evidentiary hearing testimony. (Tpp. 828, 841) Blakeney did not cross-examine Agent Underwood on either of these points at the evidentiary hearing; nor was any evidence elicited to contradict Agent Underwood's testimony on either point. Although the better practice might have been for the trial judge to have had the court reporter read back to him the relevant portions of the transcript, the judge was not "eliciting testimony" by posing those two questions. On the contrary, the trial judge merely was confirming two uncontroverted factual details from the evidentiary hearing testimony. Petitioner's Sixth Amendment confrontation rights were not violated.

As for Petitioner's due process right to be present, the Court will assume *arguendo* that Blakeney had a right to be present at this proceeding under the Due Process Clause and that neither he nor counsel were present. Petitioner can show no prejudicial error. In fact, other than stating that had trial counsel been present they could have taken issue with ADA Brewer's reply, Petitioner fails to argue how his absence at this proceeding was prejudicial.

As noted previously, ADA Brewer responded in the affirmative when the trial judge asked if it was correct that Agent Underwood had told Blakeney that he was not under arrest but that Underwood just wanted to talk to him. (Tp. 1438) Agent Underwood testified at the evidentiary hearing that when he and other officers found Blakeney sitting in his car at a friend's house, he told Blakeney that he was not under arrest but that he (Underwood) just wanted to talk to him. (Tp. 828) As also noted previously, defense counsel did not cross-examine Underwood on this point or elicit testimony from him or any other witness that contradicted his testimony. As such, it is unclear to the Court what challenge trial counsel would have raised to ADA Brewer's reply.

Under North Carolina law, Blakeney could have submitted proposed findings of fact at the conclusion of the evidentiary hearing or at any other time during the course of the trial. *See State v. Richardson*, 245 S.E.2d 754, 761 (NC 1978). More importantly, when a trial court belatedly enters findings of fact and conclusions of law into the record after a voir dire and in the absence of the defendant and counsel, the North Carolina appellate courts must consider the defendant's subsequent objections to those findings of fact and conclusions of law "just as fully as if defendant had specifically objected to the findings or conclusions at the time they were entered." *Id*. at 761-62. Petitioner did not enter any objections to the trial court's findings of fact or conclusions of law. Nor did he challenge any of the trial court's findings of fact or conclusions of law in his direct appeal. Likewise, in the instant Petition he does not challenge any of the trial court's factual findings or legal conclusions. He therefore has failed to show how he was prejudiced by the trial court's actions. For the foregoing reasons, the State court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established Federal law.

B. Unrecorded Bench Conferences Concerning Jurors

Petitioner claims that the trial court's practice of holding unrecorded bench conferences prior to each side exercising its peremptory challenges deprived him of his constitutional right to due process because it made meaningful appellate review impossible.[49] Petitioner singles out the unrecorded bench conference prior to the State's use of a peremptory challenge to dismiss Robert Crawford, a prospective African American juror.

---

[49]Additionally, Petitioner complains that these unrecorded bench conferences violated North Carolina statutory law. *See* N.C. Gen. Stat. § 15A 1241. Claims alleging violations of state law are not cognizable on federal habeas review. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Therefore, this Court's review is confined to Petitioner's due process claim.

During voir dire, and while the jury was with the State, the trial judge interrupted the prosecutor in the middle of a question that the prosecutor was posing to Robert Crawford. The Court instructed the attorneys for both sides to approach the bench. After an unrecorded bench conference of unknown duration, the State excused Crawford through use of a peremptory challenge. (Tp. 387)

Petitioner argues that by taking peremptory challenges off the record, the trial court deprived him of a meaningful appellate review. However, Petitioner has failed to identify for this Court what it was that the State court was unable to meaningfully review.

On direct appeal, as part of Claim V, Blakeney argued that because of the unrecorded bench conference prior to Robert Crawford's dismissal, the appellate court would be unable to adequately review his claim that counsel were ineffective for failing to make a *Batson* objection. However, Petitioner does not make the same argument here. In fact, he makes no mention of his direct appeal *Batson*-related IAC claim. Significantly, he does not challenge *in any way* the North Carolina Supreme Court's analysis of his IAC claim or attempt to explain why meaningful review of his claim was inadequate. As such, Petitioner has abandoned his direct appeal argument that the unrecorded bench conference deprived the appellate court of meaningful review of his claim that counsel were ineffective for failing to raise a *Batson* objection after the prosecution excused Robert Crawford.[50]

---

[50]In his Reply to Respondent's Answer and Motion for Summary Judgement, Petitioner asserts that he is raising this claim under *Miller-El v. Dretke*, and *Batson v. Kentucky*. However, as noted elsewhere in the instant Order, Petitioner did not make a *Batson* objection after the prosecutor excused Crawford; nor did he raise a *Batson* claim on direct appeal. Therefore, the appellate court would have had no reason to review this portion of the transcript and this unrecorded bench conference to look for discriminatory intent on the part of the prosecutor (except with regard to Petitioner's direct appeal IAC claim, which he has chosen to abandon for

In the instant claim, Petitioner asserts that "[the] conference concerning the dismissal of an African American juror was clearly a matter of intense interest to the Petitioner and one in which he most likely would have wanted to participate." He also speculates that he "might well have wanted his attorneys to enter a *Batson* objection to the State's dismissal of [Robert Crawford]." It is unclear to this Court how either of these arguments implicate the appellate court's ability to meaningfully review a claim. In fact, Petitioner made these arguments in his direct appeal claim, and the North Carolina Supreme Court reviewed them and denied them on the merits. *See State v. Blakeney*, 531 S.E.2d at 813-14.

Although it is not entirely clear, it appears from the argument above that Petitioner is asserting that he had right to be present at the challenged bench conference. The North Carolina Supreme Court held that Blakeney's right to be present at all critical stages of the trial was not violated because he was present in the courtroom during the bench conference, he was represented by counsel at the bench conference, and he had presented no evidence that the bench conference implicated either his confrontation rights or that his presence at the bench conference would have had a reasonably substantial relation to his opportunity to defend. *See id*.

Petitioner has cited no clearly established Federal law entitling him to be present at a bench conference at which he was represented by counsel and that did not implicate his confrontation rights or create a situation where his presence would have had a reasonably substantial relation to his opportunity to defend against the charges against him. *See Gagnon*, *supra*, 470 U.S. at 526-27 (*in camera* discussion between judge and juror did not violate

_____

the purposes of this claim). The Court notes that Petitioner makes no mention of *Strickland v. Washington* or any of its progeny, reinforcing the Court's conclusion that Petitioner has waived a challenge the North Carolina Supreme Court's review of his *Batson*-related IAC claim.

defendants' due process rights where defendants were represented by counsel, encounter was short, and defendants could have done nothing had they been at the conference) (citing *Snyder*, *supra*, 291 U.S. at 105-06, 108).  Nevertheless, Petitioner asserts that had he been present, he may have wanted his counsel to enter a *Batson* objection.

There is nothing in the record to indicate that Petitioner's ability to instruct counsel to enter a *Batson* objection was dependent upon his presence at the challenged bench conference. Nor is there anything in the record to indicate that his counsel were hampered in any way from entering a *Batson* objection.  If Petitioner was unsure of the nature of the bench conference or had any questions about it, he had a first-hand source as to what had transpired – his counsel.  If he had wanted counsel to enter a *Batson* objection, he had the means and opportunity to request that they do so.

Petitioner argues that the trial court took all peremptory strikes off the record.  That is a misstatement of fact.  The trial court required that counsel approach the bench before exercising peremptory strikes.  Not only did defense counsel not object to this procedure, they indicated that it was acceptable to them. (Tp. 5)  After the bench conference at issue in this portion of the claim, the prosecutor exercised the peremptory strike of Robert Crawford *on the record*. (Tp. 387) Nothing prevented counsel from entering a *Batson* objection at that point.  Likewise nothing prevented Petitioner from instructing counsel to object at that point.  After all, counsel and Petitioner were present throughout the voir dire and heard all of Robert Crawford's responses to the prosecutor's questions.

Furthermore, if the trial court conducted a *Batson* hearing during the unrecorded bench conference, and there is no allegation or evidence that it did, Petitioner could have preserved the

subject of the bench conference for appellate review by requesting that the trial judge recreate it for the record. *See* N.C. Gen. Stat. § 15A-1241(c). As the state Supreme Court observed, under state law, if a party requests that the subject matter of a private bench conference be put on the record for appellate review, the trial judge must reconstruct the conference for the record. *See Blakeney*, 531 S.E.2d at 814 (citing § 15A-1241(c)). Petitioner did not request that the challenged bench conference be recreated for the record.

In sum, Petitioner agreed to the procedure requiring a bench conference prior to either side exercising a peremptory challenge. He had a statutory mechanism through which to preserve the challenged bench conference for the record, and he did not use it. He has failed to show that he was prevented from instructing his counsel to enter a *Batson* objection or that his counsel were prevented from entering a *Batson* objection when the State used a peremptory challenge to excuse Robert Crawford, and he has failed to show what it was that the appellate court was unable to meaningfully review. For the foregoing reasons, the State court's adjudication of this claim was neither contrary to nor an unreasonable application of clearly established Federal law.

### C. Unrecorded Bench Conferences on Evidentiary Issues

Petitioner claims that unrecorded bench conferences regarding evidentiary issues deprived him of meaningful appellate review of those issues. Petitioner asserts that he was severely prejudiced by these unrecorded bench conferences because they may have resulted in the presentation of highly prejudicial evidence to the jury.

The North Carolina Supreme Court rejected this portion of Claim V of Blakeney's direct appeal on the merits. *See State v. Blakeney*, 531 S.E.2d at 814. The court held that it was the trial court's evidentiary rulings and not the arguments of counsel during a bench conference that

facilitates appellate review and that the substance of the trial court's evidentiary rulings was apparent from the resulting admission of evidence. *See id.*

Petitioner singles out three unrecorded bench conferences. The first occurred after a defense objection to Agent Underwood's use of a diagram to illustrate his testimony. (Tp. 891) After the conference, Agent Underwood was allowed to use the diagram to illustrate his testimony; therefore, it is clear that the trial court overruled defense counsel's objection. (Tp. 891-92) The Court notes that it was defense counsel that requested the conference and that after the conference, counsel did not request that the substance of the conference be recreated for the record in order to preserve it for appeal. *See id.*; § 15A-1241(c). Petitioner has not alleged that the trial court erred in allowing Agent Underwood to use the diagram to illustrate his testimony. Therefore, the precise nature of Petitioner's allegation of prejudice is unclear.

The second challenged bench conference occurred after the State objected to a question to an SBI agent regarding another agent's analysis. (Tp. 977) It is evident from the transcript that the trial court sustained the State's objection because after the conference, defense counsel did not immediately repeat the challenged question. (Tp. 977) Additionally, when counsel attempted to repeat the question several minutes later, the trial court sustained the State's objection on the record. (Tp. 978) Counsel did not object to the unrecorded bench conference or request that the substance of the conference be recreated for the record in order to preserve it for appeal. *See id.* Petitioner has not alleged that the trial court erred in refusing to allow defense counsel to question one agent about another agent's analysis of evidence. Therefore, the precise nature of Petitioner's allegation of prejudice is unclear.

The third example cited by Petitioner concerns two unrecorded bench conferences

regarding how many and which photos and portions of a videotape the State would introduce into evidence. The first conference was requested by defense counsel, and it preempted the State's use of a photograph of the victim's body. (Tp. 800) As is evident from Petitioner's presentation of this portion of his claim ("A series of unrecorded conferences is held concerning how many and which photos and portions of the videotape the State can introduce into evidence." (PWHC, p. 100)), the subject of the two challenged conferences is evident from the transcript. It also is evident from subsequent proceedings held on the record, that during the conferences defense counsel objected to the State's use of a number of photographs of the victim's body. (Tpp. 801, 802, 803, 807) After some apparent confusion on the part of the State (Tp. 801), the trial court excused the jury, and the issues discussed during the two bench conferences were resolved on the record. (Tpp. 800-808)

The end result of the two unrecorded bench conferences and the ensuing recorded proceeding was that the trial court sustained, at least in part, defense counsel's objection to the State's use of still photographs of the body in addition to a videotape of the body. In fact, the trial court limited the State's use of photographs to three and excluded photos of the victim's head and face as repetitive and as having no probative value. (Tpp. 805, 807) Defense counsel did not object to these rulings, although they had an opportunity to do so on the record. Furthermore, the court excluded a portion of the videotape because it unnecessarily lingered on the victim's body. (Tp. 802) Defense counsel did not object to this ruling although they had an opportunity to do so on the record. As such, the precise nature of Petitioner's allegation of prejudice is unclear.

Petitioner has failed to show how he was deprived of meaningful appellate review of any of the challenged unrecorded bench conferences. The state court's rejection of this claim was

neither contrary to nor an unreasonable application of established Federal law. *See* § 2254(d)(1).

CLAIM XVI: *Non-Statutory Mitigating Circumstance*

Petitioner claims that the trial court erred when it refused to submit part of a requested non-statutory mitigating circumstance. Specifically, Blakeney requested that the following be submitted: "The circumstances of the case in that the defendant did not set out to kill Callie Huntley and attempted to leave the house several times before the lethal acts occurred." (Record on Appeal, p. 169) The trial court refused to submit the first part of the proposed circumstance, and submitted only that, "[t]he defendant attempted to leave the house several times before the lethal acts occurred." (Record on Appeal, p. 198) Petitioner claims that the trial court's refusal to submit "the defendant did not set out to kill Callie Huntley," deprived him of his rights to due process and to be free from cruel and unusual punishment.

Blakeney raised this as Claim XIII in his brief on direct appeal to the North Carolina Supreme Court. The court denied the claim on the merits. *See State v. Blakeney*, 531 S.E.2d at 820-21.

The United States Supreme Court has held that a sentencer "may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence." *Buchanan v. Angelone*, 522 U.S. 269, 276, 118 S.Ct. 757, 761 (1998) (citations omitted). The North Carolina Supreme Court concluded that the trial court erred in refusing to present the proposed mitigating circumstance. *See State v. Blakeney*, 531 S.E.2d at 820. The court reasoned that self-serving portions of Blakeney's statement to police tended to support his requested mitigating circumstance and that a reasonable juror could find the proposed circumstance to have mitigating value. *See id*. However, the court found the error to be "harmless beyond a reasonable

doubt." *Id*. at 821.

In light of the state court's determination that the trial court erred, this Court may grant relief only if the error had a "substantial and injurious effect or influence in determining the jury's verdict."[51] *Brecht v. Abrahamson*, *supra*, 507 U.S. at 637. As such, Blakeney must show that the trial error resulted in "actual prejudice." *Id*. at 638. To determine prejudice, the Court must look to "the impact of the thing done wrong . . . in the total setting." *Jones v. Polk*, 401 F.3d 257, 265 (4th Cir. 2005) (quoting *Kotteakos*, *supra*, 328 U.S. at 774). In applying this standard, the Court cannot say that the trial court's failure to submit the circumstance that "the defendant did not set out to kill Callie Huntley" had a "substantial or injurious effect" on the jury's verdict.

Blakeney's complete statement upon which the proposed circumstance was based was read to the jury. Defense counsel argued to the jury that Blakeney tried to leave before the lethal acts ultimately occurred. (Tp. 1396) The jury was given a general statutory catch-all mitigating instruction under which one or more jurors could have found any other mitigating circumstance or circumstances arising from the evidence . *See* N.C. Gen. Stat. § 15A-2000(f)(9). As such, all of the evidence tending to support the requested nonstatutory mitigating circumstance was available for consideration by the jury under the catch-all mitigating circumstance(s). This combination of factors leads the Court to conclude that jurors were not precluded from considering Blakeney's evidence that he "did not set out to kill Callie Huntley."

---

[51]The state court concluded that the error was harmless beyond a reasonable doubt under the direct review standard of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). However, under Fourth Circuit precedent, even if this Court were to determine that the state court's conclusion constituted an unreasonable application of *Chapman*, Petitioner would not be entitled to relief unless he could show prejudice under the more stringent *Brecht* standard that is applied on collateral review. *See Jones v. Polk*, 401 F.3d 257, 265 (4th Cir. 2005).

Blakeney's sentencing jury unanimously found all four of the aggravating factors submitted by the State: that the murder was committed while the defendant was engaged in the commission of first degree arson; that the murder was committed for pecuniary gain; that the murder was especially heinous, atrocious or cruel; and that the defendant had been previously convicted of a felony involving the use of violence to the person. To prove this last aggravating factor the State presented evidence of Blakeney's prior armed robbery during which he hit the victim in the head with a pistol, just as he did to Callie Huntley. Furthermore, the jury's unanimous finding that the murder was committed for pecuniary gain would tend to show that the jurors did not believe the defense argument that Blakeney did not intend to kill Huntley.

In the way of mitigating evidence, the defense offered testimony from Blakeney's sister, Peggy, and Dr. Mark Worthen. At least one member of the jury credited some of this evidence, and the jury found that Blakeney had established three of the eight offered mitigating circumstances.

The Court finds it significant that the jury did not find the proffered circumstance that the defendant attempted to leave the house several times before the lethal acts occurred. This tends to show either that the jury did not believe Blakeney's self-serving statements that he attempted to avoid the violent conflict with Huntley or that the jurors did not find his attempts mitigating. Based on the foregoing, Petitioner has failed to show that the trial court's refusal to submit the non-statutory mitigating circumstance that he "did not set out to kill Callie Huntley" had a substantial and injurious effect on the jury's verdict. This claim is denied.

CLAIM XVII: *Statutory Mitigating Circumstance Over Defendant's Objection*

Petitioner claims that the trial court's submission of the statutory mitigating circumstance

that "the defendant has no significant history of prior criminal activity," *see* N.C. Gen. Stat. § 15A-2000(f)(1), violated his rights under the Fifth, Eighth and Fourteenth Amendments. During the instruction conference preceding the trial court's charge to the sentencing jury, the prosecutor requested submission to the jury of the statutory mitigating circumstance that the defendant did not have a significant history of prior criminal activity. The defense objected, but the trial court overruled the objection, concluding that it was required by law to submit the circumstance. Petitioner argues that in light of the fact that the State relied on evidence of his prior armed robbery conviction to support one of the aggravating factors in seeking the death penalty, *see* § 15A-2000(e)(3) ("the defendant had been previously convicted of a felony involving the use or threat of violence to the person"), no rational jury could have found that he had no significant history of criminal activity.

The United States Supreme Court has held that a sentencer "may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence." *Buchanan v. Angelone*, 522 U.S. 269, 276, 118 S.Ct. 757, 761 (1998) (citations omitted). However, as long as a state's capital sentencing scheme permits the defendant to present all relevant mitigating evidence and does not preclude the sentencing jury from considering that evidence, the state is free to shape and structure the manner in which a jury may consider mitigating evidence. *See Kansas v. Marsh*, __ U.S. __, 126 S.Ct. 2516, 2523, (2006) (citations omitted). To the extent that statutory mitigating circumstances are used "to shape and structure the jury's consideration of mitigation" in a state capital sentencing scheme, they are creatures of state law. *See Buchanan*, 522 U.S. at 275-76 (no constitutional requirement that trial court issue instructions on particular mitigating factors). As such, state law governs whether a particular

114

statutory mitigating circumstance must be submitted to the jury.

Under North Carolina law, if the evidence supporting a mitigating circumstance is such that a rational jury could find the circumstance, the trial court *must* submit the circumstance to the jury, regardless of any opposition from the State or the defendant. *See State v. Parker*, 516 S.E.2d 106, 123 (N.C. 1999), *cert. denied*, 528 U.S. 1084, 120 S.Ct. 808, 145 L.Ed.2d 681 (2000); *accord State v. Mahaley*, 423 S.E.2d 58, 66 (N.C. 1992), *cert. denied*, 513 U.S. 1089, 115 S.Ct. 749, 130 L.Ed.2d 649 (1995). The trial court has no discretion in the matter. *See id*. The North Carolina Supreme Court concluded that a rational jury could conclude that Blakeney had no significant history of criminal activity.

A state court's decision on a question of state law is binding in federal court. *See Roach v. Angelone*, 176 F.3d 210, 217 (4th Cir. 1999); *Wright v. Angelone*, 151 F.3d 151, 158 (4th Cir. 1998). As such, the state court's conclusion that the trial court did not err in submitting the mitigating circumstance is not subject to review by this Court. *See Estelle v. McGuire*, 502 U.S. 62, 68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (A federal habeas court's review is "limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").

In the instant claim, Petitioner's entire argument is dedicated to refuting the trial court's conclusion that a rational juror could find his prior criminal history insignificant. His prejudice argument, to the extent that he makes one, also is focused on the issue of whether his record was insignificant in light of the prosecution's reliance on the armed robbery conviction to prove an aggravating factor.[52] As previously indicated, those are state law issues that are not reviewable by

---

[52]Petitioner's prejudice argument is found in his Reply. Petitioner argues that the submission was prejudicial because the "prosecutor argued at length in his closing argument that the (e)(3) aggravating factor was not insignificant, and used the submission of the (f)(1)

this Court. Although he cites the Fifth, Eighth and Fourteenth Amendments, he fails to articulate

how the trial court's submission of this mitigating circumstance violated those rights. In other

words, he fails to draw a connection between the rights cited and the court's action. Petitioner

cites no case law of any kind until his Reply but then fails to explain how that case (*Lockett v.*

*Ohio*, 438 U.S. 586 (1978)) supports his claim.

Despite his reference to constitutional amendments, Blakeney's habeas claim is merely a

challenge to the trial court's conclusion that his criminal record was not significant in light of the

fact that his armed robbery conviction was being used by the State to support an aggravating

factor. Therefore, it is not cognizable on habeas review.

Even if Blakeney had raised a constitutional claim challenging submission of a mitigating

circumstance over his objection, relief is foreclosed by the rule of *Teague v. Lane*, 489 U.S. 288,

109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). *See Billings v. Polk*, *supra*, 441 F.3d at 252-54 (To grant

relief on the grounds that North Carolina's mandatory mitigating circumstance requirement, when

applied to an objecting defendant, violates the Constitution would require application of a new

rule of constitutional criminal procedure on habeas review in violation of *Teague*). For the

---

circumstance to unnecessarily heighten the jurors' awareness of the armed robbery conviction and make Blakeney's character appear worse (Tpp. 1341-1342; 1350-1352; 1360)." (Reply Brief, p. 60) In reality, while the prosecution emphasized the armed robbery conviction to support the (e)(3) aggravating factor, neither prosecutor made more than passing reference to the (f)(1) mitigating factor. In light of the fact that the prosecution introduced testimony from the victim of the armed robbery and the officer who investigated it, as well as photos of the victim and the crime scene, it is hard to imagine that a passing reference to the (f)(1) mitigator heightened the jurors' awareness of the armed robbery conviction. Furthermore, the judge informed the jury that Blakeney had not requested submission of the mitigating circumstance that he had no significant history of prior criminal activity but that the court was required by law to submit it. That, coupled with the fact that defense counsel did not attempt to minimize the significance of Blakeney's criminal history, would have removed from jurors minds any notion that Blakeney was attempting to convince the jury that his criminal history was not significant.

foregoing reasons, Petitioner has failed to raise a cognizable claim on federal habeas review. Therefore, this claim is denied.

CLAIM XVIII: *Defendant Prohibited from Arguing Consequence of Jury Deadlock at Sentencing*

Prior to trial, the prosecution filed a motion to prohibit the defense from arguing to the jury during the penalty phase of the trial that failure of the jury to unanimously agree on a punishment would result in life imprisonment. The trial court granted the motion. Petitioner claims that prohibiting him from informing the jury of the consequences of a deadlock on a sentencing recommendation violated his Fifth, Eighth and Fourteenth Amendment rights.

Petitioner raised this claim as Claim XV on direct appeal to the North Carolina Supreme Court. The court rejected the claim on the merits. *See State v. Blakeney*, 531 S.E.2d at 822.

Blakeney's two-sentence "argument" in support of this claim (PWCH, p. 107) appears to be that the court's instruction that any sentence recommendation must be unanimous, combined with the prohibition against informing the sentencing jury of the consequences of a deadlock, violated the Eighth Amendment requirement that sentencing decisions rest upon an individualized inquiry. To the extent that this is his argument, it is without merit. Furthermore, any relief would be barred by the rule of *Teague v. Lane*, *supra*.

Under Supreme Court jurisprudence, in order to satisfy the requirement that capital sentencing decisions rest upon an individualized inquiry, a state's sentencing scheme must allow a "broad inquiry" into all " 'constitutionally relevant mitigating evidence'." *Jones v. United States*, 527 U.S. 373, 381, 119 S.Ct. 2090, 2098 (1999) (quoting *Buchanan*, 522 U.S. at 276). Petitioner does not argue or provide any evidence that the failure to allow him to inform the jury of the consequences of a deadlock prevented the jurors from considering the mitigating evidence offered

117

in support of a life sentence. Furthermore, Petitioner has not cited any Supreme Court precedent

clearly establishing that a defendant must be allowed to inform a jury as to the consequences of a

sentencing deadlock where state law requires a life sentence when a jury fails to reach a

unanimous sentence. On the contrary, "a court may reasonably refuse to instruct a capital

sentencing jury as to the consequences of deadlock in order to promote jury deliberation." *Green

v. French*, 143 F.3d 865, 890 (4th Cir. 1998), *overruled on other grounds by (Terry) Williams v.

Taylor*, 529 U.S. 362, 120 S.Ct. 1494, 146 L.Ed.2d 389 (2000) (citing *Evans v. Thompson*, 881

F.2d 117 (4th Cir. 1989) ("No obligation exists for the trial judge to inform the jury of the ultimate

result should they fail to reach a verdict."); *see also*, *Jones*, 527 U.S. at 382 ("We have never

suggested . . . that the Eighth Amendment requires a jury be instructed as to the consequences of a

breakdown in the deliberative process."). For the foregoing reasons, the North Carolina Supreme

Court's rejection of this claim was neither contrary to nor an unreasonable application of clearly

established Federal law. *See* § 2254(d)(1).

Furthermore, to grant relief on the grounds that the U.S. Constitution requires that, if a

court gives an instruction that a verdict must be unanimous, the jury also must be informed of the

consequences of a deadlock, would require application of a new rule of constitutional criminal

procedure on habeas review in violation of *Teague v. Lane. See Green*, 143 F.3d at 890. Petitioner

has cited no precedent existing at the time that his conviction became final that would require a

jury be informed of the consequences of its failure to reach a unanimous verdict. *See Teague*, 489

U.S. at 301. For the foregoing reasons, this claim is denied.

CLAIM XIX: *Improper Closing Argument at Sentencing*

Petitioner asserts that during his closing argument at sentencing, one of the prosecutors

made unfounded attacks on the professionalism and credibility of the defense's expert witness, Dr. Mark Worthen. Petitioner further asserts that these attacks included false statements regarding Dr. Worthen's testimony and exposed the jurors to off-the-record matters of controversy between the defense and prosecution. Petitioner claims that the trial court's failure to intervene *ex mero motu* during the prosecutor's argument violated his Eighth and Fourteenth Amendment rights.

The posture of this claim is virtually identical to that rejected by the Fourth Circuit in *Daniels v. Lee, supra*, 316 F.3d at 487-88. In *Daniels*, the defendant failed to object during the prosecutor's closing argument but raised a claim on direct appeal to the state court that the trial court should have intervened *ex mero motu* to correct misleading statements made by the prosecutor. *See State v. Daniels*, 446 S.E.2d 298, 318 (NC 1994). Because Daniels failed to comply with the state's contemporaneous objection rule, the state court reviewed the prosecutor's argument for gross impropriety. *See id.* at 318-19. Likewise, in the instant case, Blakeney failed to object during the prosecutor's closing argument. *See State v. Blakeney*, 531 S.E.2d at 822. However, on direct appeal, he claimed that the trial court committed plain error by failing to intervene *ex mero motu* to correct the prosecutor's arguments.[53] As it did in *Daniels*, the state court reviewed the prosecutor's argument for "gross impropriety." *See id.* at 822-24.

Because Petitioner failed to preserve a constitutional challenge to the prosecutors' closing arguments for his direct appeal, this Court is procedurally barred from considering this claim. *See Daniels*, 316 F.3d at 486-488; *Howard v. Moore, supra*, 131 F.3d at 420 ("Errors at trial not

---

[53]Blakeney raised this claim as Claim XVI in his direct appeal to the North Carolina Supreme Court.

objected to, in contravention of State contemporaneous objection rules, are not cognizable in federal habeas corpus proceedings . . . ." (citations omitted). This is the case even though the North Carolina Supreme Court addressed Petitioner's claim of error on direct appeal under "the gross impropriety standard." *See Daniels*, 316 F.3d at 487 (citing *Davis v. Allsbrooks*, 778 F.2d 168, 176 (4th Cir.1985); *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001) ("We have held that [a] contemporaneous objection rule ... bars federal habeas review absent a showing of cause and prejudice.... Moreover, we view a state appellate court's review for plain error as the enforcement of a procedural default.")). When the North Carolina Supreme Court reviewed the prosecutor's remarks for "gross impropriety," it was applying a North Carolina procedural rule, not adjudicating Blakeney's claim on the merits. *See id*.

Petitioner has failed to demonstrate cause and prejudice or that a fundamental miscarriage of justice would occur to excuse his failure to preserve this issue by a timely objection. Indeed, Petitioner has alleged neither cause nor prejudice with respect to his failure to timely object to the prosecution's closing argument. This claim is procedurally defaulted. *See Wainwright v. Sykes*, 433 U.S. at 82; *Fisher v. Angelone*, 163 F.3d at 844.

CLAIM XX: *Court's Refusal to Increase Peremptory Challenges*

Petitioner claims that the trial court's denial of his pretrial motion to increase the number of peremptory challenges allowed the defense violated his rights under the Sixth, Eighth and Fourteenth Amendments. Petitioner raised this claim as a preservation issue on direct appeal to the North Carolina Supreme Court (Claim XX). The state court summarily denied the claim. *See State v. Blakeney*, 531 S.E2d at 824. A summary denial constitutes an adjudication on the merits, and the deferential standard of review outlined in § 2254(d)(1) still applies. *See Bell v. Jarvis*, 236

F.3d 149, 158 (4th Cir. 2000) (citing *Wright v. Angelone*, 151 F.3d 151, 156-57 (4th Cir. 1998)).

Therefore, the Court will conduct an independent examination of the record and the clearly

established Supreme Court law while still applying the deferential standard required by §

2254(d)(1). *See id*. (citing *Bacon v. Lee*, 225 F.3d 470, 478 (4th Cir.2000).

 The Supreme Court has emphasized that "peremptory challenges are not constitutionally

protected fundamental rights," but rather are one "state-created means to the constitutional end of

an impartial jury and a fair trial." *Georgia v. McCollum*, 505 U.S. 42, 57 112 S. Ct. 2348, 2358

(1992).  "Because peremptory challenges are a creature of statute and are not required by the

Constitution, . . . it is for the State to determine the number of peremptory challenges allowed and

to define their purpose and the manner of their exercise." *Ross v. Oklahoma*, 487 U.S. 81, 89, 108

S.Ct. 2273, 2279 (1988) (internal citations omitted).  As such, "the 'right' to peremptory

challenges is 'denied or impaired' only if the defendant does not receive that which state law

provides." *Id*.

 By statute, North Carolina provides fourteen peremptory challenges to each side in a

capital trial. *See* N.C. Gen. Stat. § 15A-1217(a).  Except to correct certain situations in which the

trial court erroneously denies a defendant's challenge for cause, the trial court has no authority to

grant any additional peremptory challenges. *See* N.C. Gen. Stat. § 15A-1214(i).  Therefore, the

trial court had no statutory authority to grant Blakeney's pre-trial motion. *See State v. Smith*, 607

S.E.2d 607, 615 (NC 2005).

 Petitioner does not argue, nor could he, that he did not receive the fourteen peremptory

challenges allowed by law.  Instead, he merely argues that he should have received more.  Because

this issue implicates state and not Federal constitutional law, the state court's rejection of this

claim is controlling and not subject to habeas review. *See Estelle v. McGuire*, 502 U.S. at 68. For the foregoing reasons, this claim is denied.

CLAIM XXI: *Brady Claim Regarding Names of People to Whom Blakeney Spoke About the Murder*

Petitioner claims that the trial court's refusal to require the State to provide him with the names of the people to whom he had spoken about the murder deprived him of a meaningful opportunity to confront and cross-examine the witnesses against him and deprived him of his rights under the Sixth, Eighth and Fourteenth Amendments. Petitioner argues further that he needed the information at sentencing to present mitigating evidence of responsibility and remorse.

This claim is unexhausted in the State courts and is procedurally barred in this Court. Furthermore, Petitioner's claim fails on the merits.

Absent a valid excuse, a state petitioner must exhaust his remedies in state court before seeking federal habeas corpus relief. *See* § 2254(b)(1)(A). Generally, a claim will be defaulted on federal habeas review if the claim was not fairly presented to all appropriate state courts and an adequate and independent state procedural rule would now bar review. *See Clagett v. Angelone*, 209 F.3d at 378. As the Fourth Circuit has noted, a petitioner need not "cit[e] book and verse on the federal constitution" in order to "fairly present" a federal claim in the state court. *See Baker v. Corcoran*, 220 F.3d 276, 289 (4th Cir. 2000) (quoting *Picard v. Conner*, 404 U.S. 270, 278, 92 S.Ct. 509, 30 L.E.2d 438 (1971)) (internal quotation marks omitted in original). However, in order to fully exhaust a claim, a petitioner must present substantially the same claim in state and federal proceedings. *See Duncan v. Henry*, 513 U.S. 364, 365-66 (1995) (per curiam); *see also*, *Clagett*, 209 F.3d at 378 (Habeas claim unexhausted because grounds asserted to support it were different than those grounds advances in state court); *Yeatts v.Angelone*, 166 F.3d 255, 260 (4th

Cir. 1999) (same).

On direct review, Blakeney raised the following claim as a preservation issue:

> The Trial Court denied defendant's pretrial motion requesting the court to order the State to provide the defendant with the names of persons to whom defendant made oral statements. (Rpp. 51, 52; Tp. 10) The statements were originally tendered to the defendant with no breaks and with no attribution. In his motion Defendant cited his need to be able to identify these persons to determine if there was any constitutional basis for suppressing the statements. (May 1, 1997, pp. 9-11; Rp. 54)
> While defendant acknowledges this Court has decided in *State v. Adcock*, 310 N.C. 1, 13, 310 S.E.2d 587, 595 (1983) that the defendant has no right to inculpatory statements made by him to persons not acting on behalf of the State, he argues nonetheless such a rule violates fundamental fairness and should be reconsidered.

(Claim XXI of Def.-Appellant's Brief on Direct Appeal to N.C. Supreme Court, p. 96) The North

Carolina Supreme Court summarily denied the claim.

Discovery rules in existence at the time of Petitioner's trial required that the State, upon

the defendant's request, disclose the substance of any oral statements made by the defendant that

were relevant to the subject matter of the case. *See* § 15A-903(a)(2)(1997). However, the statute

did not require the State to disclose the names of the people to whom the statements were made.

*See State v. Strickland*, 488 S.E.2d 194, 202 (NC 1997) (citations omitted).

On direct appeal, Blakeney did not assert that the discovery statute or the state court's

interpretation of it violated the federal Constitution. He did not cite any applicable federal rule.

As Respondent accurately points out, Blakeney cited no federal case law to support his claim and

sought only to overturn a state court decision on a matter of state law. Additionally, the state

court decision that Blakeney sought to overturn did not rely on federal constitutional principles

because the defendant in *Adcock*, like Blakeney, sought information regarding *inculpatory*

statements that he had made. In *Adcock*, as in the instant case, there was no allegation that the

information sought was in any way exculpatory. In short, Blakeney failed to present the "controlling legal principles" required to fairly present a federal claim in the state court. *See Matthews*, 105 F.3d at 911.

Therefore, Petitioner's habeas claim that the trial court's refusal to require the State to provide him with the names of the people to whom he had spoken about the murder deprived him of his confrontation clause rights under the Sixth and Fourteenth Amendments is unexhausted and would be procedurally barred if he attempted to return to state court and raise it there. *See Clagett v. Angelone*, 209 F.3d at 378; § 15A-1419(a). Furthermore, Petitioner has failed to show cause and prejudice or that a fundamental miscarriage of justice would occur if the Court failed to consider this claim. *See Coleman v. Thompson*, 501 U.S. at 750. For the foregoing reasons, this claim is procedurally defaulted on federal habeas review.

Furthermore, this claim is without merit. The record shows that, pursuant to §15A-903(a), the prosecution reduced to writing and provided defense counsel with the substance of oral statements made by Blakeney. (State MAR Exh. 12) The prosecutor informed trial counsel that all of the statements were made to law enforcement officers. Only two law enforcement officers testified at trial regarding statements Blakeney had made to them – Detective Ron Honeycutt and Agent Tony Underwood.[54] During a pretrial hearing, the prosecutor showed defense counsel which of Blakeney's oral statements were made to Honeycutt and Underwood. (May 1, 1997 Hearing Tp. 10) Therefore, there is no factual support for Blakeney's claim that he was unable to meaningfully confront the witnesses against him because he did not know their names.

---

[54]A number of law enforcement officers testified at trial, but their testimony was about evidence collected from the house, Blakeney's car and from a witness's house. None of their testimony was in reference to contact with Blakeney himself.

Blakeney also asserts that he was entitled to the names pursuant to *Brady v. Maryland* because the statements contained mitigating evidence, specifically evidence of his remorse and acceptance of responsibility.[55] This portion of his claim is completely frivolous. As an initial matter, in state court he acknowledged that these statements were inculpatory. Furthermore, these oral statements were made prior to his confession. Nowhere in the oral statements does Blakeney "accept responsibility" or "show remorse." In fact, in the statements he denies all knowledge of the fire that killed Huntley and denies knowing that Huntley had been killed. He makes no reference to having broken into his mother's house or to having fought with Huntley. There is no merit to Petitioner's claim that these oral statements contained valuable mitigating evidence such that disclosure of the names was required under *Brady*. Petitioner's claim is denied.

FOR THE FOREGOING REASONS, IT IS HEREBY ORDERED THAT:

Petitioner's Petition for Writ of Habeas Corpus [Doc. 3] is DENIED;

Petitioner's Motion for Summary Judgment, Discovery and an Evidentiary Hearing [Doc. 37] is DENIED, and

The State's Motion for Summary Judgment [Doc. 16] is GRANTED.

---

[55]This is a completely new claim raised for the first time on habeas review. Petitioner did not raise a claim in State court that he was entitled to the names of the people to whom he made inculpatory statements because the statements contained mitigating evidence. It therefore is unexhausted and procedurally defaulted on federal habeas review. *See Clagett v. Angelone*, 209 F.3d at 378; § 15A-1419(a).

Signed: May 3, 2007

Richard L. Voorhees
United States District Judge